# EXHIBIT 6

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**BOARD OF PAROLE HEARINGS**
DECISION PROCESSING AND SCHEDULING UNIT

P.O. Box 4036
Sacramento, CA  95812-4036



October 20, 2006


Hector Hernandez D-33689
Correctional Training Facility
Highway 101N
Soledad, CA 93960

Dear Mr. Hernandez:

Your parole consideration hearing was conducted on June 8, 2006. Decision Review is completed and the final decision date of your hearing is October 6, 2006.  The decision has been approved by the California Department of Corrections and Rehabilitation, Board of Parole Hearings.

The decision finding you suitable for parole may be subject to review by the Governor.

Attached is the last "Decision Page" with the stamped final date and a front cover sheet to your transcript.  Please incorporate these pages in your copy of the hearing transcript.


Sincerely,

*Sandra D. Maciel*

SANDRA D. MACIEL
Chief, Decision Processing
and Scheduling Unit


cc:    Institution Records Office

Enclosure

Pk

# EXHIBIT 7



# OFFICE OF THE GOVERNOR

November 3, 2006

*__Via Facsimile and U.S. Mail__*

Mr. Hector Hernandez, D-33689
*__Correctional Training Facility__*
Central Facility – ED – 50L
Post Office Box 686
Soledad, California 93960

Dear Mr. Hernandez:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# EXHIBIT 8

# DISCIPLINARY HISTORY SHEET

## 115's Disciplinary reports

| DATE | INST. | REASON/ FINDINGS | |
|------|-------|------------------|---|
| 11/18/90 | CTF | 3004 | DISRESPECT TOWARDS STAFF. GUILTY: COUNSELED. |
| 12/18/91 | CTF | 3006 | POSSESSION OF UTILITY KNIFE BLADE (DANGEROUS CONTRABAND) GUILTY: 30 DAYS LOC. |
| 12/18/91 | CTF | 3016 | POSSESSION OF INMATE MANUFACTURED ALCOHOL. GUILTY: 90 DAYS LOC. |
| 09/02/92 | CTF | 3053 | STEALING STATE FOOD. GUILTY: 20 HOURS EXTRA DUTY. |
| 09/10/92 | CTF | 3191(B) | OUT OF POSSESSION OF NON-EXPANDABLE PERSONAL PROPERTY. GUILTY: 40 HOURS EXTRA DUTY. |
| 10/10/92 | CTF | 3053 | MISUSE (STEALING) STATE FOOD. GUILTY: 20 HOURS DUTY. |
| 2/10/99 | CTF | 3062(E) | HAIR EXCEEDING 3 INCHES IN LENGTH. GUILTY: 20 HOURS EXTRA DUTY. |

HERNANDEZ,

HECTOR                          D33689                    CTF-SOLEDAD

**EXHIBIT 9**

'OURT OF APPEAL FIFTH APPELLATE DISTRICT

# FILED

## JAN 25 1988

KEVIN A. SWANSON - CLERK

by_____
'DEPUTY

<u>NOT TO BE PUBLISHED IN OFFICIAL REPORTS</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

DOCKETED
SACRAMENTO
No. SA86DA0978
Date 1/26 By K.O

| | |
|---|---|
| THE PEOPLE, | ) |
| Plaintiff and Respondent, | ) F007304 |
| v. | ) (Super. Ct. No. 336275-3) |
| HECTOR HERNANDEZ, | ) O P I N I O N |
| Defendant and Appellant. | ) |

APPEAL from a judgment of the Superior Court of Fresno County.  John Fitch, Judge.

Berman & Glenn and Mark D. Warshaw, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, J. Robert Jibson and Kate Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

–ooOoo–

Defendant was charged with violation of Penal Code[1] section 187 (murder), and violation of section 211 (robbery). It was alleged he used a handgun during commission of the offenses within the meaning of section 12022.5. A special circumstance was also alleged pursuant to section 190.2, subdivision (a)(17)(i) (murder during commission of or in immediate flight after a robbery or attempted robbery). Defendant pled not guilty and denied the special allegations. A jury trial followed.

The jury found defendant guilty of second degree murder, and found true the special allegation he used a firearm during the commission of the crime. However, defendant was found not guilty of robbery.

Defendant was sentenced to 17 years to life: 15 years to life for the murder plus 2 years for the firearm use enhancement. He received appropriate credits.

<u>FACTS</u>

The murder victim in this case was Sylvestre Bustos. Paramedics pronounced him dead at his home on South Levit Street in Fresno, in the early morning hours of August 15, 1985. A pathologist testified that, based upon the autopsy he performed on the victim, the cause of death was a shotgun wound to the thoracic aorta. The wound was consistent with a shot from a sawed-off shotgun, and the entry was to the upper left chest, with a trajectory which was, from front to rear, 20 percent downward in an individual who was standing upright. The pathologist estimated

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

2.

the gun was fired from a distance of approximately seven to eight feet, and that it was unlikely the victim was lying down when shot.

A deputy with the Fresno County Sheriff's Department, Scott Morrison, investigated the homicide. He discovered a window on the west side of the building was opened, and a cooler which had apparently been in the window had fallen over. The platform hiding the cooler was collapsed. He found no firearms in the house or on the victim's body, which was found face-down on the floor in a pool of blood.

Morrison did find, however, two shotgun rounds on the floor near the body. One was near the victim's knee, and the other was near his feet. The victim was by a couch. A box of .9 millimeter ammunition, typically used in a semiautomatic handgun, was found by the couch. He found the victim's car key in his pocket and, after going to the car, found $400 in cash under a floor mat.

Another deputy from the sheriff's department, Deputy Rascon, searched the victim's boots and found no heroin inside them, although some had apparently been there prior to the shooting. Rascon observed footprints near the body and followed them to the window where the cooler had been knocked down. There was blood in the area of the window. He then left the house and followed the footprints through two alleys and up to an intersection. The prints appeared to go in different directions at the intersection, which Rascon thought was consistent with someone pacing. Car tire tracks were near where the trail of footprints ended. The footprints Rascon found outside the residence matched the footprints he saw near the body.

3.

A number of people were in the residence at the time the
shooting occurred:  Dortheo Juarez; Eleno Santa Maria Mojica; and
Enrique Casias.  All three testified at trial about what they saw
and heard on the evening of the shooting.

Juarez and Mojica were asleep on the floor in the kitchen
when Jaurez was awakened by a knock on the door.  As Casias went to
open the door, defendant came in wielding a short-barrelled shotgun
and exclaimed, "Give us the chivas."  He then told everyone not to
move, pointed the gun at Juarez and Casias, and told the victim to
"Give him the gun."  The victim, who had been sleeping on a couch
in the living room, started to rise.  He was wearing pants and had
a gun under his belt.  Juarez ran to the side of the room in order
to hide, and noticed that by the time he left the room the victim
was standing.  He did not hear the victim say anything, and saw no
struggle.  After hearing the shot, Juarez ran from the house.
According to Juarez, the victim was a drug dealer.

Mojica testified he, too, was asleep in the kitchen and
was awakened by the sound of people arguing.  He looked into the
living room, only to see defendant pointing a weapon at him.
Defendant told him not to move.  He heard a shot, and ran into the
bedroom.  He did not see a gun on the victim.

Casias testified he had been given immunity from
prosecution for testifying about the events which took place on
August 15th.  He lived with the victim, who was a drug dealer, and
at times helped him sell drugs.

Casias was awakened when he heard a knock on the window.
He went to the window, opened the curtain and looked out, and
recognized defendant, who was standing outside.  He opened the

4.

window and defendant asked Casias if he would sell him drugs.
Casias agreed and defendant handed him $20 through the window.
Casias told defendant to wait at the window while he got the
drugs. He went to retrieve the heroin, which was inside one of
the victim's boots next to the couch in the living room.

As Casias was bending over the victim's boots, the front
door flew open and defendant came in with a shotgun. Defendant
demanded the victim give him his gun, which was under his belt.
Although there was no argument or fight, Casias heard a gun go
off. He ran and hid in a side room with the others who were
present that evening.

In addition to the gun in the victim's belt, the
defendant demanded heroin. At all times, Casias intended to
provide defendant with the heroin he requested. The last time
Casias saw the victim, he was alive and standing near the couch
with defendant pointing the gun at him. He did not see the victim
reach for his gun. After defendant left, the three remaining
people in the house contacted the sheriff's office.

There was also testimony from Mary Lopez, who stated that
prior to the shooting, probably the Monday before, she heard
defendant and the victim arguing at the residence. Defendant was
angry with the victim over the quantity of heroin the victim was
providing him. The victim told the defendant to go to hell if he
did not like the amount he was receiving.

A number of individuals, including defendant, testified
for the defense. Joseph Maldonado testified he had purchased
heroin from the victim in August, and that the victim came out of
his house and approached the car in which Maldonado was a

5.

passenger. The victim drew a gun and told Maldonado he did not
want him smoking marijuana, which Maldonado was doing at the time,
around his house. Maldonado testified he was a heroin addict who
was in custody in the Fresno County Jail. He also testified that
this was the only time he purchased heroin from the victim.

Mike Lopez testified he purchased heroin from the victim
on several occasions. He also knew Maldonado. According to
Lopez, the victim always carried a gun tucked in his pants, and
had pulled the gun on him more than once, without provocation.
The victim usually pulled the gun after he had been drinking, and
the first time he did so he warned Lopez not to think about trying
to rob him or rip him off. Lopez testified he personally was
never armed and had never threatened the victim in any way.

Defendant testified he had purchased heroin from the
victim on several occasions, and that he was addicted to the
drug. In fact, he had used it earlier on the day of the
shooting. Problems developed in his relationship with the victim
because the victim began carrying a gun, and because defendant
believed the quality of the heroin was poor or the quantity was
less than the victim agreed to supply.

Defendant went to the victim's residence on August 15
with the intent of purchasing more heroin. He took a gun with him
because he felt threatened by the victim and thought the victim
would treat him differently knowing he was armed. He knocked on
the door but received no reply. He then went to the window and
spoke with Casias. A sale was negotiated and Casias left.

Afraid the victim or Casias was tampering with the heroin
in order to shortchange him, defendant forced his way into the

6.

residence through the front door. He saw four or five people in
the room, one of whom was the victim. He was lying on the couch
and Casias was standing next to him. He demanded they "give [him]
the chiva," at gunpoint. Defendant saw the victim handing Casias
the heroin and intercepted it. He also demanded the victim give
him the gun which was tucked in the victim's pants. He did so in
order to disarm him. He had noticed the gun when he first entered
the room.

Casias appeared to be backing away from the victim, and
defendant told him not to move. Nevertheless, Casias continued to
move. At this point, according to defendant, the victim "made his
move" by simultaneously standing up and drawing his gun.
Defendant actually believed the victim shot him prior to firing
his own gun. After firing a shot at the victim, defendant picked
up the victim's gun and fled from the house. He left through the
window. Whoever had given him a ride to the victim's home was no
longer in the area, so defendant walked to the home of an
unidentified friend.

Defendant stated he threw the victim's gun into a river
about two days later. The sawed-off shotgun was given to another
unidentified friend, after the friend advised him the gun should
be disposed of.

DISCUSSION

I.  DOYLE ERROR.

Defendant first finds error in the following exchange
between the prosecutor and defendant while defendant was
testifying:

7.

"Q  [By Mr. Oppliger, The Prosecutor]  And I
would like to recall your attention back to, I
believe it was September -- September 5th, of
1985.  You were arrested that day, right?

"A  I remember when I was arrested.

"Q  And ultimately you were brought in to talk
to Detective Morrison and Detective Mike Trevino?

"A  I remember two officers.

"Q  And they read you your rights?

"A  I think so.

"Q  And then they asked you about the killing of
Odulio Bustos?

"A  Uh huh.

"THE COURT:  Indicating yes?

"THE WITNESS:  Yes.

"BY MR. OPPLIGER:

"Q  You didn't tell those two detectives the
truth, did you?

"A  I wouldn't say I lied either.

"Q  Did you -- did you tell them you didn't do
it?"

As the record below indicates, defense counsel objected,

a conference between court and counsel took place, and an

agreement was reached:

"MS. WHEATON [Defense Counsel]:  Your Honor?

"THE COURT:  Yes.

"MS. WHEATON:  I am objecting to the
testimony.  Foundation?

"THE COURT:  Grounds?

"MS. WHEATON:  Could maybe we approach the
bench?

"THE COURT:  Yes.

"(Sidebench conference had between Court and
counsel, not reported.)

"THE COURT:  Let the record show that counsel
reached an agreement concerning this line of
questioning.

In a subsequent argument outside the presence of the
jury, defense counsel argued the district attorney committed <u>Doyle</u>
error.  After hearing some of defense counsel's arguments and a
response from the prosecutor, the court put on the record a
summary of the "agreement" counsel reached when they had the
earlier off-record conference at the bench:

"THE COURT:  Counsel, here I am sitting as
the judge.  I don't have any idea what was said
back at the time of the interview.  I have to rely
on counsel to object.  When you did object, you
asked that line of questioning - you called for a
bench conference.  It was off the record.  And I
went back on the record and said we agreed and I
think I can state, and that you will agree, that
we had agreed that we would cease that line of
questioning until both of you had had a chance to
look over the transcript of the initial
questioning.  But it seems to me that you have
some obligation if you want something stricken or
the jury admonished, to tell me that.  And I would
would [<u>sic</u>] be happy to do it."

The court's reference to an "interview" was to the
initial interview police had with defendant.  Counsel had
discussed this interview during argument on the motion, and it was
apparently discussed when reaching the "agreement" off the
record.  Part of the significance of the court's characterization
of what took place in the discussion off record is the fact
defense counsel did not ask that the questions and responses be

9.

stricken, or that the jury be admonished. The court reminded
counsel of this later as the discussion continued.

Nevertheless, defense counsel asked for a mistrial based
upon the fact the prosecutor asked a question, heard by the jury,
which in essence asked defendant why he did not admit the truth
and confess the crime to the police, a reference to the time
period _after_ defendant exercised his right to remain silent.
Counsel responded that a curative admonition would be requested if
the new trial motion was denied, and that the district attorney be
instructed not to pursue the line of questioning. It appears
defense counsel may have been confused about how to proceed when
originally objecting to the question: the court later informed
counsel that all that was required at the time was that an
on-record conference be held outside the presence of the jury.

The court noted the questioning of defendant by the
prosecutor did not indicate to the jury that defendant had
exercised his right to remain silent. The court then instructed
the prosecution not to pursue this type of questioning any
further. The court denied the mistrial motion and found that if
the prosecutor had erred by asking the challenged question or
questions, the error was not prejudicial.

Defense counsel next asked the court to instruct the
jury, upon its return to the courtroom, with language from
footnote 9 of People v. Farris (1977) 66 Cal.App.3d 376, 390. The
prosecutor had no objection to this request, after having it read
to him by the court. However, just prior to the jury returning,
defense counsel requested the court not give the instruction
immediately, but allow counsel to reserve the right to ask for the

10.

admonition at a later time. The court agreed. The court later
offered, once more, to give the Farris admonition, if requested to
do so.

     Ultimately, a different admonition was given to which one
of defendant's two attorneys agreed:

> "THE COURT: Ladies and Gentlemen of the
> Jury, I am now going to instruct you concerning
> something. A question was asked earlier by which
> there might have been an intimation that Mr.
> Hernandez here, failed to tell the police that he
> committed this crime when he was questioned by the
> police or an inference made that maybe he should
> have confessed that. I am telling you as a matter
> of law, that under the constitution of the United
> States and the State of California, he has no
> obligation to confess that to the police. All
> right? If you took any such inference or made any
> such inference from that question, you are to
> disregard it. However, we will allow the
> questioning to go forward with regard to the
> statements actually made to the police, or
> allegedly made. We will see how that turns out.
> Okay?"

     The Farris admonition to which the parties had earlier
agreed, but which defense counsel did not later request, despite
the court providing counsel could do so, provides as follows:

> "'After a defendant has been advised of his rights
> . . ., his failure to discuss the facts of his
> case with anyone other than his attorneys or
> explain or deny evidence against him before he
> testifies in his own defense during the trial does
> not create a presumption of guilt, or an inference
> of guilt, nor does it relieve the prosecution of
> its burden of proving every essential element of
> the crime and defendant's guilt beyond a
> reasonable doubt.'" (People v. Farris, supra, 66
> Cal.App.3d at p. 390, fn. 9.)

     Defendant's reference to Doyle error comes from Doyle v.
Ohio (1976) 426 U.S. 610. In Doyle, the court phrased the

question before it as follows:

> "The question in these consolidated cases is
> whether a state prosecutor may seek to impeach a
> defendant's exculpatory story, told for the first
> time at trial, by cross-examining the defendant
> about his failure to have told the story after
> receiving _Miranda_ warnings at the time of his
> arrest." (_Id_. at p. 611, fn. omitted, emphasis
> added.)

The defendants in _Doyle_ were arrested and charged with

selling marijuana to an informant. (_Ibid_.) Each defendant

testified at his own trial, admitted most everything about the

transaction as described by the prosecution, except the critical

question of who sold to whom. (_Id_. at pp. 612-613.) The

defendants testified it was the informant who sold marijuana to

them. The questions of the prosecution in each case were

characterized by the court as follows:

> "As part of a wide-ranging cross-examination for
> impeachment purposes, and in an effort to undercut
> the explanation, the prosecutor asked each
> petitioner at his respective trial why he had not
> told the frameup story to Agent Beamer when he
> arrested petitioners." (_Id_. at p. 613.)

The questioning boiled down to the prosecutor asking each

of the defendants why they did not give to the investigating

officer who arrived at the scene the stories they were presenting

at trial. Timely objections by defense counsel in each case were

overruled. (_Id_. at p. 614.) The state appellate court affirmed

the convictions, in part, on the basis the evidence of postarrest

silence was not offered by the prosecution in its case-in-chief

(as a confession by silence, for example), but rather in

cross-examination. As a result, the intermediate state court said the questioning did not amount to error since it went to the credibility of the witness. The state Supreme Court denied further review. (Id. at pp. 615-616.) The United States Supreme Court, as noted, concluded impeachment by use of a defendant's postarrest silence after receiving his Miranda warnings violated the due process clause of the 14th Amendment. (Id. at pp. 617, 619.)

In Greer v. Miller (1987) 107 S.Ct. 3102, the defendant was on trial for murder. He testified in his own behalf and offered a different version of the events surrounding the crime than did a prosecution witness who had confessed to the crime and later entered a plea agreement in return for his testimony. (Id. at p. 3105.)

Cross-examination of the defendant started with the following exchange:

> "'Q: Mr. Miller [hereafter defendant], how old are you?
>
> "'A: 23.
>
> "'Q: Why didn't you tell this story to anybody when you got arrested?' App. 31." (Id. at p. 3105.)

As in the present case and in Doyle, defense counsel in Greer immediately objected. In addition, outside the presence of the jury, counsel moved for mistrial on the ground the question violated the defendant's right to remain silent after being arrested. The motion was denied, the objection to the question was sustained immediately, and the jury was instructed, for the time being, to ignore the question. Defense counsel did not renew

13.

the objection, or request an instruction regarding the question by
the prosecutor.  However, the judge did instruct the jury to
disregard those questions to which objections were sustained.
(Id. at p. 3105.)

The case worked its way through state and federal courts,
with the United States Supreme Court ultimately reversing the 7th
Circuit Court of Appeals decision which found the defendant's
constitutional right to a fair trial violated, the error not
harmless beyond a reasonable doubt, and the cautionary instruction
insufficient.  (Id. at p. 3106.)

After summarizing Doyle, and cases in which it had been
applied, the court found the defendant in Greer received "the
'implicit assurance' of Miranda warnings," a prerequisite to a
Doyle violation.  (Id. at p. 3108.)  However, the court noted the
holding in Doyle is that due process precludes use of a
defendant's postarrest silence for impeachment purposes.  That is,
the prosecution may not call attention to a defendant's silence.
(Id. at p. 3108.)  Doyle was therefore distinguishable from Greer
because the trial courts involved in Greer did not permit any
specific inquiry or argument regarding the post-Miranda silence of
the defendant.  As in the present case, the trial courts in Greer
"sustained an objection to the only question that touched upon
[the defendant's] postarrest silence.  No further questioning or
argument with respect to [the defendant's] silence occurred, and
the court specifically advised the jury that it should disregard
any questions to which an objection was sustained."  (Id. at
p. 3108, fn. omitted.)

As a result:

14.

"The fact of [the defendant's] postarrest silence
was not submitted to the jury as evidence from
which it was allowed to draw any permissible
inference, and thus no <u>Doyle</u> violation occurred in
this case." (<u>Id.</u> at p. 3108, fn. omitted.)

For purposes of this discussion, it is assumed to
defendant's benefit the challenged portions of his interview with
police, to which the prosecutor referred, came after defendant
received <u>Miranda</u> warnings. In the present case the defense
counsel's objection was, in essence, sustained inasmuch as the
court required the prosecutor to cease the line of questioning
pursuant to an agreement between the parties. No objection to
this procedure was made by defense counsel, although defense
counsel later made its mistrial motion. Similarly, defendant
never answered the question. Also, the prosecutor did not refer
to defendant's postarrest silence during argument. Finally, the
jury was instructed sometime later with regard to the problem area
of questioning and was told defendant had no obligation to confess
during questioning that he committed the crime being investigated.
They were also told not to take any such inference from the
question. As a result, under <u>Greer</u>, no <u>Doyle</u> violation took place
in this case.

In summary, we assume from the record of the questions
and answers that the prosecutor was getting into an area of
impermissible interrogation. However, the jury had not yet been
informed of anything of a definitive nature. In sequence,
defendant had been informed of his rights, he was then asked about
the killing, and presumably something was said by someone.
Whether he exercised his right to silence, or waived silence and

15.

continued to respond to questions is unclear.  No objection was
made to the "[y]ou didn't tell . . . the truth" question, to which
defendant responded:  "I wouldn't say I lied either."  The
appearance left by the question and answer is simply that there
was conversation which the defendant thought was truthful.  The
next question about whether defendant said he did not do it was
left unanswered "by agreement."  Rather than an issue of the
effect of silence, there appears nothing but an ambiguity about
what was said.

     As in Greer, although a Doyle violation did not occur, we
are still faced with the fact the prosecutor may have attempted to
violate the rule of Doyle through the asking of an improper
question in front of the jury.  The question therefore remains as
to whether "prosecutorial misconduct may 'so infec[t] the trial
with unfairness as to make the resulting conviction a denial of
due process.'  Donelly v. DeChristoforo, 416 U.S. 637, 643, 94
S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)."  (107 S.Ct. at
p. 3109.)

          Again quoting from Greer:

          "To constitute a due process violation, the
          prosecutorial misconduct must be '"of sufficient
          significance to result in the denial of the
          defendant's right to a fair trial."'  United
          States v. Bagley, 473 U.S. 667, 676, 105 S.Ct.
          3375, 3380, 87 L.Ed.2d 481 (1985) quoting United
          States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392,
          2399, 49 L.Ed.2d 342 (1976))."  (107 S.Ct. at p.
          3109.)

     Given the overwhelming evidence against defendant in this
case, the ambiguity in the question itself coupled with the
court's immediate response and subsequent instruction to the jury,

16.

and lack of an answer by defendant to the question, it must be concluded no due process violation occurred under the facts of this case. Indeed, the prosecutor's question was harmless beyond a reasonable doubt. (Chapman v. State of California (1967) 386 U.S. 18.) This conclusion is reached after reading the prosecutor's question in context. (Darden v. Wainwright (1986) 106 S.Ct. 2464, 2471.) Without more, we presume the jury followed the instruction and took no inference from the question. (Richardson v. Marsh (1987) 107 S.Ct. 1702, 1706-1707.)

As for defendant's complaints regarding the quality of the instruction given to the jury on this point, we note the comment by the high court in Greer regarding such a protest on appeal:

> "But Miller's trial counsel bore primary responsibility for ensuring that the error was cured in the manner most advantageous to his client. Once it became apparent that the judge was not going to grant a mistrial, it was the duty of counsel to determine what strategy was in his client's best interest." (Greer v. Miller, supra, 107 S.Ct. at p. 3109, fn. 8.)

Further, unlike Farris (the case containing the admonition defendant argues should have been given sua sponte), the defendant in the present case never answered the question, and it is unclear whether he had in fact even been Mirandized, or waived silence and continued to discuss the killing.

## II.  CALJIC NO. 2.06.

Defendant next claims the evidence was insufficient to warrant instructing the jury, over defense objection, with the following version of CALJIC No. 2.06:

17.

"If you find that a defendant attempted to
suppress evidence against himself in any manner,
such as by concealing evidence such attempts may
be considered by you as a circumstance tending to
show a consciousness of guilt. However, such
evidence is not sufficient in itself to prove
guilt and its weight and significance, if any, are
matters for your consideration." (See CALJIC No.
2.06 (4th ed. 1987 pocket pt.) p. 9.)

As noted, the instruction was given over defense objection, and

after a thorough discussion of the question by the court.

It is well established that in order to instruct a jury

on a particular inference which may be drawn from the evidence,

there must appear sufficient evidence on the record which, if

believed, would support the inference suggested. (People v.

Hannon (1977) 19 Cal.3d 588, 597; People v. Carmen (1951) 36

Cal.2d 768, 773.)

There is no doubt the record presented ample evidence

defendant willfully suppressed evidence, and as a result the jury

could, if it so desired, draw an inference of a consciousness of

guilt from this evidence. (See United States v. Hernandez-Miranda

(9th Cir. 1979) 601 F.2d 1104, 1106.)

Defendant admitted being in possession of a firearm prior

to the shooting, taking the weapon to the victim's home, shooting

the victim with the gun, and later giving it to a friend who

thought defendant should get rid of it. The "getting rid of it"

in this case can only be seen as removing it from a place where it

might be found by police and later used as evidence of defendant's

guilt.

Similarly, defendant admitted he took the victim's weapon

18.

prior to leaving the victim's home, and that he threw it in a
river a few days later.  This too was proof defendant attempted to
suppress evidence.  If the victim's gun had remained at the murder
scene, it may have shown the victim never drew it from his belt,
as defendant claimed.  In addition, the jury would have had the
benefit of knowing whether the gun was loaded at the time of the
shooting, and if a shot had been fired from it by the victim
(recalling defendant initially testified he believed he was shot
at the time he pulled the trigger).

Finally, even assuming it was error to give the
instruction, the error was not prejudicial.  Defendant has failed
to show it is reasonably probable the result would have been more
favorable to him absent the error.  (People v. Watson (1956) 46
Cal.2d 818, 836.)

The judgment is affirmed.

_____
                                    Acting P.J.

WE CONCUR:

_____
                          J.

_____
                          J.

19.

# EXHIBIT 10

# MENTAL HEALTH EVALUATION FOR
# THE BOARD OF PRISON HEARINGS
### June, 2006 Lifer Calendar

## CORRECTIONAL TRAINING FACILITY SOLEDAD
### MAY, 2006

## C-file copy

| | |
|---|---|
| **NAME:** | **HERNANDEZ, HECTOR** |
| **CDC#:** | **D-33689** |
| **DOB:** | **2/28/59** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **8/15/85** |
| **SENTENCE:** | **17 YEARS TO LIFE** |
| **MEPD:** | **4/21/97** |
| **EVALUATION DATE:** | **5/20/06** |

I.    **IDENTIFYING INFORMATION:**

Mr. Hector Hernandez is a 47 year old, first term, separated, Hispanic male from
Fresno County. He is a Christian. He has served 20 years in custody on this
offense.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 90 minute interview, plus review of the
central and medical files.

The psychological evaluation, dated 7/1/99, by Dr. Reed, Psychologist, at CTF-
Soledad, contains a Psychosocial Assessment. This information was reviewed
with the inmate and is still current and valid. As a result, this information will not
be repeated at this time.

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Hernandez related during the interview in a serious, thoughtful, open and
cooperative manner. There was no evidence of any defensiveness or hostility.
His mental status was within normal limits. He was alert and well oriented. His
thinking was rational, logical and coherent. His speech was normal, fluent and
goal oriented. His affect was appropriate. There was no evidence of anxiety or
depression. His eye contact was good. Intellectually, he is functioning in the
average ranges. His memory was intact. His judgment was intact. His insight
and self-awareness was excellent. He has spent a great deal of time in
introspection and analysis of his life.

Mr. Hernandez has been certified in Vocational Mill and Cabinet. He continues
to work in PIA Furniture Factory, where he is improving his skills in wood
working. He is also accomplished in furniture making. He continues to attend
Alcoholics Anonymous on a regular basis. He has been attending Alcoholics
Anonymous continuously for 15 years. He acknowledges that he had a serious
heroin addiction prior to the commitment offense. This drug addiction was
related to the commitment offense in that the victim was a drug dealer. He stated
that he has been clean and sober for 11 years. He has made a vow to his family
that he will not relapse or go back into heroin use. He is very aware of the
destructive effects of drug abuse. He is also suffering from Hepatitis C, due to his
years of drug use. He is very aware that any use of alcohol or drugs would
seriously impair his health. At this point in his life, this is no longer a serious
problem.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    Hepatitis C
Axis IV:     Life term incarceration
Axis V:      Current GAF: 90

### XIII.   REVIEW OF LIFE CRIME

Mr. Hernandez accepts full responsibility for the death of the victim and his
actions during the commitment offense. He described his life at that time as being

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 3

out of control and spiritually and morally bankrupt. He had just purchased some
heroin from the drug dealer who refused to give him the drug. The victim had a
history of taking his money without delivering the product. He stated that the
victim was lying on the couch, but he was not asleep. The victim had a gun
which he drew and shot. At that point, Mr. Hernandez said that he shot the
victim.

Mr. Hernandez has spent a great deal of time thinking about his life, trying to
understand life in general, and developing religious and spiritual depth. He fully
acknowledged his own sinfulness and wrongfulness in the commitment offense.
He fully understands the wrongfulness of his lifestyle at that time and his
behavior at that time. He did express feelings of sorrow and remorse at the
victim's death, as well as the victim's family's loss by suffering and grief. He has
participated in the Impact Program which explores the victim's family's grief and
losses at length. He stated that he wants to atone for this offense any way that he
can. He stated that the only way that he can atone for it, other than apologizing to
the family, is to try to do good to others who are suffering that he meets along the
way through life. He spoke about trying to lay down his life for another's sake
and to learn to die to oneself and one's own selfish motives in order to be able to
reach out and help others in any way that he can. He seems to be very sincere in
these statements. It is apparent that this man has gone through some serious self-
exploration and serious life changes. His feelings appear to be quite sincere and
genuine. He seems to be trying to lead a good, productive, helpful to others life.

XIV.    ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, I agree
   with the prior evaluator that stated that his potential for dangerous
   behavior is below average in comparison to other inmates. He has never
   received any disciplinaries for aggressive, violent or dangerous behavior
   or acting out. He stated that in 1991, he underwent serious life changes,
   and since that time he has been trying to live a law abiding life.

B. In considering potential for dangerous behavior when released to the
   community, the Level of Service Inventory-Revised was administered.
   This is an actuarial measure that assesses criminal history, disciplinary
   history, substance abuse problems, current attitude and other factors to
   determine current risk level on parole. He obtained a score of 4.2
   cumulative frequency for prison inmates. This score means that if 100
   men were released on parole, he would be expected to do better on parole
   than 95.8 of them. I agree with the prior evaluator that stated that he did

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 4

not pose any more risk to the community at this time in his life than the average citizen. In fact, he probably poses less risk, due to his growth, maturity and improvement.

C. At this point in time, there are no significant risk factors in this case.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine release planning. This man has excellent wood working skills. He will be able to obtain employment immediately in the community. He also has considerable family support in the community. He plans on living with his parents when he is released. This man's level of insight and self-understanding is impressive. He obviously has undergone significant mental, spiritual and emotional changes over the years of his incarceration. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/20/06
T:    5/21/06