# EXHIBIT 13
# Part 1 of 6



MC-275

Name  **Hector Hernandez**

Address  **Correctional Training Facility**

**P.O. Box 689**

**Soledad, CA 93960**

The foregoing instrument is a correct copy of the original on file in this office.

ATTEST:  AUG 0 3 2007

TAMARA L. BEARD, Superior Court Clerk State of California, County of Fresno

By  D.A.S.

DEPUTY

CDC or ID Number  **D-33689**

~~FILED~~

~~DEC 28 2005~~ SUPERIOR COURT

By _____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF FRESNO

(Court)

| | |
|---|---|
| **HECTOR HERNANDEZ,** | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No.  OOCRWR6785189 |
| **ARNOLD SCHWARZENEGGER, Governor,** | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

- [ ] A conviction                    [ ] Parole

- [ ] A sentence                       [ ] Credits

- [ ] Jail or prison conditions        [ ] Prison discipline

- [XX] Other *(specify)*: **Governor's reversal of grant of parole**

1. Your name: **Hector Hernandez**

2. Where are you incarcerated? **Correctional Training Facility, Soldad, CA 93960**

3. Why are you in custody?    [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      **Second degree murder w/use of a firearm**

   b. Penal or other code sections: **187 / 12022.5**

   c. Name and location of sentencing or committing court: **Fresno County Superior Court**

   d. Case number: **3362753**

   e. Date convicted or committed: **May 13, 1986**

   f. Date sentenced: **JUne 10, 1986**

   g. Length of sentence: **15 years to life plus 2 for firearm**

   h. When do you expect to be released? **When writ is granted**

   i. Were you represented by counsel in the trial court?    [ ] Yes.    [ ] No.   If yes, state the attorney's name and address:
      **N/A**

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty    [ ] Guilty    [ ] Nolo Contendere    [ ] Other: _____
   **N/A**

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial
   **N/A**

6.  GROUNDS FOR RELIEF

**Ground 1:**  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

**PLEASE SEE APPENDIX "A" PAGE 5 FOR ANSWER TO 6**

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

**PLEASE SEE APPENDIX "A" PAGE 6 FOR ANSWER TO 6(a)**

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**PLEASE SEE APPENDIX "B" PAGE 17 FOR ANSWERS TO 6(b)**

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):  **N/A**

       _____

   b.  Result: _____  c.  Date of decision: _____

   d.  Case number or citation of opinion, if known: _____

   e.  Issues raised:  (1) _____

         (2) _____

         (3) _____

   f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

       _____

9.  Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:
                              **N/A**

   a.  Result: _____  b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

         (2) _____

         (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   **N/A** _____

   _____

11. Administrative Review:

   a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

### THERE IS NO ADMINISTRATIVE REVIEW

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
      *Attach documents that show you have exhausted your administrative remedies.* **N/A**

MC 275 [Rev. January 1, 1999]                **PETITION FOR WRIT OF HABEAS CORPUS**

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ **XX** No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
**N/A**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
**No delay**

16. Are you presently represented by counsel? ☐ Yes. ☒ **XX** No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ **XX** No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
**This Court has original jurisdiction**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 12-23-06       ▶ *Hector Hernandez*
                                    (SIGNATURE OF PETITIONER)

A P P E N D I X    "A"

Answers to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION FOR GOVERNOR SCHWARZENEGGER
TO REVERSE PETITIONER BEING FOUND SUITABLE FOR PAROLE BY
THE BOARD OF PAROLE HEARINGS BASED ON IMMUTABLE FACTORS
AND NOT BEING SUPPORTED BY THE EVIDENCE.

I N T R O D U C T I O N

COMES NOW Hector Hernandez (hereafter Petitioner) with his writ
of habeas corpus challenging Governor Schwarzenegger's (hereafter
Governor) reversal of Petitioner's finding of suitability for parole
by the Board of Parole Hearings (hereafter Board) on June 8, 2006,
at Petitioner's SEVENTH parole suitability hearing.

This issue is consistent with the Due Process Clause of the
United States Constitution: Would the state's penological interest
be served by the continued imprisonment of an indeterminately
sentenced prisoner who has satisfied the legislatively prescribed
punishment for second degree murder and is a model of rehabilitation
and there is no evidence that he is _presently_ a threat to public
safety?

Answers to 6(a) - Supporting facts[1]

On June 8, 2006 Petitioner was found suitable for parole at
his EIGHTH parole suitability hearing (EXHIBIT 1, HT 49-68).[2]

The hearing began in earnest when Petitioner was sworn in
(HT 6:13-19).

---

1. Only facts relative to the Governor's decision will be presented.

2. Reference to the parole hearing transcripts will be designated by
   HT followed by page number and line number when necessary, e.g. (HT 1:1).

- 5 -



The Commitment Offense

    The facts of the commitment offense were stated on the record by the Board (HT 6:23-9:1). The Governor's presentation of the facts are taken from the Probation Officer's Report (POR) (EXHIBIT 2, pp. 2-4), and are as follows (EXHIBIT 3, p. 1):

> On August 15, 1985, Hector Henandez shot to death Sylvester Bustos while attempting to purchase heroin. Early that morning, Mr. Herbandez went to Mr. Bustos' home to buy heroin. (This was not a "home" but a drug house.) He knocked on one of the windows, waking Mr. Bustos' roommate, Enrique Casias. Mr. Casias went to the window and saw Mr. Hernandez standing outside. Mr. Casias opened the window and talked with Mr. Hernandez, agreeing to sell him heroin for $20. Mr. Hernandez paid the money and Mr. Casias went to retrieve some heroin. The heroin was inside Mr. Bustos' boots, which were next to the couch in the living room. Mr. Bustos was asleep on the couch with a gun tucked into his waistband.

> "While Mr. Casias bent over Mr. Bustos' boots, Mr. Hernandez forced his way through the front door of the residence, armed with a sawed-off shotgun. He demanded Mr. Bustos' gun and heroin. When Mr. Bustos rose from the couch, Mr. Hernandez shot him one time from a distance of approximately seven or eight feet. He took Mr. Bustos' gun and fled the scene.

> "Mr. Hernandez was subsequently arrested. Following a jury trial, he was convicted of second degree murder with the use of a firearm. He was sentenced to 15 years to life for murder, plus two consecutive years for the firearm enhancement. The judgment was affirmed on appeal." (For a complete facts of the case from trial transcripts, see EXHIBIT 4, facts from the appellate court opinion, best evidence.)

    For what the Governor covers, Petitioner concedes that the facts of the offense are correct. Additionally, however, the victim was known for carrying a gun and threatening people (EXHIBIT 4, p. 5, line 26 thru p. 6, line 2; p. 6, lines 6-12). The facts of the Appellate Court Opinion continue (EXHIBIT 4, pp. 6-7):

> "Defendant went to the victim's residence on August 15 with the intent of purchasing heroin. He took a gun with him because he felt threatened by the victim and thought the victim would treat him differently knowing he was armed. He knocked on the door but received no reply. He then went to the window and spoke with Casias. A sale negotiated and Casias left.

> "Afraid the victim or Casias was tampering with the heroin in order to shortchange him, defendant forced his way into the residence through the front door. He saw four or five people in the room, one of them was the victim. He was lying on the couch and Casias was standing next to him. He demanded they 'give [him] the chiva,' at gunpoint. Defendant saw the victim handing Casias the heroin

and intercepted it. He also demanded the victim give him the gun which was tucked in the victim's pants. He did so in order to disarm him. He noticed the gun when he first entered the room.

"Casias appeared to be backing away from the victim, and defendant told him not to move. Nevertheless, Casias continued to move. At this point, according to defendant, the victim 'made his move' by simultaneously standing up and drawing his gun. Defendant actually believed the victim shot him prior to firing his own gun. After firing a shot at the victim, defendant picked up the victim's gun and fled from the house. He left through the window."

The autopsy report confirmed that the victim was "standing upright" when shot and most likely died instantly "with a shotgun wound to the thoracic aorta" (EXHIBIT 4, p. 2); and "[t]here was blood in the area of the window" from which Petitioner left the residence (EXHIBIT 4, p. 3), suggesting that he may very well have been grazed by a gunshot from the victim.

In relying on the commitment offense to reverse the Board's grant of parole suitability, the Governor states (EXHIBIT 3, p. 2):

"Despite the positive factors I have considered, the second-degree murder for which Mr. Hernandez was convicted was especially grave, in part because of the callous manner in which it was carried out. According to the probation report, Mr. Bustos was asleep on his couch when Mr. Hernandez kicked open the door and entered with a sawed-off shotgun. The probation officer noted that Mr. Bustos 'was particularly vulnerable' when Mr. Hernandez entered the home and shot Mr. Bustos just after waking him up. There is also evidence in the record before me that the murder involved some level of premeditation. .... The gravity of the second-degree murder committed by Mr. Hernandez is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public safety risk."

Basically, the Governor relies on the POR (EXHIBIT 2, pp. 2-4) rather than the Appellate Court opinion (EXHIBIT 4), trial evidence.

Disciplinary History

The Governor covers Petitioner's disciplinary history, stating Petitioner "was disciplined seven times for rules violations involving grooming standards,[3]/ possession of inmate manufactured alcohol,

---

3. In a class action decision, Warsoldier v. Woodford, Case No. CV-04-02233-RSWL, the grooming standards were held unconstitutional and therefore repealed and all disciplinary write ups for failure to comply with the grooming standards were to be expunged from prison files.

possession of a utility blade, stealing food, improperly loaning

personal property, and disrespecting staff.  He was also counseled

12 times for minor misconduct, most recently in 2000" (EXHIBIT 3, p. 1).

The Board discussed Petitioner's disciplinary history with him,

noting the last CDC 115 he received was in 1990 for disrespect towards

staff, recognizing Petitioner has "had seven total 115's in the 20

years you've been down" (HT 36:15-18).  The Board noted a "look at

your history doesn't show other than the instant offense any real

violence" (HT 36:21-22), which included Petitioner prior criminal

history the Board previously covered (HT 12:6-15:13).

The Board considered and weighed Petitioner's disciplinary

history in the decision finding him not to pose a current threat

to public safety, stating: "while you have seven 115's, none of them

are violent" (HT 54:19-20).  "So you've distanced yourself from any

of the discipline problems that you had.  You had some streaks there.

You weren't programming well.  You weren't doing anything well.

But you've certainly gotten the handle on that" (HT 54:26-55:5).

Prior Criminal History

The Governor relies on Petitioner's prior criminal activity

and drug abuse in reversing the Board, stating (EXHIBIT 3, p. 2):

"When he committed this crime, Mr. Hernandez was 26 years old and already had
an extensive criminal record, including juvenile adjudications for armed robbery,
assault with a deadly weapon, burglary, petty theft, carrying a concealed firearm,
joyriding, and resisting arrest.  His criminal behavior continued into adulthood,
as was convicted of discharging a firearm at an occupied dwelling/vehicle,
harboring a federal fugitive, being under the influence of a controlled substance,
and driving under the influence of a controlled substance.  He also admitted
to the probation officer that he routinely abused heroin, and used cocaine, LSD,
marijuana and PCP prior to the life offense.  Mr. Hernandez's [sic] criminal
history, which began at a young age and included incidents of violent and
assaultive behavior toward others, demonstrates his inability or unwillingness
to conform his behavior to the rules of society, and this weighs against his
parole suitability at this time."

- 8 -

Petitioner concedes his prior criminal history to be true.

In determining Petitioner is not a current threat to public safety, the Board covered Petitioner's prior criminal history extensively (HT 11:17-15:14), also discussing Petitioner's history of drug abuse (HT 16:11-16). Petitioner's prior criminal history did not escape the Board in making its decision, starting with juvenile behavior at age 11 (HT 53:3-6) and his adult history, stating his record but noting Petitioner "lack[s] a significant criminal history of violent crime" (HT 53:11-18). A key factor in the Board determining Petitioner was not a current threat to public safety was his many years of clean and sober living and commitment to living a drug-free life, having invested 11 years in NA and being co-chairman (HT 51:21-25), having "received numerous laudatory chronos behind NA. That's so important given your history and the commitment offense" (HT 52:21-24).

The Board recognized that at the time of the commitment offense, Petitioner "committed the crime as a result of a significant stress in your life" (HT 52:25-26), clarifying "that stress was self-induced, substance abuse" (HT 53:6-7), affirming the mitigating factor found in the POR under Rule 423(b): "defendant was suffering from a mental or physical condition that significantly reduced his culpability for the crime due to his stated use of the drug heroin" (EXHIBIT 2, p. 16).

The Board recognized, "[t]he mitigating factor, the prisoner participated in a crime under partially excusable circumstances, heroin inebriation that did not amount to a criminal, a legal defense" (HT 12:2-6).

The Governor finding, "I believe that factor alone is presently insufficient to mitigate the nature and circumstances of the murder" (EXHIBIT 3, p. 3).

## Opposition to Parole

The Governor, in his decision to reverse states: "I note that the Fresno County District Attorney's Office opposed parole with the 2006 Board, based, in part, on the gravity of the offense, Mr. Hernandez's [sic] lengthy criminal history, his lack of insight into the nature of his offense, and his failure to establish concrete parole plans" (EXHIBIT 3, p. 3). The statement by the Fresno County District Attorney was not in evidence because it was submitted in violation of the "10-day rule" and therefore not considered by the Board (HT 5:16-26).

## Petitioner's Rehabilitation

The Governor did state he "considered various positive factors in reviewing whether Mr. Hernandez is suitable for parole at this time" (EXHIBIT 3, p.1), to include:

"Mr. Hernandez made efforts to enhance his ability to function within the law upon release. He earned his GED in 1998, and he took additional adult basic education courses and infectious disease courses. He completed vocational training graphic arts, and in mill and cabinet work. He held institutional jobs as a furniture assembler, industry worker, teacher's aide, boiler room operator, and machine operator, among other things. In addition, he has availed himself of an array of self-help and therapy, including Employability Program, Anger Management, Impact, Character Development, Life Skills, Responsibility for Self-Determination, Mind Transformation, Chemical Dependency, Red Road, Alcoholics Anonymous, and Narcotics Anonymous. He maintains seemingly solid relationships and close ties with supportive family and friends, and he received some positive evaluations from mental-health and correctional professionals over the years."

In determining Petitioner is not a current threat to public safety, the Board weighed heavily his rehabilitation. The evidence, inter alia, Petitioner's 2005 Life Prisoner Evaluation Report (LPER) (EXHIBIT 5, noted at HT 6:10-11); Petitioner's 2006 psychological

evaluation prepared by one of the state's own forensic experts, Dr.
Macomber (EXHIBIT 6, HT 37:5-38:16), and Petitioner's 1999
Psychological evaluation prepared by Dr. Reed (EXHIBIT 7 [both Dr.
Reed's and Dr. Macomber's expert evaluations being weighed in finding
that Petitioner is not a current threat to public safety at HT
55:21-57:15]).

The Board finding, "Dr. Reed back in 1999 which is your prior
psych report had written that your violence potential within a
controlled setting is considered to be below average. Released to
the community violence potential is considered to be no more than
the average citizen" (HT 55:21-26).

Supporting Dr. Reed's expert evaluation, seven years later,
reading from Dr. Macomber's report (HT 56:20-57:5):

"considering potential for dangerousness when released to the community, the
level of service inventory revised, you retained a score of 4.2. Means that
if a hundred men were released on parole you're expected to do better on parole
than 95.8 of them. But agree also with the prior evaluator that you do not pose
any more risk to the community at this time in his life than the average citizen.
In fact probably poses less risk due to his growth, maturity and improvement.
And found no significant (risk) factors."

The Board concurred, stating: "And your level of insight and
self-understanding is impressive. I know it impressed the panel.
You obviously have undergone significant mental, spiritual and
emotional changes over the years of incarceration" (HT 57:8-13).
Concluding, on this point, "[a]nd the doctor concludes with the
prognosis for successful adjustment in the community is excellent"
(HT 57:13-15).

The LPER before the Board for the 2006 suitability hearing
prepared by correctional experts (EXHIBIT 5), taking all factors
into consideration: "the commitment offense, prior record and prison

- 11 -

adjustment, this writer believes that the prisoner would probably pose a low degree of threat to the public at this time" (EXHIBIT 5, p. 6). This finding had been consistently established by previous correctional experts (EXHIBIT 8, 2003 LPER, p. 1 ["the prisoner would probably continue to pose a low degree of threat to the public at this time"]; EXHIBIT 9, 2001 LPER, p. 2 ["low degree of threat to the public at this time"]; EXHIBIT 10, 1999 LPER, p. 4 ["minimal risk to public safety at this time"]; EXHIBIT 11, 1997 LPER, p. 2 ["low to moderate degree of threat to the public at this time"] and EXHIBIT 12, 1995 LPER, p. 5 [minimal risk to public safety at this time"]). In other words, by Petitioner's 2006 parole hearing, during the past decade no less than four (4) forensic experts and twenty (20) correctional experts found Petitioner to be a low threat to public safety.

Essential to the Board's determination was Petitioner's demeanor throughout the hearing, commenting on Petitioner's sincerity: "But I think you displayed it. We both feel you displayed it. You're not just telling us that you believe this, you're showing us. You live it. So that was very compelling. As well as your closing speech. I can honestly tell you I've been doing this for eleven months. I started last July 1st. And I've never, ever heard a closing remark better than yours. .... I think you have the courage of your convictions. I really do" (HT 50:22-51:11). What was it about Petitioner's demeanor and rehabilitation the Board was impressed with?

In answering why Petitioner got involved with drugs (HT 18:21-24), he answerd candidly that he's "in recovery now" (HT 19:2),

telling the Board although he was raised in a dysfunctional family he accepts responsibility for his drug abuse (HT 19:4-16), stating how "maybe it was all for the good now because I've addressed all these issues. I've tackled them in the best of my ability to get an understanding as I say, not only for myself but the social, the social environment that I was in and endeavors to bring a higher consciousness to the community that I come from" (HT 19:22-20:2).

Petitioner's "main desire is to work as a counselor in recovery with youth and drug offenders with violence intervention" (HT 22:10-12). Petitioner not only having real life experience as a former addict, but being "proudest of the Relapse Prevention class where I was a facilitator and main speaker of the course" (HT 22:18-22).

After reading a letter of commendation from the prison's meditation leader (HT 28:3-29:19), then asked how he shares the message, Petitioner answered he shares it with anyone who will listen, even on the prison yard (HT 30:4-11).

When the Board asked Petitioner about his participation in NA and how important it would be to him if paroled (HT 35:3-6), he answered "One hundred percent...[it is] [p]retty much my whole life of recovery and just remaining alive has to be with staying sober" (HT 35:7-13).

The Board commented on Petitioner's writing about his recovery, stating "they're quite eloquent" and asked if he shares his writings with others (HT 35:14-17). Petitioner does, not only in the prison paper, but on the National Public Radio station in Santa Cruz (HT 35:21-36:13). Please see EXHIBIT 13 for Petitioner's writings. To understand why the Board was so impressed with Petitioner's closing

- 13 -

speech, stating: "I can honestly tell you I've been doing this for eleven months. I started last July 1st. And I've never, ever heard a closing remark better than yours. .... I think you have the courage of your convictions. I really do" (HT 50:22-51:11), please read HT 43:13-48:8, incorporated herein by reference). Also see letter in Petitioner's file sent to organizations in the community (EXHIBIT 14).

Prior Decisions

Leading up to Petitioner's finding of suitability was six previous parole suitability hearings, all relying on the commitment offense, prior history of drugs and criminal behavior to deny parole: 1995 decision (EXHIBIT 15); 1997 decision (EXHIBIT 16); 1999 decision (EXHIBIT 17); 2002 decision (EXHIBIT 18); 2003 decision (EXHIBIT 19); 2004 decision (EXHIBIT 20); and, after a one year deferral turned into a two year deferral, the 2006 decision finding Petitioner is not a current threat to public safety (EXHIBIT 1, HT 49-57), weighing all the evidence, including Petitioner's demeanor.

The Board erred, however, in the 2006 decision finding him suitable for parole in that: (1) the time calculation, adding time for use of a firearm (HT 58:24-26), when the firearm enhancement was served consecutively to the 15 years to life (EXHIBIT 4, p. 2); and (2) "The term is derived from the matrix located in the California Code of Regulations, Title 15 at 2403(c), second degree murder. .... The panel finds the Category 1C is appropriate" (HT 58:5-9). Category 1 is appropriate, participating victim, e.g., drug dealer, but Category C, severe trauma, e.g., beating, clubbing, stabbing, not resulting in immediate death, is not appropriate. Category B, death was almost immediate is appropriate, middle term of 17 years.

- 14 -

The Decision Review Unit reviewed the record and affirmed Petitioner is not a current threat to public safety, doing so on October 6, 2006 (EXHIBIT 21).

Governor's Conclusion

The Governor concludes his findings (EXHIBIT 3, p. 3):

"At age 47 now, after being incarcerated for more than 21 years, Mr. Hernandez made some credible gains in prison. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find the negative factors weighing against Mr. Hernandez's [sic] parole suitability presently outweigh the positive ones. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Hernandez."

The Governor presented no contravening forensic evidence to the two forensic experts, Dr. Reed in 1999 (EXHIBIT 7) and Dr. Macomber in 2006 (EXHIBIT 6) documenting Petitioner's rehabilitation and both concurring that Petitioner is currently no more threat to the public than the average citizen in the community, and in Dr. Macomber's expert opinion probably even less, concluding: Petitioner's "level of insight and self-understanding is impressive. He obviously has undergone significant mental, spiritual and emotional changes over the years of his incarceration. The prognosis for successful adjustment in the community is excellent" (EXHIBIT 6, p. 4).

## C O N C L U S I O N

Based on the foregoing facts, court records in this case, and the attached memorandum of law, Petitioner respectfully requests that the Court order the Governor to show cause, making a rational connection between the static factors relied on to reverse Petitioner's grant of parole and his <u>current</u> threat to public safety, why the writ should not be granted, and why excess custody credits should not be applied to Petitioner's parole.

Date: _12-23-06_

Respectfully submitted,

_Hector Hernandez_
Hector Hernandez
Petitioner in pro per

V E R I F I C A T I O N

I, Hector Hernandez, hereby declare that I have read the foregoing facts and state they are true and correct, and the exhibits in support of the facts are true copies. Doing so this 23 day of _December_, 2006, at Soledad, California.

_Hector Hernandez_
Hector Hernandez
Petition in pro per

P R A Y E R   F O R   R E L I E F

I, Hector Hernandez, state that I have no other plain or speedy relief save habeas corpus and therefore pray that the Court will:

1. Issue an Order to Show Cause why relief should not be granted;

2. Appoint counsel to protect the rights of Petitioner;

3. Grant discovery as needed to fully develop Petitioner's case;

4. Hold an evidentiary hearing as needed;

5. Grant the writ, ordering Petitioner's immediate release and any and all excess conduct credits be deducted to Petitioner's period of parole;

6. Any other relief in the interest of justice and to preserve judicial integrity.

Date: _12-23-06_

Prayerfully submitted,

_Hector Hernandez_
Hector Hernandez
Petitioner in pro per

# A P P E N D I X    "B"

## M E M O R A N D U M   O F   L A W

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION FOR GOVERNOR SCHWARZENEGGER
TO REVERSE PETITIONER BEING FOUND SUITABLE FOR PAROLE BY
THE BOARD OF PAROLE HEARINGS BASED ON IMMUTABLE FACTORS
AND NOT BEING SUPPORTED BY THE EVIDENCE.

---

### I N T R O D U C T I O N

On August 15, 1985, twenty-one (21) years ago, Hector Hernandez
(hereafter Petitioner) shot and killed Silvestere Bustos. Arrested
September 5, 1985, he has been incarcerated since.

On May 13, 1986, by a jury of his peers, Petitioner was found
guilty of second degree murder in violation of Penal Code § 187[4/]
and the firearm allegation in violation of Penal Code § 12022.5 found
to be true.

On June 10, 1986    Petitioner was sentenced pursuant to Penal
Code § 190 to an indeterminate term of 15 years to life for the murder
and two years consecutively for the gun use allegation.

On June 8, 2006, after nearly 21 years of incarceration and
demonstrating an amazing transformation of rehabilitation, the Board
of Parole Hearings (hereafter Board) found that Petitioner is not
"presently too dangerous to grant a fixed parole release date"
(In re Dannenberg (2005) 34 Cal.4th 1061, 1080), and therefore not
a current threat to public safety. On October 8, 2006 the decision
was affirmed by the Executive's Decision Review Unit.

---

4.  All statutes and regulations are California, unless otherwise noted.

On November 22, 2006, in a decision pointing to no evidence that Petitioner is a <u>current</u> threat to public safety, relying on immutable factors over two decades old, Governor Schwarzenegger, in a sub rosa decision using sophistry, reversed the Board's and Decision Review Unit's finding Petitioner suitable for parole.

This habeas corpus petition is to give meaning to Petitioner's indeterminate sentence of 15 years to life with eligibility for parole at two thirds the minimum pursuant to Penal Code § 190.

## STANDARD OF EVIDENCE

In opining that the Governor's determination need only satisfy the "some evidence" standard, relying on <u>Superintendent v. Hill</u> (1985) 472 U.S. 445, the <u>Rosenkrantz</u> court (<u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, 652-658) did not have the advantage of the recent United States Supreme Court decision of <u>Hamdi v. Rumsfeld</u> (2004) 542 U.S. 507, 124 S.Ct. 2633, clarifying the ambiguity of when the "some evidence" standard applies. If the Executive's decision need only be supported by "some evidence," and judicial review looks for only "some evidence" to support the Executive's decision, how then does the "some evidence" standard apply itself?

Petitioner minimum eligible parole release date (MEPD) was established to be April 27, 1997 (EXHIBIT 1, HT 1:16-17). Petitioner has a liberty interest in parole and therefore an "expectation that [he] will be granted parole unless the Board finds, in the exercise of its discretion, that [he] is unsuitable for parole in light of the circumstances specified by statute and by regulation" (<u>Id.</u>, at 654). The only statutory reason to find a prisoner unsuitable for parole is the timing and gravity of the offense (Penal Code § 3041).

- 18 -

"In procedural and substantive terms, this type of determination
is more analogous to the sentencing determination made by the court"
(In re Roberts (2005) 36 Cal.4th 575, 587-588). Thus, "'[a] petition
for a writ of habeas corpus attacking parole denial is a challenge
to the length of sentence, i.e., the sentence itself' [Citation]"
(Id., at 586).

This is a basic departure from basic conditions of a disciplinary
hearing; thus the "some evidence" standard is ill suited to the
situation in which a habeas petitioner has received no prior
proceedings before any tribunal and had no prior opportunity to rebut
the Executive's factual assertions before a neutral decisionmaker"
(Hamdi v. Rumsfeld, supra, 124 S.Ct., at 2651). The High Court held:
the "some evidence" standard is "a standard of review, not a standard
of proof" (Id.).

Whether it has been overlooked or simply ignored, the Board's
own regulations mandate that decisions shall be supported by "a
preponderance of the evidence" (California Code of Regulations, Title
15 (hereafter Cal. Code Regs., tit. 15), § 2000(b)(50)).

If international terrorists who are enemy combatants of this
great nation are entitled to "a preponderance of the evidence"
standard at the Executive level review, are not citizens who are
eligible for parole and have proved their rehabilitation entitled
to anything less when the Executive is going to extend their terms?
Especially when once being granted parole a prisoner has a greater
expectation of liberty than one who has not be found suitable for
parole (In re Rosenkrantz, supra, 29 Cal.4th, at 656).

However, as recently held in In re Lee (2006) 143 Cal.App.4th

1400, 2006 DJDAR 13961, 13963 (10/19/06) (emphasis in original):

> "The test is not whether some evidence supports the <u>reasons</u> the Governor cites
> for denying parole, but whether some evidence indicates a parolee's release
> <u>unreasonably endangers public safety</u>. (Cal. Code Regs. tit. 15, § 2402, subd.
> (a) [parole denied if prisoner 'will pose an unreasonable risk or danger to
> society if released from prison'], see e.g. <u>In re Scott</u> (2005) 133 Cal.App.4th
> 573, 595 ['The commitment offense can negate suitability [for parole] only if
> circumstances of the crime...rationally indicate that the offender will present
> an unreasonable public safety risk if released from prison'], but see <u>In re Lowe</u>
> (2005) 130 Cal.App.4th 1405 [suggested 'some evidence' applies to the factors,
> not dangerousness].) Some evidence of the existence of a particular factor does
> not necessarily equate to some evidence the parolee's release unreasonably
> endangers public safety."

Indeed, if the Executive need only point to "some evidence" in support

of a factor, "'some evidence' of unsuitability for parole would exist

in virtually <u>every</u> parole hearing" (<u>McQuillion v. Duncan</u> (9th Cir.

2002) 306 F.3d 895, 905, quoting <u>In re Caswell</u> (2001) 92 Cal.App.4th

1017, 1029, emphasis in original). Thus, the question is not whether

the Governor's decision is supported by a preponderance of the

evidence," or even "some evidence," but is there any evidence that

Petitioner <u>currently</u> poses a threat to public safety? The answer

is, No.

Whether by a preponderance of the evidence or "some evidence"

the decision by the Governor to reverse Petitioner's grant of parole

is supported by neither.

<u>Answers to 6(b)-supporting cases and authorities</u>

A.  <u>The Offense Is No Longer Reliable Evidence In Determining Current
    Threat To Public Safety.</u>

The only statutory reason to deny Petitioner parole is the

"timing and gravity" of the offense (Penal Code § 3041(b)). Our

Supreme Court has taken this to mean an indeterminately sentenced

prisoner is to be granted parole unless the prisoner "is presently

too dangerous to grant a fixed parole release date" (<u>In re Dannenberg</u>,

- 20 -

supra, 34 Cal.4th, at 1080), the "abiding concern that the Board not schedule the release of any life-maximum prisoner who is still dangerous" (Id., at 1088; see also <u>Sass v. California Board of Prison Terms</u> (9th Cir. 2006 461 F.3d 1123, 1135, Reinhardt, Circuit Judge, dissenting opinion [evidence must show <u>current</u> threat to public safety).

Every crime will have unique facts. Merely reciting those facts, as a prelude to moral outrage, does not amount to "a preponderance of the evidence" or even "some evidence." Once, however, a prisoner convicted of second degree murder "reaches that point" in time such that he would be "eligible for parole if he had been convicted of first degree murder" it is necessary to "consider if his offense would still be considered especially egregious for a <u>first degree murder</u>" (<u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 690, J. Moreno concurring, emphasis in original). Once reaching the point in time he would be eligible for parole if convicted of first degree murder the consideration must be is the offense particularly egregious for a first degree murder. Stating the murder is "especially callous," however, is not enough because every murder can be described as a callous disregard for the suffering of another. See <u>In re Lee</u>, <u>supra</u>, 143 Cal.App.4th 1400, 2006 DJDAR 13961, 13963-13964 for a "yardstick" as to what constitutes "particularly heinous, atrocious or cruel."

Petitioner is now eligible for parole if he had been convicted of first degree murder. Thus, the Governor must not merely recite in rote fashion that the offense was "exceptionally callous," but must <u>rationally</u> explain how Petitioner is <u>presently</u> a threat to public

safety after reaching the legislatively prescribed punishment for first degree murder. <u>Rosenkrantz</u> is the guidon from which all second degree murders can be measured, the facts so well known they need not be repeated here, and Petitioner's case coming nowhere near to that of <u>Rosenkrantz</u>, and if <u>Rosenkrantz</u> has been paroled after 19 years, then the Governor cannot demonstrate Petitioner is a <u>current</u> threat to public safety based on the offense alone. Petitioner has been imprisoned 21 years, thus the commitment offense is no longer "reliable" evidence of <u>current</u> threat to public safety, and if it is no longer reliable, it is neither relevant evidence of current threat to public safety (<u>In re Scott</u> (2005) 133 Cal.App.4th. 573, 595).

The Governor relies primarily on the commitment offense to reverse the Board finding Petitioner suitable for parole, stating, "The gravity of the second-degree murder committed by Mr. Hernandez is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public safety risk" (EXHIBIT 3, p. 2). Other than the use of boilerplate generic terms, "the second-degree murder...was especially grave, in part because of the callous manner in which it was carried out," the Governor does not state in any way what it is about this second degree murder committed 21 years ago that makes Petitioner a <u>current</u> threat to public safety. Petitioner is guessing that the Governor is relying on Cal. Code Regs., tit. 15, § 2402(c)(1)(D): "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." The Governor also states "the murder involved some level of premeditation." The Governor uses such language without

- 22 -

regard for the facts as though it is some kind of magic incantation. Regardless, the offense is an immutable factor that will never change and is therefore not to be viewed and weighed as though the offense occurred yesterday, but how Petitioner is today and his <u>current</u> threat to public safety.

As opined in <u>In re Scott</u>, <u>supra</u>, 133 Cal.App.4th, at 594-595, fns. omitted:

"The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair [citation]; and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny."

See also <u>In re Lee</u>, <u>supra</u>, 143 Cal.App.4th 1400; <u>In re Elkins</u> (2006) ___ Cal.App.4th ___, 2006 DJDAR 14489 (11/1/06); <u>In re Shaputis</u> (2005) 135 Cal.App.4th 217; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910; <u>Irons v. Warden of California State Prison-Solano</u> (E.D. Cal. 2005) 358 F.Supp.2d 942; <u>Martin v. Marshall</u> (N.D. Cal. 2006) 431 F.Supp.2d 1038; <u>Sanchez v. Kane</u> (C.D. Cal. 2006) 444 F.Supp.2d ___, 2006 WL 2252640; <u>Rosenkrantz v. Marshall</u> (C.D. Cal. 2006) 444 F.Supp.2d ___, 2006 WL 2327085; <u>Mickens-Thomas v. Vaughn</u> (3rd. Cir. 2004) 355 F.3d 294; <u>Marshall v. Lansing</u> (3rd. Cir. 1988) 839 F.2d 933; <u>U.S. ex rel Farese v. Luther</u> (3rd Cir. 1992) 953 F.2d 52; <u>Dunn v. United States Parole Commission</u> (10th Cir. 1987) 818 F.2d 743; <u>Quaglito v. Sullivan</u> (D.Minn 1989) 719 F.Supp. 860, all in accord, after passage of time cannot merely mouth words, but there must be rational connection

between the facts and _current_ threat to public safety.

All murders require expressed or implied malice. "For this reason, it can reasonably be said that _all_ second degree murders by definition involve some callousness--i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of other" (In re Smith (2003) 114 Cal.App.4th 343, 366). Like in _Smith_, "the Governor does not specify how [Petitioner] manifested exceptionally callous disregard for [Bustos'] suffering. There is no evidence [Petitioner] acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured [Bustos] before deciding to shoot [him]; or that he gratuitously increased or unnecessarily prolonged [his] pain and suffering." The record shows that Petitioner shot Bustos with a single shotgun blast, presumably killing him instantly. "Was the crime callous? Yes. However, are the facts of the crime some evidence [Petitioner] acted with exceptionally callous disregard for [Bustos'] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No" (Id, at 367), but see In re Lee, supra, 143 Cal.App.4th 1400, 2006 DJDAR 13961, at 13963-13964 [cases in which Governor properly denied parole.] However, even Rosenkrantz, after 19 years was paroled.

While it is true when determining a prisoner's parole suitability the Governor considers all relevant and reliable information, including the timing and gravity of the offense, it is just as true that the offense is not to be viewed in a vacuum as though it occurred yesterday, but is to be put into perspective relative to time, "entailing primarily what a man is and what he may become rather

than simply what he has done" (<u>Greenholtz v. Inmates of Nebraska
Penal and Correctional Complex</u> (hereafter <u>Greenholtz</u>) (1979) 442
U.S. 1, 10).  Moreover, "the ultimate purpose of parole is...the
long-range objective of rehabilitation" (<u>Id.</u>, at 13); and, although
the commitment offense is a consideration in any particular case,
"[t]he behavior record of an inmate during confinement is critical
in the sense that it reflects the degree to which the inmate is
prepared to adjust to parole release" (<u>Id.</u>, at 15; <u>In re Minnis</u> (1972)
7 Cal.3d 639, 645 [in prison conduct and potential for rehabilitation
are of "paramount importance"; see also <u>Biggs v. Terhune</u>, <u>supra</u>,
334 F.3d, at 916-917; <u>In re Scott</u>, <u>supra</u>, 133 Cal.App.4th, at 595).
Thus, "[p]arole decisions are based in large measure on occurrences
subsequent to the commission of the offense" (<u>In re Rodriguez</u> (1975)
14 Cal.3d 639, 652).  As it was observed in <u>In re Andrade</u> (2006)
141 Cal.App.4th 807, at 823,  Pollak J., dissenting, "This record,
like that in numerous recent cases, strongly suggests that California
[Governors] are losing sight of that fact[,]" so can it be said in
case at bench.

The Board meticulously reviewed Petitioner's record and asked
him questions.  Most importantly, the Board got to observe
Petitioner's demeanor, an important part of the evidence.  The Board
found Petitioner does not pose a <u>current</u> risk to public safety based
on his impressive rehabilitation, which is the spirit of the law
(<u>Greenholtz</u>, <u>supra</u>, 442 U.S., at 10, 12, 15; <u>In re Rodriguez</u>, <u>supra</u>,
14 Cal.3d, at 652; <u>In re Minnis</u>, <u>supra</u>, 7 Cal.3d, at 645; <u>In re Fain</u>
(1983) 139 Cal.App.3d 295, 305; <u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.3d,
at 916-917 [in accord, parole decisions "are based in large measure

- 25 -

on occurrences subsequent to the commission of the offense"]). How the Governor can read through Petitioner's achievements of rehabilitation and see how far he has come from 1985 to 2006 and say he is a _current_ threat to public safety defies reason.

B. **Petitioner's Prior Drug Abuse Is Not Reliable Evidence That He Is A Current Threat To Public Safety.**

The Governor was concerned, and rightfully so, with Petitioner's prior criminal history that was intertwined with drug abuse, the Governor stating this "demonstrates his inability or unwillingness to conform his behavior to the rules of society, and this weighs against his parole suitability at this time" (EXHIBIT 3, p. 2).

Petitioner's prior criminal history revolved entirely around drugs; the commitment offense the result of a drug deal gone bad. Simply, Petitioner's criminal/drug history are immutable factors that he cannot change and with the passage of time, and his complete rehabilitation, are unreliable evidence of a current threat to public safety. The Governor has been put on notice for using such reasons to deny parole several times, but fails to heed the court's decisions. First made clear in In re Smith, supra, 114 Cal.App.4th, at 372 (emphasis in original):

> "Smith's entrenched desire for drugs due to long-term abuse—does not constitute some evidence Smith might start using drugs and become violent again, and therefore that he _currently_ poses an unreasonable risk of danger without further treatment. Indeed, if Smith's past use of drugs did invariably establish his unsuitability, then the Governor could deny parole for the rest of Smith's life based on this immutable factor, without regard or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone to violent conduct as a result of it."

The forensic experts who conducted face-to-face interviews with Petitioner agree that he is fully rehabilitated and will not relapse into drug abuse (see EXHIBIT 7, p. 4 [although drug abuse was a risk

- 26 -

factor in 1999 if paroled, by 2006 "there are no significant risk factors in this case" (EXHIBIT 6, p. 4).

Moreover, to deny Petitioner parole based on his prior drug addiction violates the Americans with Disabilities Act (ADA). Denying parole because the prisoner had a drug addiction is insufficient because, "it is not enough that individuals pose a hypothetical or presumed risk. Instead, the evidence must establish that an individual does, in fact, pose a significant risk" (<u>Bay Area Addiction Research and Treatment Inc. c, City of Antioch</u> (9th Cir. 1999) 179 F.3d 725, 737; <u>Sass v. California Board of Prison Terms</u> (9th Cir. 2006) 461 F.3d 1123, 1140-1141 ["The Supreme Court has made clear that an individual cannot be punished on the basis of statutes alone, including the status of being afflicted with an addiction," Reinhardt, Circuit Judge, dissenting, citing <u>Robinson v. California</u> (1962) 370 U.S. 660]). The Governor obviously presumed that having abused drugs prior to the murder conviction, Petitioner will continue to abuse drugs, regardless of his years of rehabilitation and clean living. "That presumption would preclude any possibility of rehabilitation and doom any prospect of parole" (<u>Mickens-Thomas v. Vaughn</u>, <u>supra</u>, 355 F.3d, at 304). It appears the Governor's position is based on that which the ADA was meant to protect those like Petitioner: "from deprivations based on prejudice, stereotypes, or unfounded fear" (<u>Bay Area Addiction Research and Treatment, Inc. v. City of Antioch</u>, <u>supra</u>, 179 F.3d, at 737).

Based on the record, there are no reasonable grounds to reject the forensic and correctional experts consistent findings that Petitioner does not pose a <u>current</u> threat to public safety. The

- 27 -

evidence the Governor relied on was a historical relic, thus the decision is arbitrary and capricious (In re Smith, supra, 114 Cal.App.4th, at 369).

C. **Petitioner's Non-Violent Disciplinaries Over 15 Years Past Do Not Constitute Evidence He Is A Current Threat To Public Safety.**

The Governor is correct in stating that Petitioner "was disciplined seven times for rules violations...(and) 12 times for minor misconduct" (EXHIBIT 3, p. 1). Unlike the Board, however, what the Governor fails to do is see the distance in time and nature of Petitioner's CDC 115s. The Board recognized that the last CDC 115 Petitioner received was in 1990, and has "had seven total 115's in the 20 years you've been down" (HT 36:15-18). Actually, a review of the record shows that Petitioner's last CDC 115 was in 1992, and he has only six as the one for violating grooming standards was expunged from his file, or should have been. Regardless, as the Board noted in regard to Petitioner's current threat to public safety, none of his 115s were violent, he had distanced himself from any discipline problems he had, and certainly has a handle on it (HT 54:19-55:5).

Petitioner has been disciplinary free long enough to reach his MEPD if he had started over after receiving the last 115 in 1992. The CDC-128 counseling chronos, however, are not disciplinary actions (In re Smith (2003) 109 Cal.App.4th 489, 505 ["In prison argot, 'counseling chronos' document 'minor misconduct,' not discipline"]). Moreover, even our Supreme Court recognized that a dozen disciplinary violations over a 22 year period was "exemplary" behavior (In re Dannenberg, supra, 34 Cal.4th, at 1089), discussing In re Rodriguez (1975) 14 Cal.3d 639 [Rodriguez "has been charged with only a dozen

rules infractions" (Id., at 644 fn. 7).] See also Martin v. Marshall, supra, 431 F.Supp.2d, at 1042 [Martin had "received twenty disciplinary violations" including "'possession of drugs, weapons material and gambling paraphernaila" but had not had a serious rules violation since 1995]; the court opining, "With respect to petitioner's disciplinary violations, there is significant evidence in the record of petitioner's positive institutional behavior, which reasonably mitigates the effect that petitioner's past violations have on his unsuitability for parole" (Id., at 1045).

Simply, relative to time and the minor nature of Petitioner's rules violations, like the commitment offense, they are no longer reliable or relevant to Petitioner's current threat to public safety, not being evidence and relying on such was arbitrary, violating Petitioner's right to due process.

D.   OPPOSITION LETTER FROM THE DISTRICT ATTORNEY IS NOT EVIDENCE
     SUPPORTING UNSUITABILITY FOR PAROLE.

While it is true that letters in opposition to parole may be submitted by the district attorney or other interested parties (Penal Code § 3042(a)(f)(3), and the Governor may consider such letters (In re Dannenberg, supra, 34 Cal.4th, at 1085), it is not within the statutes or regulations as a factor upon which parole can be denied. In this instant, however, the opposition letter from the district attorney's office should not have even been considered by the Governor.

When the opposition letter was introduced into evidence at Petitioner's parole hearing it was suppressed as evidence under the "10-day rule" (HT 5:16-26). "At least 10 days prior to any hearing by the Board of Prison Terms, the prisoner shall be permitted to

review his or her file which will be examined by the board and shall
have the opportunity to enter a written response to any material
contained in the file" (Penal Code § 3041.5(a)(1); Cal. Code Regs.,
tit. 15, § 2030(c)).  Petitioner has the right "to secure information
necessary to prepare for interviews with the Authority" (In re Morrall
(2002) 102 Cal.App.4th 102 Cal.App.4th 280, 296, citing In re Sturm
(1974) 11 Cal.3d 258, 268; see also In re Rosenkrantz, supra, 29
Cal.4th, at 655).  Thus, the Governor must restrict his review to
"the evidence presented at the parole hearing which is relevant to
those findings, not to findings that [he] now suggests might have
made" (In re DeLuna (2005) 126 Cal.App.4th 585, 593-594); thus, the
district attorney's letter considered in violation of the "10-day
rule" was an "improper factor" (In re Rosenkrantz, supra, 29 Cal.4th,
at 678).

Moreover, as one appellate court opined, "[w]e find nowhere
in the statutes or regulations where it states that parole should
be granted or denied based on the position of the District Attorney's
office.  The decision to grant parole rests on the guidelines listed
in section 2400 et seq and Penal Code section 3041. (Rosenkrantz,
supra, 29 Cal.4th at p. 658 [there must be 'some evidence in the
record before the Board [that] supports the decision to deny parole,
based upon the factors specified by statute and regulation' (italics
added)])" (In re Samble, 2006 WL 401282 (Cal.App. 6 Dist. 2/21/06);
see also Rosenkrantz v. Marshall, supra, 444 F.Supp.2d 1063, 2006
WL 2327085, *12 fn. 14 [evidence from these agencies was merely
"cumulative" to the Governor's opinion and added no new evidence]).
If the decision to grant or deny parole were to be influenced by

- 30 -

the district attorney or some other agency, then all grants or denials of parole would be arbitrary because of the changing opinions of these agencies, as clearly evidenced in <u>Rosenkrantz v. Marshall</u> where the District Attorney flipped flopped back and forth, as did the Board (see <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, 2006 WL 2327085, *1-8 for history of flip flops; <u>Martin v. Marshall</u> (N.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2642123, *1, Board's flip flopping on evaluation of same evidence).    If the Board and Governor denies parole when opposed by an agency, but sometimes also grants parole when opposed by the same, such clearly results in an arbitrary use of the statute.

E.  <u>Denying Parole For Not Having A Firm Job Offer Is Not Evidence And Is Contrary To The Regulations.</u>

The Governor, after stating correctly, that Petitioner has made plans to live with his family upon parole. having their support, and having marketable skills, it appears the Governor uses Petitioner's not having secured a job offer, stating: "Having a legitimate way to provide financial support for himself immediately upon release is essential to Mr. Hernandez's [sic] success on parole" (EXHIBIT 3, p. 2).

The regulations simply require that Petitioner "has made realistic plans for release <u>or</u> has developed marketable skills that can be put to use upon release" (Cal. Code Regs., tit. 15, § 2402(d)(8), emphasis added).  "Thus, based on its clear language, the regulation's requirement that an inmate have parole plans is limited to requiring realistic plan" (<u>In re Andrade</u> (2006) 141 Cal.App.4th 807, 817).  It is unreasonable for the Governor to deny parole because a prisoner does not have a firm job offer.  Unlike

the Governor who gave Petitioner's job skills lip service, the Board

rightly applied the law, finding at HT 53:18-54:18:

"You have realistic parole plans. While they do not have a job offer you have
a tremendous amount of family support. You've got two places to live.... What
with your arc welding this is for the record, these are both farming communities.
And mill and cabinet work, as well as arc welding clearly are marketable skills
and could (be) very valuable in those areas.

"So we don't feel that given what we've seen here today as well as the skills
that you have, we don't have a problem that you can get out there and get a job.
.... We feel that because of your maturation, your growth, greater understanding
and your age at this time which is not prohibitive in terms of working, this
has reduced your probability of recidivism. We don't think you're going to come
back. We feel comfortable that we release you, you're going to be a success
in whatever you endeavor."

Petitioner has fulfilled the letter and spirit of the law.

That is all that is required and the Governor's decision on this

factor was arbitrary.

F. Petitioner's Rehabilitation

"By the time of the Governor's 200[6] review, [Petitioner] had

served [21] years, [9] years beyond his minimum eligible date.  The

gravity of his offense had been cited as the prime reason for denial

of parole in every Board decision from 199[5] through 200[4]"

(In re Elkins, supra, 2006 DJDAR 14489, 14498): see EXHIBITS 15,

16, 17, 18, 19, and 20).  On Petitioner seventh time, before the

Board in June, 2006, "he was finally granted parole, and the Governor

has now reversed that decision, once more relying on the gravity

of the offense, something that no amount of rehabilitative progress

can ever change" (Id.).

It would be easy for a court to simply cite In re Dannenberg,

supra, 34 Cal.4th 1061 and deny this writ, but that would not do

justice to Petitioner's excellent rehabilitative progress.  Unlike

someone like Rosenkrantz who came from a privileged upbringing and

who was a model citizen until his offense then continued his model behavior postconviction, Petitioner was not raised with the privileges so many have. But, wanting to change, work very hard, as the Board recognized, to rehabilitate himself, breaking addiction to drugs, developing exemplary and ethical work habits, and most of all, changing the way he thinks and reaching out to others to share his experience in a meaningful way. What purpose does it achieve to keep one like Petitioner imprisoned any longer? None.

"The goals of the parole system can best be achieved by 'the liberation of a prisoner on parole at the earliest period when permitted by law and when on consideration of the merits of each individual case, parole ought, in the judgment of the Board, to be granted" (In re Minnis, supra, 7 Cal.3d, at 644; see also Martinez v. California (1978) 85 Cal.App.3d 430, 437 ["It is important for the well-being of both society and the individual to release persons as soon as they are rehabilitated"]).  The parole system was enacted to prevent the prison crisis of overcrowding we have today, for "a large number of men who could be trusted to go upon their parole and thus save the State a very great expense" (In re Fain, supra, 145 Cal.App.3d  at 554).

Not only is the Governor's decision arbitrary, violating Petitioner's right to due process, but it is simply irresponsible of the Governor, with prison overcrowding and the federal courts at the gates to take over, for political reasons to deny parole to those like Petitioner who have earned their liberty through extraordinary rehabilitative efforts and do not pose a current threat to public safety.

### C O N C L U S I O N

The Govenor's decision was not only fixated on immutable factors, the offense, having zero predictive value after 20 plus years, Petitioner's prior criminal history, prior drug addiction, which should have been weighed as a mitigating factor and not an aggravating factor, and other factors unsupported by the evidence, but the Governor presented no contravening evidence to the psychological forensic experts finding that Petitioner is no more a threat to the public than the average citizen in the community, perhaps even less, nor did the Governor make any rational connections between his findings and Petitioner's <u>present</u> threat to public safety. In essence, the Governor canceled out, without any evidence, Petitioner's extraordinary rehabilitation, when considering all, is a "poster boy" for rehabilitation.

WHEREFORE, it is respectfully requested that this Court issue an Order to Show Cause why the writ should not be granted and order the Governor's decision vacated and grant of parole reinstated, and Petitioner's term recalculated and fixed pursuant to his culpability within the legislatively prescribed matrix and that term not be enhanced for the firearm allegation for which he has already served time for. It is further requested that counsel be appointed.

Date: <u>12-23-06</u>

Respectfully submitted,

Hector Hernandez
Petitioner in pro per

- 34 -

# EXHIBIT "1"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )          CDC Number D-33689
                           )
HECTOR HERNANDEZ           )          INMATE
                           )          COPY
                           )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 8, 2006

11:20 A.M.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
SUZANNE ROTHLISBERGER, Deputy Commissioner

OTHERS PRESENT:

HECTOR HERNANDEZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

Ramona Cota              Peters Shorthand Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 6 |
| Pre-Commitment Factors | 12 |
| Post-Commitment Factors | 30 |
| Parole Plans | 22 |
| Closing Statements | 40 |
| Recess | 48 |
| Decision | 49 |
| Adjournment | 68 |
| Transcriber Certification | 69 |

--oOo--

1              P R O C E E D I N G S

2          DEPUTY COMMISSIONER ROTHLISBERGER:  -- on

3    record.

4          PRESIDING COMMISSIONER SAWYER:  This is a

5    Subsequent Parole Consideration Hearing for

6    Hector Hernandez, H-E-R-N-A-N-D-E-Z, CDC number

7    D as in David 33689.  Today's date is June the

8    8th, 2006.  It's 11:20 in the afternoon, in the

9    morning, I'm sorry, and we are located at the

10   Correctional Training Facility in Soledad.  The

11   date received was 7/7 of 1986.  The date the

12   life term started was 12/22 of 1986.  The county

13   of commitment is Fresno.  The offense is murder

14   in the second degree with the use of a firearm,

15   case number 3362753, count number one, 187 with

16   12022.5.  The term is 15 to life plus 2.  The

17   minimum eligible parole date was 4/27/1997.

18   This hearing is being tape-recorded and for the

19   purpose of voice identification each of us is

20   required to give our first and last name,

21   spelling our last name.  And when it comes to

22   you, Mr. Hernandez, if you'd also give us your

23   CDC number after you spell your last name.  I'll

24   start and go to my left.  Tom Sawyer,

25   S-A-W-Y-E-R, Commissioner.

26          DEPUTY COMMISSIONER ROTHLISBERGER:

27   Suzanne Rothlisberger, R-O-T-H-L-I-S-B-E-R-G-E-

1    R, Deputy Commissioner.

2        **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-

3    R-D-I-F-F, attorney for Mr. Hernandez.

4        **INMATE HERNANDEZ:**  Hector Hernandez, H-E-

5    R-N-A-N-D-E-Z, D-33689.

6        **PRESIDING COMMISSIONER SAWYER:**  Very

7    good, thank you.  We also have two correctional

8    peace officers in the room for security

9    purposes.  Mr. Hernandez, the record reflects

10   you signed a BPT Form 1073, which is a

11   Reasonable Accommodation Notice and Request in

12   accordance with the provisions of the Americans

13   with Disabilities Act.  It was signed on 3/8 of

14   2005.  You indicate on this form you do not have

15   any disabilities.  Is that correct, sir?

16       **INMATE HERNANDEZ:**  That's correct.

17       **PRESIDING COMMISSIONER SAWYER:**  Okay.

18   And you don't need any help.  You don't wear

19   glasses?

20       **INMATE HERNANDEZ:**  I'm fine without them.

21       **PRESIDING COMMISSIONER SAWYER:**  You're

22   fine, you can read documents without, without

23   your glasses?

24       **INMATE HERNANDEZ:**  Yes.

25       **PRESIDING COMMISSIONER SAWYER:**  What do

26   you use your glasses for?

27       **INMATE HERNANDEZ:**  When I'm going to read

3

1  for long periods of time.

2       PRESIDING COMMISSIONER SAWYER:  I see,

3  okay.  And you didn't bring them because you

4  don't think you're going to need them today?

5       INMATE HERNANDEZ:  I'm sure I could get

6  by without them.

7       PRESIDING COMMISSIONER SAWYER:  What

8  strength are those glasses?

9       INMATE HERNANDEZ:  I'm not sure.

10       ATTORNEY TARDIFF:  I can accommodate him.

11       DEPUTY COMMISSIONER ROTHLISBERGER:  Do we

12  have a magnifier?  Do you have a magnifier?  Oh,

13  reading glasses.

14       PRESIDING COMMISSIONER SAWYER:  See if

15  those help.

16       ATTORNEY TARDIFF:  I guess not.

17       INMATE HERNANDEZ:  I'm fine without them.

18  Okay, thank you.

19       PRESIDING COMMISSIONER SAWYER:  Okay,

20  well you're not 1.50.  We're going to get a

21  magnifier for you.  We need to ask you to look

22  at this form.  You'll notice there's a check on

23  it, a fresh ink check that your attorney checked

24  because it wasn't checked.  It says, I do not

25  need any help for my hearing.

26       ATTORNEY TARDIFF:  I don't have any

27  disabilities.  It's about your disabilities,

4

1   basically.  Is that still accurate?

2       INMATE HERNANDEZ:  Yes.

3       PRESIDING COMMISSIONER SAWYER:  Okay,

4   good, thank you.  If you'll give that back.  And

5   just as a precaution we're going to give you a

6   magnifier that you might -- if you come to a

7   word you don't, that you can't read then that

8   will be there for your assistance.  Ms. Tardiff,

9   did you talk to Mr. Hernandez about his

10  accommodations for disabilities?

11      ATTORNEY TARDIFF:  I did.

12      PRESIDING COMMISSIONER SAWYER:  The

13  outline of the hearing procedure?

14      ATTORNEY TARDIFF:  Yes.

15      PRESIDING COMMISSIONER SAWYER:  The

16  inmate's rights?

17      ATTORNEY TARDIFF:  Yes.

18      PRESIDING COMMISSIONER SAWYER:  And the

19  confidential?

20      ATTORNEY TARDIFF:  Yes.

21      PRESIDING COMMISSIONER SAWYER:  Okay.

22  Would you waive the reading of those scripts?

23      ATTORNEY TARDIFF:  I do.

24      PRESIDING COMMISSIONER SAWYER:  Thank

25  you.  I'll mark it Exhibit One.  Do we have any

26  confidential material, Commissioner

27  Rothlisberger?

1          **DEPUTY COMMISSIONER ROTHLISBERGER:**  No.

2          **PRESIDING COMMISSIONER SAWYER:**  Okay.

3      I'm going to mark Exhibit Two.  This is the

4      hearing checklist.  I've added to this

5      checklist, which may not be on yours, the Board

6      Report addendums and a new psychiatric report

7      that was received today.

8          **ATTORNEY TARDIFF:**  I have all these

9      documents, thank you.

10         **PRESIDING COMMISSIONER SAWYER:**  Okay.

11         **ATTORNEY TARDIFF:**  And I've submitted a

12     couple of things earlier, nothing further.

13         **PRESIDING COMMISSIONER SAWYER:**  Okay,

14     thank you.  Do you have any preliminary

15     objections, counsel?

16         **ATTORNEY TARDIFF:**  No I don't.  Oh, there

17     was some material I received today and one of

18     them was a letter from the District Attorney.  I

19     object to it being used as it violates the ten-

20     day rule.  I've not had enough time to -- Well

21     it just violates the rule, period.

22         **PRESIDING COMMISSIONER SAWYER:**  Okay, you

23     don't have to justify it.

24         **ATTORNEY TARDIFF:**  Thank you.

25         **PRESIDING COMMISSIONER SAWYER:**  I'll

26     sustain that objection.  Will the inmate be

27     speaking with the panel?

6

1          **ATTORNEY TARDIFF:**  Except for he doesn't

2    want to discuss the commitment offense but he

3    does have something to say about the commitment

4    offense.  So I don't know how we work with

5    something like that.

6          **PRESIDING COMMISSIONER SAWYER:**  We'll see

7    how it works.

8          **ATTORNEY TARDIFF:**  Okay.

9          **PRESIDING COMMISSIONER SAWYER:**  Okay.

10   Okay, I'm going to be using the July 2005

11   calendar Board Report.

12         **ATTORNEY TARDIFF:**  Did you swear him in?

13         **PRESIDING COMMISSIONER SAWYER:**  Oh I'm

14   sorry, you're right.  Could you raise your right

15   hand, sir.  Do you solemnly swear or affirm the

16   testimony you are about to give in this hearing

17   will be the truth, the whole truth and nothing

18   but the truth?

19         **INMATE HERNANDEZ:**  I affirm.

20         **PRESIDING COMMISSIONER SAWYER:**  Okay,

21   thank you.  Now I'll be using the July 2005

22   calendar Board Report page one.

23          "On 8/15/1985 at approximately

24          3:56 a.m. Officer F. Lopez, L-O-P-

25          E-Z, was dispatched to South 11th

26          Street number four in Calwa, C-A-

27          L-W-A, regarding an injured