# EXHIBIT 13
# Part 3 of 6

51

1   live it.

2       **PRESIDING COMMISSIONER SAWYER:**  So that

3   was very compelling.  As well as your closing

4   speech.  I can honestly tell you I've been doing

5   these for eleven months.  I started last July

6   1st.  And I've never, ever heard a closing

7   remark better than yours.  That was well thought

8   out.  It was well read.  And it was very

9   sincere.  You're a very serious guy.  And I

10  think you have the courage of your convictions.

11  I really do.  And so let the record reflect that

12  you, during your speech that you did not falter

13  and during your speech pulled some beaded

14  artwork from around your neck and displayed that

15  with an eagle and an American flag and a bear on

16  the back and even turned it around.  I mean you

17  could probably use both hands huh?  You can eat

18  with both hands right (laughter from inmate)?

19  If you played golf you'd hit either side of the

20  ball, it doesn't matter.  Very articulate.

21  Another issue in self-help programs and this is

22  very meaningful as you got 11 years in NA.

23  You've clearly articulated to us how important

24  that is.  You're also the co-chairman.  How long

25  have you been the co-chairman?

26      **INMATE HERNANDEZ:**  Off and on for quite a

27  HECTOR HERNANDEZ   D-33689   DECISION PAGE 3   06/08/06

52

1   while.

2         PRESIDING COMMISSIONER SAWYER:   Yeah,

3   because I saw it back in the history there too.

4   You've had ten weeks of hep C.   You've had a 13-

5   week course of IMPACT and these are just the

6   most recent courses.   We're not going all the

7   way back to the beginning here.   Through PIA

8   viewed the inmate employability program.   Some

9   very important issues in terms of your

10  vocational programs.   Your vocational welding,

11  arc welding certificate.   That's a marketable

12  skill that can be used in your future.   You do

13  have some, well you don't have a certificate,

14  you've got vocational graphic arts and printing.

15  That was in about three years ago.   Currently

16  you're working in the furniture factory with

17  above average work reports for PIA.   And you

18  have a certificate in mill and cabinet, right?

19        INMATE HERNANDEZ:   Yes.

20        PRESIDING COMMISSIONER SAWYER:   Okay.

21  You've received numerous laudatory chronos

22  behind your NA.   That's so important given your

23  history and the commitment offense.   Your

24  involvement with NA is very, very important.

25  You committed the crime as a result of a

26  significant stress in your life.   This is not an

27  HECTOR HERNANDEZ   D-33689   DECISION PAGE 4   06/08/06

53

1    excuse.  We're not in any way, shape or form

2    saying that you had stress in your life.  But

3    you were out of control.  You started at 11

4    years of age burglarizing.  You didn't have any

5    respect for anybody's stuff or yourself more

6    importantly.  And that stress was self-induced,

7    substance abuse.  It looks like you've done just

8    about everything.  Paint, glue, you're lucky to

9    be alive today.

10           INMATE HERNANDEZ:  Yes.

11           PRESIDING COMMISSIONER SAWYER:  Because

12   we know horror stories about paint and glue.

13   You lack a significant criminal history of

14   violent crime.  You got lots of substance abuse

15   history.  You've got a lot of burglaries.  Again

16   taking people's stuff when they weren't looking.

17   Going to the markets, going into a pharmacy or

18   doctor's office and taking money.  You have

19   realistic parole plans.  While they do not have

20   a job offer you have a tremendous amount of

21   family support.  You've got two places to live,

22   one in Sanger, one in Selma with your mom and

23   dad in Sanger, the old family homestead.  And

24   with your sister in Selma.  What with your arc

25   welding this is for the record, these are both

26   farming communities.  And mill and cabinet work,

27   HECTOR HERNANDEZ   D-33689   DECISION PAGE 5   06/08/06

54

1    woodwork as well as arc welding clearly are

2    marketable skills and could very valuable in

3    those areas.  Do you agree?

4            INMATE HERNANDEZ:  I agree.

5            PRESIDING COMMISSIONER SAWYER:  So we

6    don't feel that given your what we've seen here

7    today as well as the skills that you have, we

8    don't have a problem that you can get out there

9    and get a job.  You're still young enough to do

10   that.  You don't have any physical maladies and

11   so you're in good shape there.  We feel that

12   because of your maturation, your growth, greater

13   understanding and your age at this time which is

14   not prohibitive in terms of working, this has

15   reduced your probability of recidivism.  We

16   don't think you're going to come back.  We feel

17   comfortable that we release you, you're going to

18   be a success in whatever you endeavor.

19   Institutional behavior, while you do have seven

20   115's, none, none of them are violent.

21           INMATE HERNANDEZ:  Okay.

22           PRESIDING COMMISSIONER SAWYER:  And the

23   last one was in 1999.  It was for long hair and

24   that's a violation of the rule, clearly.  You've

25   had eleven 128's.  The last one being in the

26   year 2000.  So you've distanced yourself from

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 6  06/08/06

1  any of the discipline problems that you had.

2  You had some streaks there.  You weren't

3  programming well.  You weren't doing anything

4  well.  But you've certainly gotten the handle on

5  that.  We feel you show a sign of remorse.  It

6  indicates that you understand the nature and the

7  magnitude of the offense, accepts responsibility

8  for the criminal behavior and has the desire to

9  change towards good citizenship.  Give me an

10 affirmative.

11      INMATE HERNANDEZ:  That's an affirmative,

12 that's obviously a duty.

13      PRESIDING COMMISSIONER SAWYER:  Okay.

14      INMATE HERNANDEZ:  Absolutely.

15      DEPUTY COMMISSIONER ROTHLISBERGER:  The

16 tape machine doesn't read your nods though

17 (laughter by all).

18      PRESIDING COMMISSIONER SAWYER:

19 Commissioner Rothlisberger.

20      DEPUTY COMMISSIONER ROTHLISBERGER:

21 Absolutely, Dr. Reed back in 1999 which is your

22 prior psych report had written that your

23 violence potential within a controlled setting

24 is considered to be below average.  Released to

25 the community violence potential is considered

26 to be no more than the average citizen.  But did

27 HECTOR HERNANDEZ  D-33689  DECISION PAGE 7  06/08/06

56

 1    say that heroin abuse did present a significant

 2    risk factor.  And this inmate does appear to

 3    have a heroin abuse problem.  This was in '99

 4    and you continued participation in NA during

 5    your incarceration as well as a contingency of

 6    parole is suggested.  And Dr. Macomber in his

 7    most recent psychological evaluation states of

 8    course on the Axis I, you have no mental

 9    disorder, Axis II, no personality disorder.  He

10    agreed with Dr. Reed and says that the potential

11    for dangerousness behavior in the institution

12    agrees with the prior evaluator, below average

13    in comparison to other inmates.  Never received

14    any disciplinaries for aggressive, violent or

15    dangerous behavior.  And stated again that in

16    1991 when you underwent serious life changes.

17    When you got clean and sober.

18         **INMATE HERNANDEZ:**  That's it.

19         **DEPUTY COMMISSIONER ROTHLISBERGER:**  And

20    considering potential for dangerous when

21    released to the community, the level of service

22    inventory revised, you retained a score of 4.2.

23    Means that if a hundred men were released on

24    parole you're expected to do better on parole

25    than 95.8 of them.  But agrees also with the

26    prior evaluator that you do not pose any more

27    HECTOR HERNANDEZ   D-33689   DECISION PAGE 8   06/08/06

1  risk to the community at this time in his life

2  than the average citizen.  In fact probably

3  poses less risk due to is growth, maturity and

4  improvement.  And found no significant risk

5  factors.  Again I believe we have this on the

6  record before but you have excellent wood

7  working skills.  You are able to obtain

8  employment.  Considerable family support.  And

9  your level of insight and self-understanding is

10 impressive.  I know it impressed the panel.  You

11 obviously have undergone significant mental,

12 spiritual and emotional changes over the years

13 of incarceration.  And the doctor concludes with

14 the prognosis for successful adjustment in the

15 community is excellent.  Commissioner.

16       PRESIDING COMMISSIONER SAWYER:   Thank

17 you.  And it's okay to smile a little

18 (laughter).  You don't have to be so stoic.

19       DEPUTY COMMISSIONER ROTHLISBERGER:

20 You're so serious.

21       PRESIDING COMMISSIONER SAWYER:   Okay the

22 base term of confinement, we're going to do the

23 numbers here.  In fact I've given --

24       DEPUTY COMMISSIONER ROTHLISBERGER:

25 Counsel.

26       PRESIDING COMMISSIONER SAWYER:   Counsel,

27 HECTOR HERNANDEZ   D-33689   DECISION PAGE 9   06/08/06

58

1    a copy of this for you.  The base term offense

2    for which the prisoner has been convicted is

3    murder in the second degree, PC 187, 12022., in

4    addition 12022.5.  The offense occurred on 8/15

5    of 1985.  The term is derived from the matrix

6    located in the California Code of Regulations,

7    Title 15 at 2403(c), second degree murder.

8    Offense committed on or after 11/8 of 1978.  The

9    panel finds the Category 1C is appropriate.  1

10   would be participating victim, victim was an

11   accomplice or otherwise implicated in a criminal·

12   act with the prisoner during which the result of

13   the death occurred, drug dealer.  There was an

14   illegal act going on here.  And that led up to

15   this particular murder.  The C is severe trauma,

16   death resulted from severe trauma inflicted with

17   deadly intensity, a shotgun.  A shot to this

18   victim and killing him.  We have a choice of

19   three numbers.  A mitigating number, a middle

20   number or an aggravated number.  Given the

21   circumstances of this case we're going to take

22   the middle number of 18 years.  We assess 216

23   months which is 18 years for the base offense.

24   And this is how it comes out.  We're adding

25   because you used a weapon in this 12022.5 charge

26   on that, 24 months.  So now that brings up to

27   **HECTOR HERNANDEZ   D-33689   DECISION PAGE 10 06/08/06**

59

1  240 months.  Which is in my head 20 years.

2      DEPUTY COMMISSIONER ROTHLISBERGER:  Yes

3  (laughter).

4      PRESIDING COMMISSIONER SAWYER:  Okay.

5  Post-conviction credit, post-conviction credit

6  from the date the life term started, that's

7  12/22 of 1986 to today's date, 6/8 of '06 is 60

8  months.  Do you know what the post-conviction

9  credit is?  Do you know what I'm talking about

10  here?

11      INMATE HERNANDEZ:  Generally, not

12  exactly.

13      PRESIDING COMMISSIONER SAWYER:  You get

14  four months a year for every year you don't have

15  a 115.

16      INMATE HERNANDEZ:  All righty.

17      PRESIDING COMMISSIONER SAWYER:  And you

18  got five years.  Now some years you had two

19  115's so it's not, we're not taking seven years

20  off.  What we're taking is, what did we took,

21  took five, four or five.

22      DEPUTY COMMISSIONER ROTHLISBERGER:  How

23  did we get to 60?

24      PRESIDING COMMISSIONER SAWYER:  We added

25  the, he had --

26      ATTORNEY TARDIFF:  He had seven, okay --

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 11 06/08/06

60

1          PRESIDING COMMISSIONER SAWYER:  He had

2    seven 115's but some of them were multiple --

3          DEPUTY COMMISSIONER ROTHLISBERGER:  Were

4    in the same year.

5          ATTORNEY TARDIFF:  So it was more than

6    five years or whatever.  How many years were --

7          DEPUTY COMMISSIONER ROTHLISBERGER:  What

8    did I do with the --

9          PRESIDING COMMISSIONER SAWYER:  It was 76

10   months total.

11         DEPUTY COMMISSIONER ROTHLISBERGER:  Oh,

12   here we go.  Yeah it was 76 months minus 16.

13         PRESIDING COMMISSIONER SAWYER:  Minus 16.

14   We gave you four years because --

15         DEPUTY COMMISSIONER ROTHLISBERGER:

16   Right.

17         PRESIDING COMMISSIONER SAWYER:  These

18   seven 115's occurred --

19         DEPUTY COMMISSIONER ROTHLISBERGER:

20   Didn't all happen in different years.

21         PRESIDING COMMISSIONER SAWYER:  -- over a

22   four year period.

23         DEPUTY COMMISSIONER ROTHLISBERGER:

24   Right.

25         ATTORNEY TARDIFF:  So he didn't get the

26   credit for four years.

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 12 06/08/06

61

1        PRESIDING COMMISSIONER SAWYER:  He didn't

2   get the credit for four years.

3        DEPUTY COMMISSIONER ROTHLISBERGER:

4   Right.

5        PRESIDING COMMISSIONER SAWYER:  He lost

6   16 months.

7        DEPUTY COMMISSIONER ROTHLISBERGER:

8   Right.

9        PRESIDING COMMISSIONER SAWYER:  So he had

10  76 months of credit.  We took 16 months off of

11  that which gives you 60, five years.  So we're

12  going from 20 years down to five years.  Twenty

13  years minus five years gives you a total of 118

14  -- of a 180 months, which is 15 years

15  essentially, 15 or 14.

16       ATTORNEY TARDIFF:  Wait a minute, the

17  credit is four --

18       PRESIDING COMMISSIONER SAWYER:  Fifteen

19  years.

20       ATTORNEY TARDIFF:  -- four months off for

21  each year of no 115's.  How many years was he

22  115 free?

23       PRESIDING COMMISSIONER SAWYER:  Well we

24  figured his time at 19 years because it'll be 20

25  years in December.

26       ATTORNEY TARDIFF:  Okay.

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 13 06/08/06

62

1           DEPUTY COMMISSIONER ROTHLISBERGER:

2    Right.

3           PRESIDING COMMISSIONER SAWYER:    If we

4    figured his time at 19 years that he's been

5    down.

6           ATTORNEY TARDIFF:    And five years.    He

7    wasn't credited with five years.

8           PRESIDING COMMISSIONER SAWYER:    He was

9    credited for five years.

10          DEPUTY COMMISSIONER ROTHLISBERGER:    He

11   was.

12          PRESIDING COMMISSIONER SAWYER:    He was

13   given five years credit, 60 months.

14          ATTORNEY TARDIFF:    No, but how many years

15   of 115's?

16          DEPUTY COMMISSIONER ROTHLISBERGER:    Well

17   I have times four, 19 years times four.

18          ATTORNEY TARDIFF:    That would be 15 years

19   of good time.

20          PRESIDING COMMISSIONER SAWYER:    That's

21   correct.

22          DEPUTY COMMISSIONER ROTHLISBERGER:

23   That's correct.

24          ATTORNEY TARDIFF:    Times four gives him,

25   that's how you got the 60.

26   //

27   HECTOR HERNANDEZ   D-33689   DECISION PAGE 14 06/08/06

63

1        **DEPUTY COMMISSIONER ROTHLISBERGER:**

2   That's how we got there.  We just -- Right.

3        **PRESIDING COMMISSIONER SAWYER:**  There are

4   several ways you can go.

5        **ATTORNEY TARDIFF:**  Okay.  You went the

6   other way.

7        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Thank

8   you counsel.

9        **ATTORNEY TARDIFF:**  Thank you.

10       **PRESIDING COMMISSIONER SAWYER:**  I move

11  slow (laughter).

12       **ATTORNEY TARDIFF:**  That's where the 60

13  months comes in.

14       **PRESIDING COMMISSIONER SAWYER:**  Okay so

15  you have 180.  Your date then would be 15 years

16  from 12/22 of 1986.

17       **INMATE HERNANDEZ:**  Okay, very good.

18       **PRESIDING COMMISSIONER SAWYER:**  So you've

19  served that 15 years plus.  All right.  Let's

20  finish your conditions for you.  And I'm going

21  to ask you at the end of this if there is, if

22  you have any problem with any of these

23  conditions.  These are imposed.  Do not use

24  alcoholic beverages.  Submit to alcohol testing,

25  submit to anti-narcotic testing, submit to THC

26  testing, participate in substance-abuse programs

27  **HECTOR HERNANDEZ  D-33689  DECISION PAGE 15 06/08/06**

64

1   such as AA or NA.  Attend outpatient clinic.  Do

2   you have any problems with any of those?

3       INMATE HERNANDEZ:  I have no problem with

4   any of that.

5       PRESIDING COMMISSIONER SAWYER:  I would

6   imagine.  Okay.  We don't have any other special

7   conditions of parole.  The biggest single item,

8   issue is the NA and we're going to be testing

9   you while you're on parole.  And of course it

10  goes without saying that there are going to be

11  other parole conditions.  For example if your

12  father, if you go to live your father and he has

13  a gun in the house he's going to have to remove

14  it, okay.  Because you can't ever possess a gun

15  as an ex-felon.  You'll always unfortunately be

16  an ex-felon, okay.  But in the free world that's

17  not so bad.  So do you have any questions of me

18  or us?

19      INMATE HERNANDEZ:  No questions.

20      PRESIDING COMMISSIONER SAWYER:  Okay.

21  Counsel?

22      ATTORNEY TARDIFF:  I have none.

23      PRESIDING COMMISSIONER SAWYER:  Okay.

24      ATTORNEY TARDIFF:  Thank you.

25      PRESIDING COMMISSIONER SAWYER:  Your

26  welcome.  Oh, now, as was, as you've heard

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 16 06/08/06

65

```
 1    before, this decision goes to the Decision
 2    Review Unit at the Board of Prison (sic)
 3    Hearings.  That's our legal folks who will look
 4    over and make sure all of our calculations are
 5    correct and we've done everything that we need
 6    to do by law and regulation.  Then it's sent
 7    over to the Governor's Office.  And the Governor
 8    and his staff, his staff will make
 9    recommendations to him whether to let it go or
10    let it happen or reverse it.  If it is reversed
11    you'll be notified and then it comes back to the
12    Board.  There's 12 commissioners, 11 other
13    commissioners and myself in the state.  We meet
14    once a month and we look at anything the
15    Governor has concerns about.  We meet and
16    discuss those.  And we can send it back from
17    that meeting to the Governor and say we don't
18    agree with you Governor.  Which we do, which we
19    do often.  So it's, we send it back and forth.
20    The Governor can do what he wants at that point.
21    He can reverse your decision.  Let me, let me
22    tell you, if for some reason something happens
23    at the state level and it comes back it's
24    reversed don't get discouraged.  Don't get
25    discouraged.  Sometimes that's not officially a
26    test but that is a test.  That's testing you to
27    HECTOR HERNANDEZ  D-33689  DECISION PAGE 17 06/08/06
```

```
 1   see if you are really going to be able to put up
 2   with some stress.  Having a date, getting it
 3   reversed, oh, so, you know, your character will
 4   show at that point.  You don't want to get any
 5   115's between now and ever.  You get a 115 or
 6   have a problem along the line, I'd also advise
 7   you not to, try to keep it under your hat.  It's
 8   not easy to do I know.  The rumors run around
 9   here all the time.  But try to keep it under
10   your hat as much as you can so nobody gets
11   jealous.  And --
12        DEPUTY COMMISSIONER ROTHLISBERGER:  Tries
13   to sabotage you.
14        PRESIDING COMMISSIONER SAWYER:  Yes
15   sabotage your date.  Getting you into a mutual
16   combat --
17        DEPUTY COMMISSIONER ROTHLISBERGER:  And
18   they will.
19        PRESIDING COMMISSIONER SAWYER:  -- or
20   something like that.  You know how to handle
21   that.  You've never had a mutual combat, okay.
22   So what we're saying is walk on eggs for a
23   while.  You'll probably hear in about three or
24   four months.  By law they're supposed to let you
25   know within 120 days but sometimes that doesn't
26   happen because we're doing an awful lot of
27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 18 06/08/06
```

67

1  hearings now.  We're really cranked up on

2  hearings.  And I can tell you that out of the

3  dates I've given I've had the Governor reverse

4  two of them and I won both of those at the Board

5  meeting.  And I've given a number of dates.  So

6  I've got -- He's letting mine go through for

7  some reason or another.  Some people get more.

8  What can I say?  So we're optimistic for you

9  Mr. Hernandez.  We're hoping that you get your

10  date and go live with your mom and dad and your

11  sister and you reunite yourself with your

12  children and your grandchildren and live a

13  successful life.  We've got all the confidence

14  in you.  We don't think we'll be reading about

15  you in the newspaper doing something bad.  Maybe

16  we'll be reading some of your literature.

17      **INMATE HERNANDEZ:**  Hopefully yes.

18      **PRESIDING COMMISSIONER SAWYER:**  Okay.

19      **INMATE HERNANDEZ:**  Absolutely.

20      **PRESIDING COMMISSIONER SAWYER:**  All

21  right, that concludes -- Do you have anything

22  you'd like to say?

23      **DEPUTY COMMISSIONER ROTHLISBERGER:**  No,

24  just to wish you all the best of luck.

25      **INMATE HERNANDEZ:**  Thank you very much.

26  //

27  **HECTOR HERNANDEZ  D-33689  DECISION PAGE 19 06/08/06**

68

1          **DEPUTY COMMISSIONER ROTHLISBERGER:**    Carry

2    your message always.

3          **PRESIDING COMMISSIONER SAWYER:**    Okay,

4    we're 17 minutes past one and that concludes

5    this hearing.

6                          --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE GRANTED**                    OCT 16 2006

24    **THIS DECISION WILL BE FINAL ON:**_____

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    HECTOR HERNANDEZ  D-33689  DECISION PAGE 20 06/08/06

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
~~LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION~~
GRANT PAROLE

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

[ ] **PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison...................................................... _316_ Months

| Case # | Count # | Offense |
|---|---|---|

B. Time for using a weapon.................................... + _24_ Months

C. Time for other crimes.................................... + _____ Months

| Case # | Count # | Offense | Months |
|---|---|---|---|

| Case # | Count # | Offense | Months |
|---|---|---|---|

| Case # | Count # | Offense | Months |
|---|---|---|---|

D. Total term.............................................. = _240_ Months

E. Time credit from _____ to _____ - _60_ Months
        (Life term start date)  (Date of hearing)

F. .......................................................... = _180_ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

| HEARING PANEL |
|---|

Name _____    Date _____

Name _____    Date _____

Name _____    Date _____

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|

**BPT 1005(a)(REV. 01/02)**

Distribution: White –C. File
Canary- BPT
Pink- Prisoner

69

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 68, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
HECTOR HERNANDEZ, CDC NO. D-33689, on JUNE 8,
2006, and that the foregoing pages constitute a
true, complete, and accurate transcription of
the aforementioned tape to the best of my
ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated July 3, 2006, at Sacramento County,
California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT    "2"

HECTOR HERNANDEZ

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff

ACTION NUMBER 336275-3

vs.

REPORT AND RECOMMENDATION OF THE PROBATION OFFICER

HECTOR HERNANDEZ            Defendant

Probation No.  82028
CII  A05400164    FBI  0827976V3
///SO  139961    DA  85S0435
Race:  Mexican

TO THE HONORABLE JUDGE OF THE ABOVE ENTITLED COURT:

Pursuant to the statutes and at the direction of the court, your probation officer hereby respectfully submits the following report and recommendation as to the above named defendant, after ( ) conviction in court trial (X) verdict in jury trial ( ) plea: Guilty

| | |
|---|---|
| 942 Edgar Street, Sanger, CA | PC 187; Second Degree Murder w/PC 12022.5, |
| Address | Charge(s)    Use of Gun |
| 27 (2-28-59) /  518 days | August 15, 1985 |
| Age            Time in Custody | Date of Offense |
| Lucile Wheaton, Public Defender | September 5, 1985 |
| Attorney | Date of Arrest |
| June 10, 1986            8:30 a.m. | John Fitch            Twelve |
| Date of Sentencing       Time | Judge            Dept. |

BRIEF SUMMARY OF FACTS:

On August 15, 1985, defendant Hernandez shot and killed Silvestere (Odulio) Bustos.

NOTE:  Defendant Hernandez was, on October 23, 1984 under Fresno Municipal Court #675358, placed on two years formal probation on misdemeanor violations of CVC 23152a, Driving while Intoxicated, H&S 11550a, Under the Influence of a Controlled Substance, and PC 148, Resisting Arrest.

On May 13, 1986, defendant Hector Hernandez was found guilty by a jury trial in Department Twelve of the Fresno County Superior Court of a felony violation of Section 187, Murder in the Second Degree, as charged in Count One of the First Amended Information. Additionally, the jury found the defendant guilty of an enhancement within the meaning of Penal Code Section 12022.5, Personal Use of a Gun, as charged within Count One.

A referral was then directed to the probation officer for the preparation of a presentence investigation report, and sentencing was calendared for June 10, 1986 at 8:30 a.m. in Department Twelve of the Fresno County Superior Court. The probation officer was instructed to file a written report on June 7, 1986.

## CIRCUMSTANCES OF THE OFFENSE

The defendant was convicted by jury trial on May 13, 1986, and the information presented to the jury which resulted in the conviction of the defendant was not made available to your officer. Therefore, the circumstances of the offense were obtained from the preliminary hearing transcript, the Fresno County Sheriff's Department Crime Report, Case #85-16278, and from the Fresno County District Attorney's file #85S0435:

On August 15, 1985 at approximately 3:56 a.m., Officer F. Lopez was dispatched to 2448 South Eleventh #4, Calwa, regarding an injured person and there met with four Mexican males and one female who were standing outside the residence. The officer entered the front living room area of the apartment and observed a Mexican male subject lying on the living room floor with a large pool of blood under the chest and face area. Paramedics and American Ambulance personnel arrived at the scene and advised Officer Lopez that the victim was deceased. The victim was subsequently identified as being Silvestere Odulio Bustos. Subsequent investigation determined that the victim had been shot at close range by a shotgun and at the time that he was shot, the victim was wearing a watch, two gold-colored rings on each hand and had his car keys and currency in his pocket. Officers made contact with Eleno Santa Maria Mojica, Genaro Flores, Doroteo Juarez, Enrique Casias and Mary Lopez.

Enrique Casias was given immunity by the prosecution and then testified that he had been living with the victim at the apartment on South Eleventh Street for approximately one month, that he knew the man killed as being Odulio Bustos with a nickname of "Lolo", and that victim Bustos was the one renting the apartment. Casias testified that at 3:00 a.m. on August 15, 1985, there was a knock on the door, at which time Casias looked out the window and observed defendant Hernandez, who asked Casias if he "had some" (meaning heroin) and then gave Casias $20.00. Casias said he then told defendant Hernandez, "Let me see if my friend has some," referring to victim Bustos. Casias was getting "pieces" from victim Bustos' boots when the defendant

kicked open the door ● ..ered with a shotgun and sta ● u, "Give me the gun."
Victim Bustos was asleep, however, the defendant again repeated, "Give me the
gun." The defendant also asked victim Bustos for the "chiva", which means
heroin. As soon as defendant Hernandez said, "Give me the gun," the defendant
shot Bustos. Casias stated that defendant Hernandez had pointed the gun at
Casias first and as Casias ran backwards with his hands up and stayed in the
background, he heard the gun go off. Casias then ran and hid in the next room
with his friends. Casias stated that Bustos had been sleeping on the sofa
facing up with a gun tucked into and sticking from his waistband and that
defendant Hernandez did not get any heroin that night because Casias did not
have time to give it to him. Casias further related that victim Bustos only
had two or three pieces in his boot that he sold for $10.00 and that Bustos
told Casias that if someone came to the home and the victim was asleep, Casias
could obtain two or three pieces from victim Bustos' boot.

Witness Casias testified that when Bustos went to sleep, he would put two or
three $10.00 pieces into his boot and as Casias was bending over the victim on
the night of the instant crime, the defendant came in with his weapon and
said, "la chiva". Witness Casias had seen the defendant there at the house
three or four days before and had seen the defendant at the apartment for a
total of four or five times. Casias testified he had sold drugs to the
defendant for Bustos at those times but denied knowing that it was heroin that
he was selling and that Bustos had never given Casias any money for having
sold the "chiva". Casias testified that he and his friends continued to hide
in the bedroom for about ten minutes, then after being convinced that the
defendant left the apartment telephoned the authorities.

Witness Eleno Santa Maria Mojica told the officers and later testified that he
had been staying at the house of the victim approximately three days prior to
the shooting. On the night of the instant crime, while sleeping on the floor
in the kitchen, he heard an argument and sat up. Mojica testified that the
defendant pointed a gun at Mojica and said, "Don't move." At the sound of the
shot, Casias and Mojica ran and remained in a bedroom. Mojica also testified
that he had been awakened by people talking, however, was not sure that an
argument had ensued.

An additional witness, Doroteo Juarez, told the officers and later testified
that he was living at another house, however, on the night of the instant
crime spent the night at victim Bustos' residence and was sleeping in the
kitchen when he heard a knock on the door and then saw defendant Hernandez
come into the residence with a shotgun. He testified that before the
defendant shot Bustos, defendant Hernandez said, "Give me the gun" twice to
victim Bustos. He testified that when the defendant said that, victim Bustos
got up and pulled the gun from his waistband, at which time defendant
Hernandez took the gun from the victim, and witness Juarez ran and hid.

Two unexpended shotgun shells were observed near the victim's left knee, and a
partially filled box of nine-millimeter ammunition was on the floor near the
victim's head. A smear of possible blood was located on the inside windowsill
on the west window and on a chair outside of the door which had been entered.
Each item was taken as evidence, and it was believed that the defendant had
left the residence through the window rather than the door. Foot tracks found

outside indicated that one suspect ran northbound through an alley to an intersecting alley, then ran westbound through the alley to Tenth Street. The foot tracks were followed southbound on Tenth to the intersection of Burns. At that location, a small piece of chewed gum was observed where the suspect possibly stopped for a short time. The gum was also taken as evidence, however, the shoe tracks could not be followed from the intersection. Three shoe tracks were additionally found near the victim.

On August 15, 1985 at approximately 7:00 a.m., Detective J. Rascon interviewed witness Maria Lopez, who was statedly a friend of victim Bustos, and to the other witnesses in the case who had contacted her at her residence. Witness Lopez advised the officer that from the description provided by the witnesses, she believed the suspect to be a subject she knew from Sanger, however, was unable to remember the name. She further related that she frequented the victim's residence, knew the victim was dealing narcotics and had seen the subject from Sanger at the victim's residence on numerous occasions buying drugs. Lopez stated that in fact a few days prior to the shooting, she heard the victim and the suspect arguing at the victim's residence over money and later told the officer that the suspect's name was Hector Hernandez and identified a photograph as being defendant Hector Hernandez. On August 15, 1985, witness Casias, who had had prior contacts with the defendant as he had sold the defendant heroin on five occasions face-to-face, was shown a single photograph by Detective Rascon of suspect Hernandez, at which time Casias identified defendant Hector Hernandez as the person who shot and killed victim Bustos. On August 15, 1985, witness Flores was provided with three photograph albums of booking photographs from the Sheriff's Department booking files, at which time he selected the photograph of defendant Hector Hernandez as the subject from Sanger who was constantly buying narcotics from victim Bustos.

On September 5, 1985 at approximately 2:25 p.m., officers from the Fresno County Sheriff's Department were conducting a surveillance on the residence of 1315 Faller in Sanger when a 1976 dark blue Ford T-Bird arrived at the residence, which was a vehicle occupied by Fidencio Martinez, who then entered the residence and exited along with Juanita Hernandez, wife of the defendant. Both Martinez and Hernandez proceeded out of Sanger and went to the area of Chestnut and King Canyons Avenue, where Hernandez exited the vehicle, used the telephone located there and then she and Martinez drove to the area of Maple and Shields Avenue. Juanita Hernandez then exited the vehicle and made contact with a male subject standing near a convenience store located at the northeast corner of Maple and Shields, who then got into the vehicle, as did Juanita Hernandez. The vehicle was followed to the area of Barton and Nevada, where a felony vehicle stop was conducted after defendant Hector Hernandez had been identified as being the wanted suspect. All occupants were arrested and taken into custody.

Defendant Hernandez was subsequently Mirandized and after waiving his rights, he agreed to talk to Detectives Trevino and Morrison, however, denied knowing the victim, having purchased heroin from the victim or having committed the instant crime. He then invoked his right to have an attorney, and the interview was terminated.

DEFENDANT'S STATEME

As of the date of dictation, defendant Hernandez had failed to supply your officer with a defendant's statement. However, during an interview with the defendant at the Fresno County Jail on May 21, 1986, the defendant stated that the victim was his connection for heroin and that he had thought for some time that the victim was "pinching" on his buys and that he had talked to him before about it prior to the commission of the instant crime. The defendant stated to your officer that he had been involved in at least two arguments with the victim because of his shorting the supply of purchased heroin. The defendant made no other statements regarding the instant crime.


VICTIM STATEMENT AND ASSESSMENT

A referral has been directed to the Victim Services Unit by your officer in an attempt to have contact made with the victim's mother, who is said to be residing in Mexico. Their report should be provided to the Court by the date of sentencing.


STATEMENT OF THE DISTRICT ATTORNEY

A letter requesting a statement of views has been directed to the Fresno County District Attorney's Office. As of the date of dictation, no reply has been received at the Probation Office. Should one be received prior to sentencing, it will be attached to the report for the Court's consideration.


DEFENSE STATEMENT

A statement of views has been received from the Fresno County Public Defender's Office. It has been read and considered and is attached to this report for the Court's consideration.

Attached for the Court's consideration is a letter from the Defense Attorney, dated December 30, 1985.


RESTITUTION

Restitution may be an issue in this matter due to the fact that the victim's body was transported to Mexico for burial.


PRIOR JUVENILE RECORD

The following information was obtained from the defendant's prior juvenile record:

7-31-70    Referred to informal probation without petition by probation officer: Section 602: Burglary, until January 31, 1971.

The circumstances of the above offense were that on July 28, 1970, defendant Hernandez at approximately 5:30 p.m. broke into the office of Dr. R. Lee at Tenth and "N" Streets in Fresno and from there removed $80.00 in cash.

10-5-70    Petition Filed: Section 602: Burglary.

10-23-70    Hearing: Allegations true; placed on probation without wardship until April 23, 1971.

The circumstances of the above offense were that on September 22, 1970, the defendant entered the residence located at 15570 East Anadale, Sanger, and from there removed property valued at approximately $515.00. The property included a .410 shotgun, a .20 gauge shotgun, a .218 caliber rifle, a .22 caliber pistol, a Winchester rifle, a .22 semiautomatic rifle, a .22 caliber bolt-action, single shot rifle, a Polaroid camera and a radio.

5-19-71    Order: Dismissed.

4-22-71    Petition Filed: Section 602: Burglary.

5-19-71    Hearing: Adjudged ward of the Court, on probation until further order of the Court; released to parents.

The circumstances of the above offense were that on April 7, 1971, the defendant entered the Mission Baptist Church at 1417 "J" Street in Sanger and from there removed $10.50.

9-23-71    Petition Filed (Subsequent): Section 602: Petty Theft.

10-14-71    Hearing: Allegations true; remain ward of the Court, on probation until further order of the Court; pay restitution; work program at Sanger Police Department.

The circumstances of the above offense were that on July 26, 1971, defendant Hernandez in association with the co-defendant stole approximately $190.00 belonging to Luallen's 76 Service Station at 466 Academy in Sanger, California. As a condition of probation, the defendant was ordered to work six weekends at the Sanger Police Department and was placed on intensive supervision and ordered to pay restitution through the probation officer.

6-29-72    Petition Filed (Subsequent): Section 602: Burglary.

7-18-82        Hearing: ...egations true as amended; ... ward of the Court, on proba...n until further order of the ...ourt; commit to Youth Center, suspended.

               The circumstances of the above offense were that on June 26, 1972 at approximately 10:15 p.m., the defendant and a co-defendant were found inside the closed business of Padilla's Market at 85 Acacia Drive in Sanger.

10-27-72       Petition Filed (Subsequent): Section 602: Burglary.

11-16-72       Hearing: Remain ward of the Court, on probation until further order of the Court; commit to Youth Center; detain Juvenile Hall pending transfer.

               The circumstances of the above offense were that on October 25, 1972, the defendant entered the residence located at 1131 "N" Street in Sanger and from there removed a purse from a victim which contained approximately $20.00. The defendant was committed to the Fresno County Youth Center for a period not to exceed 180 days.

10-31-73       Petition Filed (Subsequent): Section 602: Burglary.

11-6-73        "A" Petition Filed: Section 602: Burglary.

11-28-73       Disposition Hearing: Remain ward of the Court; commit C.K. Wakefield School; detain Juvenile Hall pending transfer.

               The circumstances of the above offenses were that on October 25, 1973, the defendant entered the residence at 1201 Rawson, Sanger. Further investigation determined that no property was lost as the defendant and a co-defendant were discovered during the commission of the crime and had fled. The circumstances of the "A" petition were that on November 5, 1973, the defendant in association with a co-defendant removed a hasp and lock from a garage located at 1211 "P" Street, Apartment "A", in Sanger, where the defendant was observed and subsequently apprehended. On November 28, 1973, after both petitions were found true, the defendant was committed to the C.K. Wakefield School for a period not to exceed 180 days, however, on May 24, 1974, the Court ordered that the commitment to C.K. Wakefield be terminated. The defendant was continued on probation until further order of the Court.

11-6-74        Petition Filed (Subsequent): Section 602: Joyriding; Count Two: Section 602: Carrying a Concealed Firearm.

11-7-74        Detention Hearing: Allegations true Count Two; detained Juvenile Hall pending adjudication on Count One November 19, 1974.

11-19-74    Adjud:    and Disposition Hearing    allegations true both
counts.

12-3-74    Disposition Hearing:  Remain ward of the Court, in charge of
probation officer; commit to California Youth Authority; County
pay maintenance; detain Juvenile Hall pending transfer by Fresno
Sheriff's Office.

The circumstances of the above offenses were that on November 4,
1974, the defendant in association with an unidentified person
took a 1955 Chevrolet pickup without the consent of the owner.
Additionally, on November 5, 1974, the defendant was found to be
in possession of a firearm with a barrel of less than twelve
inches without having a license to carry such a firearm.

11-12-75    Petition Filed (Subsequent):  Section 602:  Armed Robbery; Count
Two:  Section 602:  Resisting an Officer.

11-13-75    Detention Hearing:  Count Two true; detain Juvenile Hall pending
adjudication.

11-25-75    Adjudication Hearing:  Count One dismissed; detain Juvenile Hall
pending disposition on Count Two.

The circumstances of the above offense were that at
approximately 4:50 p.m. on October 22, 1975, Mrs. Lozada along
with Mr. Higaneda and Mr. Gutierrez arrived at the Sanger Police
Department and contacted Officer Ramirez and Sergeant Padilla.
Mr. Gutierrez reported that on October 21, 1975 at approximately
9:30 p.m., he was home cleaning the dishes when six young
subjects came into his home, told him that he owed someone some
money and was asked by the suspects where his check was.
Gutierrez stated three of the suspects held him at knifepoint
while they took his wallet, and then three suspects had gone
into the bedroom where Mr. Higaneda was lying in bed. Gutierrez
stated that the three suspects who entered the bedroom were
armed with two pipes and a large stick.  Mr. Higaneda stated
that the three suspects who entered his bedroom had ransacked
his room and had found his wallet, which contained $246.00.
After the suspects found his wallet, one of them had struck him
on the head with a pipe.  After he was struck with the pipe, Mr.
Gutierrez told the suspects not to hit him.  At that point, one
of the suspects struck Gutierrez in the left eye with his closed
hand.  Higaneda stated that one of the suspects had placed a
knife to Mr. Gutierrez's neck and had told him to shut his mouth
or he would "get it".  Higaneda stated that the suspects had
taken the money from him and Mr. Gutierrez and had left.
Gutierrez stated that the suspects had stolen approximately
$79.00 from his wallet.

11-26-75    Petiti~~c~~ ●54-A Filed:  Section 602: ● Robbery.

12-22-75    Petition 38154-B Filed:  Section 602:  Armed Robbery; Count
            Two:  Section 602:  Assault with Deadly Weapon.

12-30-75    Adjudication Hearing:  Allegations true "A" petition and Count
            Two "B" petition; Count One in "B" petition untrue.

1-12-76     Disposition Hearing:  Remain ward of the Court, in charge of
            probation officer; recommitted to California Youth Authority;
            detain Juvenile Hall pending transfer by Fresno Sheriff's Office.

            On December 22, 1975, a Supplemental "B" Petition was filed
            alleging Assault with a Deadly Weapon.  The circumstances of the
            offense were that on October 27, 1975, the defendant returned to
            the residence of Mr. Higaneda and stabbed him on the left thigh
            with a knife.  On December 30, 1975, a hearing was held, at
            which time the Armed Robbery in the "A" petition was found true,
            and the Assault with a Deadly Weapon in the "B" petition was
            found true.  A dispositional hearing was calendared for January
            12, 1976.  On that date, the defendant was committed to the
            California Youth Authority.

            On February 20, 1976, a rehearing was held in Department Eight
            of the Fresno County Superior Court, at which time defendant
            Hernandez was again committed to the California Youth Authority
            and was ordered detained in the Fresno County Juvenile Hall
            pending transfer to the Fresno County Sheriff's Office.  On
            February 23, 1976, the defendant was successful in escaping from
            the Fresno County Juvenile Hall.  Subsequent to the defendant's
            arrest on the instant offense, he appeared in the Fresno County
            Juvenile Court, at which time he was remanded to the custody of
            the Fresno County Sheriff awaiting transfer to the California
            Youth Authority per orders of the Juvenile Court, dated January
            12, 1976 and February 20, 1976.

PRIOR CRIMINAL RECORD

The following is the defendant's prior criminal record as provided by the
California Identification and Investigation Bureau and from the United States
Department of Justice:

| DATE | ARRESTING AGENCY | CHARGE | DISPOSITION |
|---|---|---|---|
| 12-2-74 | CYA Perkins | Juv Tk Veh Tmp Use<br>Carry Concl Wpn on<br>Person/Vehicle | 7-29-75: paroled |

-9-

3-13-78      PD San.  ⬤             H&S 11350, Pos ⬤  5-16-78 Fresno SC
                                    Narc Contrld Sub    #228480-0; comm
                                                        CYA

The circumstances of the above offense were that on March 12, 1978, defendant
Hernandez was booked in to the Sanger Police Department on other charges and
on March 13, 1978, the defendant's property was searched.  Found therein was
aluminum foil containing .32 grams of heroin.

3-12-78      PD Sanger              PC 245a, Asslt      5-8-78 Sanger JC
                                    with Deadly Wpn     #C-879, PG PC 246
                                    PC 246              1 yr BP; 364 ds
                                    VC 12025            w/cred 57 ds
                                    VC 12031

The circumstances of the above offense were that on March 12, 1978 at
approximately 9:46 p.m., Sanger Officers were dispatched to the area of Faller
and Eleventh Street regarding subjects in a white vehicle shooting firearms in
the area.  There they observed a white 1965 Pontiac and saw a flash of a
weapon and three explosions as the vehicle slowly turned southbound onto
Faller Avenue.  The shots came from the vehicle and from the direction of the
muzzle flashes, the officers felt they were directed in an easterly direction
towards Eleventh Street.  The officers pursued the vehicle, stopped it and
arrested the driver, Jose Ramirez, and the passenger, Hector Hernandez, who
was holding a handgun in his right hand at the time of the vehicle stop.  Both
subjects then ran from the officers and after an extensive chase with several
officers in pursuit, defendant Hernandez was found hiding in a large dog
house.  The handgun was subsequently located in one of the yards through which
the defendant had run.  When the defendant was en route to the police vehicle,
he kicked out at a bystander and struck him in the head with the tip of his
shoe.  The defendant was then placed into a police unit and while en route to
the police department, defendant Hernandez kicked out the rear window of the
police unit.

NOTE:  On April 12, 1978, the defendant appeared in the Sanger Justice Court
and entered a guilty plea to a violation of Health and Safety Code Section
11350a, and the matter was certified to the Fresno Superior Court under
Information #22848-0.  The change-of-plea transcript indicated that upon the
defendant's plea of guilty to Criminal Complaint #C-857 and further, upon the
defendant's plea of guilty to Count One of Criminal Complaint #C-850, alleging
a misdemeanor violation of Penal Code Section 246, the following agreements
were made with the District Attorney:  That a motion would be made to dismiss
Count Two of Criminal Complaint #C-850, alleging a violation of Penal Code
Section 245; Count Three, alleging a violation of Penal Code Section 594c; and
Count Four, alleging a violation of Penal Code Section 148.  The District
Attorney agreed further to motion the Court to dismiss Criminal Complaint
#C-830, alleging in Count One a violation of Penal Code Section 245a and in
Count Two, a violation of Penal Code Section 415.  The Court granted the
motions of the District Attorney, and no other promises or agreements were
made in regard to sentencing under Fresno Superior Court #22848-0.

-10-

| 3-14-79 | CYA Pe &A 09111 | 1) H&S 11350, Narc Contr Subst | 12-17-79, paroled 2-16-82, discharged |

Your officer notes that on May 16, the defendant was ordered committed to the California Youth Authority under Action #22848-O. However, on May 8, 1978, the defendant was ordered to serve one year in custody of the Fresno County Sheriff on a misdemeanor violation of Penal Code Section 246. In a letter dated December 15, 1978, the Youth Authority reported to the Court that it had been over six months since the defendant's case was referred by the Court to the Youth Authority and that he had never been delivered to them. A check with the Fresno County Jail revealed that the defendant had timed out on the aforementioned Sanger Justice Court case on January 9, 1979 and was then presently pending transportation to the California Youth Authority. On February 23, 1979 under Fresno Superior Court #228480-O, the Court ordered the defendant recommitted to the California Youth Authority.

| 10-6-81 | CAUS MO1OO USM LA, CA 8112-1006 | 1) Acc Aft Fact, 18USC3 2) Conc Pers Frm 18USC1701 | 12-8-81, PG bth cts; sent 179 ds ea ct to srvd consec |

| 2-22-82 | TXO71O17C Latuna Fed Corr 74322-012 | 1) Acc Aft Fact 2) Conc Pers Frm Arrest | 7-23-82, discharged; rel exp to comm in Sanger, CA |

The circumstances of the above offense were that from November 16, 1980 to December 1, 1980, defendant Hernandez, having knowledge that Jose DeLeon was under judgment of conviction and a ten-year prison sentence and knowing that DeLeon was a fugitive from said commitment, aided and assisted DeLeon from being apprehended by the U.S. Marshall's Office. Further information was developed by the U.S. Marshall's Office to the effect that during November of 1980 through December of the same year, defendant Hernandez rented a house trailer in the rural outskirts of Fresno and was told by the landlord that Jose DeLeon also resided in that trailer for approximately two to three weeks. In September of 1981, the U.S. Marshall's Office centered their investigation in the southern California area as they had received information to the effect that defendant Hernandez as well as Jose DeLeon were residing in a religious retreat in San Bernardino County. On October 6, 1981, the U.S. Marshall's Office with assistance from numerous law enforcement agencies converged on the religious retreat called Victory Outreach located in a deserted, unpopulated area of San Bernardino and arrested both defendant Hernandez and Jose DeLeon.

| 10-26-84 | SO Fresno | 1) H&S 11550(a), Use/Und Inf Contr Substance 2) PC 148, Resist Officer | 10-23-84 MC Fresno #675358; PG H&S 11550; 2 yrs FP; 180 ds ss exc 90 w/31 ds cred; DWI; no alc; $110 fn ss; OAL; PG VC 23152a; 180 das ss exc 90 conc; $673 fn ss exc $130 |

-11-

The circumstances of ● above offense were that o● ebruary 10, 1984, a California Highway Patrolman was southbound on Belmont Avenue when he observed a vehicle being driven in a slow manner and weaving. After making a traffic stop and contacting the driver, who was defendant Hernandez, it was noted that Hernandez was unsteady on his feet, his eyelids were drooped, and the officer noted an injection site on the defendant's left arm which had scarring. His right arm had several non-hygenic sites, one of which was still bleeding. The officer questioned the defendant about his drug usage, at which time the defendant stated he started on the Methadone Program that day. The officer then had the passengers in the vehicle get out and as they were so doing, the defendant ran. The officer did not chase the defendant, however, filed a complaint against him.

NOTE:  Your officer notes that the defendant has outstanding failures to appear under Fresno Court #644637 and 674429 for CVC 12951a (two counts) and VC 5200. Additionally, the defendant has a failure to appear under Sanger Court #10680 for VC 12951a and VC 27360a.


PROBATION HISTORY

The defendant's juvenile probation history has been covered under that section of this report. The following information was obtained from the defendant's adult probation file:

On May 8, 1978, defendant Hernandez was placed on one year bench probation on a misdemeanor violation of PC 246 under Sanger Justice Court #C-879 and was ordered to spend 364 days in custody with credit for time served of fifty-seven days. On October 23, 1984 under Fresno Municipal Court #675358, the defendant was placed on two years formal probation on a misdemeanor violation of H&S 11550a, CVC 23152a and PC 148. The defendant was ordered to spend 180 days in custody, all of which was suspended except ninety days, with thirty-one days credit for time served for the H&S 11550a violation. In addition, he was to enroll himself in the DWI Program, was ordered not to consume alcohol, to pay a fine of $110.00, which was suspended, and ordered to obey all laws. On his violation of CVC 23152a, the defendant was ordered to spend 180 days in jail, all of which was suspended except ninety days which was to run concurrent with the time being served on the H&S 11550a violation. The defendant was ordered to pay a fine of $673.00, all of which was suspended with the exception of $130.00. On May 14, 1985, the defendant's probation was revoked and a bench warrant issued. On June 10, 1985, the defendant's probation was reinstated with the same terms and conditions.

On August 27, 1984 under Fresno #714123, the defendant was placed on two years bench probation on a misdemeanor violation of CVC 14601l.

## PAROLE HISTORY

On December 28, 1974, the defendant was committed to the California Youth Authority for Joyriding and Carrying a Concealed Weapon and was paroled on July 29, 1975. On January 12, 1976, the defendant was committed to the California Youth Authority on petitions alleging Assault with a Deadly Weapon and Armed Robbery, however, on February 20, 1976, a rehearing was held in Department Eight of the Fresno Superior Court, at which time the defendant was again committed to the California Youth Authority. The defendant was ordered detained in the Fresno County Juvenile Hall pending transfer by the Fresno County Sheriff's Office. On February 23, 1976, the defendant was successful in escaping from the Fresno County Juvenile Hall. On May 16, 1978 under Fresno County Superior Court #228480-0, the defendant was committed to the California Youth Authority on a felony violation of H&S 11350a, however, due to the fact that he was on May 8, 1978 under Sanger Case #C-879 ordered to spend 364 days in custody at the Fresno County Jail on a misdemeanor violation of PC 246, the defendant was on February 23, 1979 recommitted to the California Youth Authority under Superior Court #22848-0 and was on December 17, 1979 paroled. On February 16, 1982, the defendant received a dishonorable discharge as a result of his having been committed to federal prison on February 22, 1982 for Harboring a Federal Fugitive and Accessory After the Fact. The defendant was discharged from federal prison on July 23, 1982.


## SOCIAL HISTORY

The following information was obtained from the defendant during an interview with your officer at the Fresno County Jail on May 21, 1986:


## FAMILY HISTORY

Hector Hernandez, age twenty-seven, was born February 28, 1959 in Fresno, California, where he has lived most of his life. The defendant lived last with his parents at 942 Edgar in Sanger, California.

The defendant is one of eight children born of the marriage between Guadalupe Hernandez and Dolores Mejia. The natural father is employed as a machinist, and the natural mother is employed by the Barr Packing Shed in Sanger. The defendant has six brothers and one sister, and the defendant is the seventh child.

The defendant's brother, Guadalupe, Jr., has for the past five years been in Soledad State Prison on a charge of murder. According to the defendant, he was ordered to serve twenty-nine years to life. No other history of family criminality or mental illness was noted by the defendant.

The defendant completed the tenth grade at Sanger ____ School in 1975 and obtained his G.E.D. while incarcerated in federal prison in 1982. The defendant has received additional vocational training at the Valley Technical and Trade School in Fresno during 1980 or 1981 in welding and stated the course consisted of three months, which he successfully completed. The defendant has never been in any branch of the United States military, is involved in no community organizations, however, irregularly attends the Pentecostal Church. The defendant lists as his recreational interests reading, handball, jogging, lifting weights, calisthenics, music, camping, television, parks, picnics and spending time with his family.


## MARITAL HISTORY

Hector Hernandez married Janie Ramirez on October 3, 1982 in San Bernardino, California by whom four children have been born: Christina (age 5); Rebecca (age 4); Corina (age 2); and Hector, Jr. (age 6 months). The defendant's wife and children currently reside with her family in Sanger and are supported by funds from the Aid to Families with Dependent Children and food stamp programs. The defendant related that he was having problems with his wife prior to the commission of the instant crime but that his marriage was intact.


## EMPLOYMENT HISTORY

The defendant was last employed as a field laborer from June, 1985 through August 1985 for a man named "Polo", who was said to be a field contractor. The defendant also during that same period of time was employed by another contractor named Esteban. The defendant stated that he has done mostly field work, some gardening, packing shed and agricultural ranch work.


## FINANCIAL STATUS AND REPORT FEES

Attached hereto and to be considered a part of this report unless waived is the form containing a recommendation in regard to Presentence Investigation Report fees, pursuant to Section 1203.1b of the Penal Code.

The defendant stated that he has no assets, however, that he owes fines in Sanger for traffic matters.


## USE OF ALCOHOL/CONTROLLED SUBSTANCES

The defendant drinks four or five beers or wine every other day and on weekends drinks heavier. The defendant does not consider himself to have an alcohol problem and stated that he first began using alcohol at the age of twelve years. The defendant denies having received any type of treatment for alcohol.

The defendant last used heroin approximately nine months ago, stating he was using shortly before and after the commission of the instant crime. The defendant denies that he was under the influence of any drug when he committed the instant crime, however, estimated that he had a daily heroin habit of $20.00 to $40.00 for the past two years. The defendant was involved in the Methadone Detox Program for twenty-one days in 1985 and stated he went three or four times and completed their program. The defendant has smoked marijuana on an average of once a day since he was twelve years of age. He tried PCP four to five times when he was approximately sixteen years of age. During the same period, the defendant also experimented with LSD. The defendant last used cocaine in August of 1985, stating he used "a few bags", and first used cocaine in 1981. As a youth, the defendant used paint "a lot". Defendant Hernandez stated that, "I did crank for awhile", for about three months in 1979 on a daily basis but not since that date.

## PSYCHOLOGICAL OR MEDICAL HISTORY

The defendant considers himself to be in fair health and currently has venereal disease for which he is receiving treatment while incarcerated. Defendant Hernandez related that he has had venereal disease for about two years and that he has received treatment on an off and on basis during that time. The defendant has also been obtaining counseling from a psychologist while in jail due to a condition of being unable to sleep, depression and anxiety. The defendant was, during his current incarceration, taking the drugs Synaquat and Milloril, however, currently receives no type of medication.

Attached for the Court's consideration is a letter from Dr. Howard B. Terrell, dated January 13, 1986.

## STATEMENT OF REFERENCES AND INTERESTED PARTIES

At the time of dictation, the defendant had failed to supply your officer with a character reference form.

## CUSTODY

Defendant Hernandez was arrested on the instant crime on September 5, 1985 and has remained in custody since that date. Therefore, by the date of sentencing on June 10, 1986, the defendant will have served 279 days, is entitled to good time credits of 139 days, for total confinement credits of 518 days.

## FACTORS AFFECTING PROBATION

Defendant Hernandez is statutorily ineligible for probation under Penal Code Section 1203.06(a)(1)(i).

(The recommended application of the following factors and circumstances is set forth in the Conclusion section of this report.)

## CIRCUMSTANCES IN MITIGATION

Your officer finds no factors in mitigation relating to the crime as set forth in Rule 423a.

Under Rule 423b, facts relating to the defendant, your officer notes that the defendant was suffering from a mental or physical condition that significantly reduced his culpability for the crime due to his stated use of the drug heroin one day prior to the commission of the crime (Subsection 2).

## CIRCUMSTANCES IN AGGRAVATION

Regarding factors in aggravation relating to the crime as set forth in Rule 421a, your officer notes that the victim was particularly vulnerable in that the defendant entered the victim's home and shot him while he was lying on his couch and awakened by the defendant (Subsection 3). The planning, sophistication and professionalism with which the crime was carried out indicated premeditation (Subsection 8).

Under Rule 421b, facts relating to the defendant, your officer notes that defendant Hernandez has engaged in a pattern of violent conduct which indicates that he is a serious danger to society; the defendant's prior convictions as an adult or adjudications of commissions of crime as a juvenile are numerous and increasingly serious in nature; the defendant has served prior prison terms, whether or not charged or chargeable as an enhancement under Section 667.5; the defendant was on probation when he committed the instant crime; and the defendant's prior performance on probation and on parole was unsatisfactory (Subsections 1, 2, 3, 4 and 5).

## ENHANCEMENTS

Penal Code Section 12022.5 mandates that the sentence be enhanced by two years and consecutive to the punishment prescribed for the instant crime.

CONCLUSION

Appearing before the Court is a twenty-seven-year-old defendant who was convicted by jury of Second Degree Murder and Use of a Shotgun. As previously noted, the defendant has an extensive criminal record, both as a juvenile and as an adult, involving serious property crimes and burglaries where the defendant has removed many guns in addition to a serious record of assaultive behavior, demonstrating his past and current propensity for violence.

Pursuant to Section 1203.06(a)(1)(i), defendant Hernandez is ineligible for a grant of probation. Additionally, Penal Code Section 190 mandates that the defendant be committed to the California Department of Corrections for a term of fifteen years to life. PC 12022.5 mandates that the sentence be enhanced by two years in addition and consecutive to the sentence imposed by the Court on the instant crime.

RECOMMENDED PRISON TERM

| CRIME | MIT/MID/AGG | BASE TERM | ENHANCEMENTS | CONSEC/CONCURR | |
|-------|-------------|-----------|--------------|---------|---|
| PC 187, 2nd Degree | 15 yrs. to life | 15 yrs. to life | Yes/PC 12022.5/ 2 yrs. | Yes | N/A |

TOTAL YEARS:  SEVENTEEN YEARS TO LIFE

RECOMMENDATION

It is hereby recommended that probation be denied and that the defendant, Hector Hernandez, be committed to the California Department of Corrections for the indeterminate term of imprisonment of fifteen years to life in Count One.

It is further recommended that the defendant's term of imprisonment be enhanced for a period of two years pursuant to PC 12022.5 and that this term be served prior to the indeterminate sentence.

It is further recommended that the defendant be committed to the California Department of Corrections for a total term of seventeen years to life with credit for 518 days time served (279/139).

In compliance with Government Code Section 13967, it is respectfully recommended that a restitution fine of $1,000.00 be imposed.

-17-

The attorney hours ●●ot appear on the Court i●●●●l to the Probation Department.

Respectfully submitted,

DON HOGNER, CHIEF PROBATION OFFICER

By: *Evelyn H. King*

Evelyn H. King, Deputy

Dated:  June 3, 1986

Read and Approved:

*Charles Smith*

Supervising Probation Officer

jm

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The foregoing report has been read and considered.

Dated:  June 10, 1986

/s/ John Fitch

JUDGE OF THE SUPERIOR COURT

The foregoing instrument is a correct copy of the original on file in this office.

ATTEST:    JUN 17 1986

GALEN LARSON, County Clerk
State of California, County of Fresno

By _____ DEPUTY

-18-

# EXHIBIT "3"

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**HECTOR HERNANDEZ, D-33689**
**SECOND-DEGREE MURDER**

AFFIRM:            _____

MODIFY:            _____

REVERSE:           _____X_____

On August 15, 1985, Hector Hernandez shot to death Sylvestre Bustos while attempting to purchase heroin. Early that morning, Mr. Hernandez went to Mr. Bustos' home to buy heroin. He knocked on one of the windows, waking Mr. Bustos' roommate, Enrique Casias. Mr. Casias went to the window and saw Mr. Hernandez standing outside. Mr. Casias opened the window and talked with Mr. Hernandez, agreeing to sell him heroin for $20. Mr. Hernandez paid the money and Mr. Casias went to retrieve some heroin. The heroin was inside Mr. Bustos' boots, which were next to the couch in the living room. Mr. Bustos was asleep on the couch with a gun tucked into his waistband.

While Mr. Casias bent over Mr. Bustos' boots, Mr. Hernandez forced his way through the front door of the residence, armed with a sawed-off shotgun. He demanded Mr. Bustos' gun and heroin. When Mr. Bustos rose from the couch, Mr. Hernandez shot him one time from a distance of approximately seven or eight feet. He took Mr. Bustos' gun and fled the scene.

Mr. Hernandez was subsequently arrested. Following a jury trial, he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life for murder, plus two consecutive years for the firearm enhancement. The judgment was affirmed on appeal.

During his incarceration for the life offense, Mr. Hernandez was disciplined seven times for rules violations involving grooming standards, possession of inmate manufactured alcohol, possession of a utility knife blade, stealing food, improperly loaning personal property, and disrespecting staff. He was also counseled 12 times for minor misconduct, most recently in 2000.

I considered various positive factors in reviewing whether Mr. Hernandez is suitable for parole at this time. Mr. Hernandez made efforts to enhance his ability to function within the law upon release. He earned his GED in 1998, and he took additional adult basic education courses and infectious disease courses. He completed vocational training in graphic arts, and in mill and cabinet work. He held institutional jobs as a furniture assembler, industry worker, teacher's aide, boiler room operator, and machine operator, among other things. In addition, he availed himself of an array of self-help and therapy, including the Employability Program, Anger Management, Impact, Character Development, Life Skills, Responsibility for Self-Determination, Mind Transformation, Chemical Dependency, Red Road, Alcoholics Anonymous, and Narcotics Anonymous. He maintains seemingly solid relationships and close ties with supportive family and friends, and he received some positive evaluations from mental-health and correctional professionals over the years.

Hector Hernandez, D-33689
Second-Degree Murder
Page 2

Mr. Hernandez also made plans upon his release to live with family in Fresno County, the county of
last legal residence. Although he has marketable skills, he has not secured a job offer in Fresno
County. Having a legitimate way to provide financial support for himself immediately upon release
is essential to Mr. Hernandez's success on parole.

Despite the positive factors I have considered, the second-degree murder for which Mr. Hernandez
was convicted was especially grave, in part because of the callous manner in which it was carried
out. According to the probation report, Mr. Bustos was asleep on his couch when Mr. Hernandez
kicked open the door and entered with a sawed-off shotgun. The probation officer noted that Mr.
Bustos "was particularly vulnerable" when Mr. Hernandez entered the home and shot Mr. Bustos
just after waking him up. There is also evidence in the record before me that the murder involved
some level of premeditation. According to the Court of Appeal opinion, Mr. Hernandez testified at
trial that he purchased heroin from Mr. Bustos on several prior occasions. One witness testified
that, days before the murder, she heard Mr. Hernandez arguing with Mr. Bustos over the quantity of
the heroin he received. On the night of the murder, Mr. Hernandez went to Mr. Bustos' residence
armed with the shotgun. Mr. Hernandez then forced his way through the front door of the residence
and shot Mr. Bustos when he got up off the couch. The gravity of the second-degree murder
committed by Mr. Hernandez is alone sufficient for me to conclude presently that his release from
prison would pose an unreasonable public-safety risk.

Mr. Hernandez says he is remorseful and accepts responsibility for his actions. But in his statement
summarized in the 2006 Life Prisoner Evaluation, he said, "the actual gunshot which took [Mr.
Bustos'] life was fired in self defense." Likewise, according to his statement as summarized in the
2006 mental-health evaluation, Mr. Hernandez claimed that Mr. Bustos pulled his gun and fired
before Mr. Hernandez shot him. But at least two witnesses reported in the Fresno County Sheriff's
report that they heard one gunshot the night of the murder. They testified similarly at trial,
according to the Court of Appeal opinion. According to the probation report, one witness also saw
Mr. Hernandez take the gun from Mr. Bustos after Mr. Bustos removed it from his waistband.

In any event, Mr. Hernandez took a sawed-off shotgun to Mr. Bustos' home, kicked open the door
to the residence, and according to the Court of Appeal opinion, pointed the gun at everyone inside.
The 2003 Board asked, "what would you expect [Mr. Bustos'] reaction to be if he's confronted with
a man with a shotgun?" Mr. Hernandez later responded, "[p]robably everything that happened."

When he committed this crime, Mr. Hernandez was 26 years old and already had an extensive
criminal record, including juvenile adjudications for armed robbery, assault with a deadly weapon,
burglary, petty theft, carrying a concealed firearm, joyriding, and resisting an officer. His criminal
behavior continued into adulthood, as he was convicted of discharging a firearm at an occupied
dwelling/vehicle, harboring a federal fugitive, being under the influence of a controlled substance,
and driving under the influence of a controlled substance. He also admitted to the probation officer
that he routinely abused heroin, and he used cocaine, LSD, marijuana and PCP prior to the life
offense. Mr. Hernandez's criminal history, which began at a young age and includes incidents of
violent and assaultive behavior toward others, demonstrates his inability or unwillingness to
conform his behavior to the rules of society, and this weighs against his parole suitability at this
time.

Hector Hernandez, D-33689
Second-Degree Murder
Page 3

The 2006 Board noted Mr. Hernandez's prior criminal history and drug abuse when it found that he "committed the crime as a result of significant stress in [his] life." The Board, however, also said that the stress was "self-induced," and that "[w]e're not in any way, shape or form saying that you had stress in your life." While Mr. Hernandez was indeed abusing heroin at the time, he was also aware of available treatment programs in the community. He told the probation officer that he completed a Methadone treatment program in 1985, the same year that he murdered Mr. Bustos. Even if Mr. Hernandez was under stress when he perpetrated the life offense, I believe that factor alone is presently insufficient to mitigate the nature and circumstances of the murder.

I note that the Fresno County District Attorney's Office opposed parole with the 2006 Board based, in part, on the gravity of the offense, Mr. Hernandez's lengthy criminal and drug abuse history, his lack of insight into the nature of his offense, and his failure to establish concrete parole plans.

At age 47 now, after being incarcerated for more than 21 years, Mr. Hernandez made some creditable gains in prison. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the negative factors weighing against Mr. Hernandez's parole suitability presently outweigh the positive ones. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Hernandez.

Decision Date: 11-02-2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT  4