# EXHIBIT 15
# Part 2 of 7

3

1  for long periods of time.

2       PRESIDING COMMISSIONER SAWYER:  I see,

3  okay.  And you didn't bring them because you

4  don't think you're going to need them today?

5       INMATE HERNANDEZ:  I'm sure I could get

6  by without them.

7       PRESIDING COMMISSIONER SAWYER:  What

8  strength are those glasses?

9       INMATE HERNANDEZ:  I'm not sure.

10       ATTORNEY TARDIFF:  I can accommodate him.

11       DEPUTY COMMISSIONER ROTHLISBERGER:  Do we

12  have a magnifier?  Do you have a magnifier?  Oh,

13  reading glasses.

14       PRESIDING COMMISSIONER SAWYER:  See if

15  those help.

16       ATTORNEY TARDIFF:  I guess not.

17       INMATE HERNANDEZ:  I'm fine without them.

18  Okay, thank you.

19       PRESIDING COMMISSIONER SAWYER:  Okay,

20  well you're not 1.50.  We're going to get a

21  magnifier for you.  We need to ask you to look

22  at this form.  You'll notice there's a check on

23  it, a fresh ink check that your attorney checked

24  because it wasn't checked.  It says, I do not

25  need any help for my hearing.

26       ATTORNEY TARDIFF:  I don't have any

27  disabilities.  It's about your disabilities,

4

```
 1  basically.  Is that still accurate?

 2           INMATE HERNANDEZ:  Yes.

 3           PRESIDING COMMISSIONER SAWYER:  Okay,

 4  good, thank you.  If you'll give that back.  And

 5  just as a precaution we're going to give you a

 6  magnifier that you might -- if you come to a

 7  word you don't, that you can't read then that

 8  will be there for your assistance.  Ms. Tardiff,

 9  did you talk to Mr. Hernandez about his

10  accommodations for disabilities?

11           ATTORNEY TARDIFF:  I did.

12           PRESIDING COMMISSIONER SAWYER:  The

13  outline of the hearing procedure?

14           ATTORNEY TARDIFF:  Yes.

15           PRESIDING COMMISSIONER SAWYER:  The

16  inmate's rights?

17           ATTORNEY TARDIFF:  Yes.

18           PRESIDING COMMISSIONER SAWYER:  And the

19  confidential?

20           ATTORNEY TARDIFF:  Yes.

21           PRESIDING COMMISSIONER SAWYER:  Okay.

22  Would you waive the reading of those scripts?

23           ATTORNEY TARDIFF:  I do.

24           PRESIDING COMMISSIONER SAWYER:  Thank

25  you.  I'll mark it Exhibit One.  Do we have any

26  confidential material, Commissioner

27  Rothlisberger?
```

5

1          **DEPUTY COMMISSIONER ROTHLISBERGER:**  No.

2          **PRESIDING COMMISSIONER SAWYER:**  Okay.

3    I'm going to mark Exhibit Two.  This is the

4    hearing checklist.  I've added to this

5    checklist, which may not be on yours, the Board

6    Report addendums and a new psychiatric report

7    that was received today.

8          **ATTORNEY TARDIFF:**  I have all these

9    documents, thank you.

10          **PRESIDING COMMISSIONER SAWYER:**  Okay.

11          **ATTORNEY TARDIFF:**  And I've submitted a

12    couple of things earlier, nothing further.

13          **PRESIDING COMMISSIONER SAWYER:**  Okay,

14    thank you.  Do you have any preliminary

15    objections, counsel?

16          **ATTORNEY TARDIFF:**  No I don't.  Oh, there

17    was some material I received today and one of

18    them was a letter from the District Attorney.  I

19    object to it being used as it violates the ten-

20    day rule.  I've not had enough time to -- Well

21    it just violates the rule, period.

22          **PRESIDING COMMISSIONER SAWYER:**  Okay, you

23    don't have to justify it.

24          **ATTORNEY TARDIFF:**  Thank you.

25          **PRESIDING COMMISSIONER SAWYER:**  I'll

26    sustain that objection.  Will the inmate be

27    speaking with the panel?

6

1          **ATTORNEY TARDIFF:**  Except for he doesn't

2     want to discuss the commitment offense but he

3     does have something to say about the commitment

4     offense.  So I don't know how we work with

5     something like that.

6          **PRESIDING COMMISSIONER SAWYER:**  We'll see

7     how it works.

8          **ATTORNEY TARDIFF:**  Okay.

9          **PRESIDING COMMISSIONER SAWYER:**  Okay.

10    Okay, I'm going to be using the July 2005

11    calendar Board Report.

12.         **ATTORNEY TARDIFF:**  Did you swear him in?

13          **PRESIDING COMMISSIONER SAWYER:**  Oh I'm

14    sorry, you're right.  Could you raise your right

15    hand, sir.  Do you solemnly swear or affirm the

16    testimony you are about to give in this hearing

17    will be the truth, the whole truth and nothing

18    but the truth?

19          **INMATE HERNANDEZ:**  I affirm.

20          **PRESIDING COMMISSIONER SAWYER:**  Okay,

21    thank you.  Now I'll be using the July 2005

22    calendar Board Report page one.

23          "On 8/15/1985 at approximately

24          3:56 a.m. Officer F. Lopez, L-O-P-

25          E-Z, was dispatched to South 11th

26          Street number four in Calwa, C-A-

27          L-W-A, regarding an injured

```
 1            person.  Upon arrival Officer
 2            Lopez met four Mexican males and
 3            one female standing outside the
 4            residence.  Upon entering the
 5            living room of the residence the
 6            officer observed a Mexican male
 7            subject lying on the floor with a
 8            large pool of blood under his
 9            chest and face area.  The victim
10            was pronounced dead at the scene.
11            The victim was identified as
12            Silvestere Odulio Bustos."
13  I'll spell all three for the transcriptionist.
14  S-I-L-V-E-S-T-R -- I'll start again.  S-I-L-V-E-
15  S-T-E-R-E.  The middle name, O-D-U-L-I-O.  And
16  the last name Bustos, B-U-S-T-O-S.
17            "A subsequent investigation
18            determined that the victim had
19            been shot at a close range by a
20            shotgun.  Officers made contact
21            with several witnesses of the
22            crime, one of whom was Enrique
23            Casias, C-A-S-I-A-S, a roommate of
24            the victim.  He testified that at
25            3 a.m. on the same day, 8/15/85,
26            there was a knock on the door, at
27            which time Casias observed
```

8

1        Hernandez standing there.

2        Hernandez asked Casias if he had

3        some heroin and gave him $20.

4        Casias said he told Hernandez to

5        let me see if my friend has some,

6        referring to victim Bustos.

7        Casias was getting pieces from

8        Bustos' boots when Hernandez

9        kicked open the door and entered

10       the residence with a shotgun and

11       stated, give me the gun and give

12       me the chiva, which means Spanish

13       for heroin.  According to Casias

14       as soon as Hernandez said give me

15       the gun Hernandez shot Bustos.

16       The probation officer's report

17       indicates that several witnesses

18       were interviewed and that their

19       statements correlated with Casias'

20       statement.  They also related in

21       part that Hernandez had been to

22       the residence on numerous

23       occasions to purchase drugs and

24       one day prior to the incident he

25       had had an argument with the

26       victim about money.  Hernandez was

27       convicted of the crime by a jury

9

1          trial on 5/13/1986."

2     And you said you wanted to make a statement

3     about this crime?

4          INMATE HERNANDEZ: Well basically first

5     and foremost I'm not proud of it. I'm extremely

6     sorry for it, for the deceased Silvestere Odulio

7     Bustos. Just to hear about it right now again I

8     feel even more sorry for it. I'm overwhelmed by

9     it that I could never repay, never bring him

10    back to life. I do what I can, I make amends, I

11    live my life as if somehow I can do a deed that

12    will somehow pay for it perhaps. And I would

13    only -- As I say I'm not proud of it. I don't

14    even like to talk about it with anybody period,

15    I don't. But if the opportunity for the

16    prevention of things like this happening I will

17    speak about it in that context, such as a 12

18    step group or some other form of alternative to

19    violence program. But otherwise I see no, no

20    reason for speaking about it and thank you very

21    much.

22         PRESIDING COMMISSIONER SAWYER: Okay. In

23    your version that was dated February 2004 it

24    says it remains the same. It's pretty

25    philosophical. It says here:

26          "In order to make a statement that

27          would give some clarity and

10

1          resolution I would practically

2          have to answer the question of

3          what is the meaning of life and

4          death.  As difficult and at times

5          overwhelming as this task is it is

6          what I have endeavored to do.  I

7          should say that my opponent, who

8          became the victim, had been

9          stealing from me and threatening

10         my life and the actual gunshot

11         that took his life was in self-

12         defense, all of which is true."

13  Is that correct?

14         **INMATE HERNANDEZ:**  That is correct.

15         **PRESIDING COMMISSIONER SAWYER:**

16         "Yet in order to reach a greater

17         and healthier understanding I

18         would first have to admit

19         responsibility, which is what I've

20         done.  A few of the areas I

21         addressed in order to gain a

22         deeper understanding of the crime

23         I committed includes my childhood,

24         peer environment, spirituality.

25         Only after extensive self-

26         examination in those areas and

27         I've reached the conclusion that I

1           needed a major adjustment in the

2           way I relate to others, which

3           entails developing a great

4           integrity for morals and ethics.

5           This is an ongoing process with

6           continual room for improvement.

7           Suffice to say that this journey

8           of recovery and healing is

9           something I'll be doing for the

10          rest of my life."

11   Is that correct, sir?

12          **INMATE HERNANDEZ:**  That is correct.

13          **PRESIDING COMMISSIONER SAWYER:**   Okay.

14   In this case the victim was particularly

15   vulnerable and the prisoner entered the victim's

16   home and shot him while he was lying on his

17   couch and awakened by the prisoner.   The

18   prisoner had a history of criminal behavior for

19   which the term has been enhanced.   The prisoner

20   engaged in other reliably documented criminal

21   conduct.   Attempted drug purchase, which was an

22   integral part of the crime for which he's

23   currently committed.   The inmate was on

24.  probation at the time the crime was committed.

25   During the commission of the crime the prisoner

26   had a clear opportunity to cease but continued.

27   The manner in which the crime was committed

12

1    created a potential for serious injury to

2    persons other than the victim of the crime.    The

3    mitigating factor, the prisoner participated in

4    a crime under partially excusable circumstances,

5    heroin inebriation that did not amount to a

6    criminal, a legal defense.    In your rap sheet

7    under juvenile record, 1970, burglarized a

8    doctor's office in Fresno, removed $80 in cash

9    and you were put on informal probation.    Is that

10   correct?

11         INMATE HERNANDEZ:    That's correct.

12         PRESIDING COMMISSIONER SAWYER:    How old

13   were you then, 1970?

14         INMATE HERNANDEZ:    Eleven.

15         PRESIDING COMMISSIONER SAWYER:    Again in

16   '70, entered a residence, removed nine different

17   types of weapons, a Polaroid camera and a radio.

18   Placed on probation without wardship until

19   5/23/1971, case was dismissed.    That also

20   occurred when you were about 11 or were you 12

21   then?    When's your birthday?

22         INMATE HERNANDEZ:    '59.

23         PRESIDING COMMISSIONER SAWYER:    What

24   month?

25         INMATE HERNANDEZ:    2/28.

26         PRESIDING COMMISSIONER SAWYER:    Two,

27   okay.    So that was, you were still 11 there.

13

1    Then when you were 12 you entered the Mission

2    Baptist Church, removed $10.50.  Probation

3    ordered, released to your parents.  Again in '71

4    petty theft, subject and accomplice stole $190

5    from Llewellyn's (phonetic) 76 service station.

6    Remained a ward of the court, paid restitution,

7    work program, Sanger PD.  And then in 1972,

8    burglary.  Commit to a youth center, detained

9    juvenile hall pending transfer.  And then again

10   in '72, defendant and accomplice were found in

11   inside of a closed business at Padilla's Market.

12   Remained a ward of the court on probation,

13   commit to a youth center, suspended.  Okay,

14   between '72 and '80 there wasn't any criminal

15   offenses.  What was going on in that part of

16   your life?  An eight year period there that you

17   weren't in trouble.

18          INMATE HERNANDEZ:  Well I've always, I've

19   always aspired to work.  I would have to say at

20   that time is when, that must be when I was

21   successful at just basically --

22          PRESIDING COMMISSIONER SAWYER:  We'll

23   pull that microphone up for you.  If you could

24   speak a little bit louder so we make sure that

25   everything gets on the record, okay.  So you

26   were working during that period of time?

27          INMATE HERNANDEZ:  I believe so.

14

1          PRESIDING COMMISSIONER SAWYER:   Okay.

2          INMATE HERNANDEZ:   Yes.

3          PRESIDING COMMISSIONER SAWYER:   That

4    would be, you would be 14, 11, 12, 13 years old

5    in '72.  Were you going to school?

6          INMATE HERNANDEZ:   Probably not.

7          PRESIDING COMMISSIONER SAWYER:   Okay.   In

8    1980, carrying a concealed weapon, carrying a

9    loaded weapon, receiving stolen property.  This

10   was January of '80.  In October of '80 burglary,

11   no disposition shown.  There was another part on

12   your rap sheet that said burglary in November of

13   1980.  Then 10/6 of 1984, harboring a federal

14   fugitive.  Convicted, sentenced to 358 days in a

15   federal correctional institution.  What was

16   that?

17         INMATE HERNANDEZ:   Excuse me?

18         PRESIDING COMMISSIONER SAWYER:   You were

19   harboring a federal fugitive?

20         INMATE HERNANDEZ:   Oh yes.

21         PRESIDING COMMISSIONER SAWYER:   Okay, in

22   1984.

23         INMATE HERNANDEZ:   Yes.

24         PRESIDING COMMISSIONER SAWYER:   And you

25   got nearly a year in the pen.

26         INMATE HERNANDEZ:   Yes.

27         PRESIDING COMMISSIONER SAWYER:   Okay.

1    Who were you harboring?

2        INMATE HERNANDEZ:  A friend, a friend who

3    needed a place to stay.

4        PRESIDING COMMISSIONER SAWYER:  And the

5    feds picked him up and took you too.

6        INMATE HERNANDEZ:  Yes.

7        PRESIDING COMMISSIONER SAWYER:  In 1982,

8    sale and transport marijuana, burglary,

9    transport/sale controlled substance.  All

10   charges in that case were dismissed.  And then

11   1984, under the influence of a controlled

12   substance, obstruction, resisting arrest,

13   disposition none.  And then we have the instant

14   offense.  You were born 2/28 of 1959 in Fresno

15   to Guadalupe Hernandez and Dolores Megaia, M-E-

16   G-A-I-A.  One of eight children.  His brother,

17   Guadalupe Hernandez Jr. was also convicted of

18   murder in an unrelated case.  His brother is

19   currently housed at California State Prison,

20   Corcoran.  Is he still there?

21       INMATE HERNANDEZ:  Yes.

22       PRESIDING COMMISSIONER SAWYER:  That you

23   know of.

24       INMATE HERNANDEZ:  He may be in a

25   different prison in Coalinga now.

26       PRESIDING COMMISSIONER SAWYER:  Okay.

27   You completed the tenth grade at Sanger High

16

1    School in 1975.  Passed his GED test on 5/4 of

2    1992.  Indicated that he completed vocational

3    training in welding at Valley Technical and

4    Trade School in Fresno.  Hernandez married

5    Joyce, Janice I'm sorry, Ramirez, R-A-M-I-R-E-Z,

6    on 10/2 of 1982 in San Bernardino.  Four

7    children?

8            INMATE HERNANDEZ:  Yes.

9            PRESIDING COMMISSIONER SAWYER:  The

10   marriage is no longer intact.  His work consists

11   of agricultural-related labor.  Being a daily

12   user of heroin, between 20 and 40 dollars worth

13   of heroin every day.  He also admitted to being

14   a regular consumer of beer as well as sniffing

15   glue and paint, using PCP, LSD and cocaine

16   occasionally.  While Hernandez was incarcerated

17   in the county jail he was prescribed Synaquad.

18           INMATE HERNANDEZ:  Yes.

19           PRESIDING COMMISSIONER SAWYER:  I'll

20   spell that for the transcriptionist, S-Y-N-A-Q-

21   U-A-D.  Hernandez is not receiving psychiatric

22   treatment or medication since coming to

23   California Department of Corrections.  So who

24   visits you?

25           INMATE HERNANDEZ:  I have not had a visit

26   in several years.  The last visit I had was my

27   ex-wife and all the kids as well as two of my

17

1    son-in-laws.

2         PRESIDING COMMISSIONER SAWYER:   And how
3    are your kids doing?

4         INMATE HERNANDEZ:   As far as I know my
5    son is doing fine, growing up becoming a young
6    man.  My oldest daughter is doing fine, she just
7    had her first baby recently.  Her and her
8    husband are doing fine from all, all that I know
9    of them as far as I know.  My next daughter is
10   doing good as far as I know.  Recently graduated
11   from college and also had her second baby.  Her
12   and her husband are doing fine.  I'd have to say
13   excellent.

14        PRESIDING COMMISSIONER SAWYER:   Good.

15        INMATE HERNANDEZ:   And my youngest
16   daughter is I would have to say struggling
17   because I know she's got it hard.  She has two
18   babies and is single.

19        PRESIDING COMMISSIONER SAWYER:   And how
20   old is she?

21        INMATE HERNANDEZ:   She is approximately
22   22.

23        PRESIDING COMMISSIONER SAWYER:   Okay.
24   They've all managed to stay out of the
25   correctional institutions?

26        INMATE HERNANDEZ:   Yes.

27        PRESIDING COMMISSIONER SAWYER:   Good.  Do

18

1  you correspond with them?

2       INMATE HERNANDEZ:  I was writing and they

3  would not respond.  Rarely did they respond.  I

4  started getting response mainly from my son.  I

5  started getting a lot of response from my son.

6  And at that time right after that I started

7  getting response from his mother and my other

8  daughters.  Then I was, I stopped hearing from

9  them so that's where it is.

10       PRESIDING COMMISSIONER SAWYER:  How about

11  your brothers and sisters?

12       INMATE HERNANDEZ:  I have no

13  correspondence with them.  I used to write, I

14  used to correspond with my brother in prison and

15  we have not corresponded for some time now.

16  That's about it.

17       PRESIDING COMMISSIONER SAWYER:  Is he a

18  lifer?

19       INMATE HERNANDEZ:  Yes.

20       PRESIDING COMMISSIONER SAWYER:  Okay, so

21  what -- Tell me why you were doing all this.

22  How did you get involved with heroin and

23  sniffing glue and paint.  What was all that

24  about?

25       INMATE HERNANDEZ:  It's a long story.

26       PRESIDING COMMISSIONER SAWYER:  Can you

27  give me the Reader's Digest version of it?

19

1          INMATE HERNANDEZ:   I don't know where to
2     begin.   I'm in recovery now.
3          PRESIDING COMMISSIONER SAWYER:   Okay.
4          INMATE HERNANDEZ:   And recovery not only,
5     not only does it, does it deal with the aspects
6     of drugs and alcohol but also in the wider range
7     as far as being raised up in a dysfunctional
8     family you might say and my whole environment.
9     But I've been -- As I say, I've been in recovery
10    and I've accepted responsibility for, for the
11    damage, for the drug abuse.   And even for the
12    dysfunctional family as far as even my parents.
13    I've accepted a responsibility for them.   I know
14    they done the best.   But nevertheless they was,
15    they were lacking in education and in social
16    skills and other aspects.   And as well as for my
17    brother.   He's my only brother and he's in
18    prison but I accept responsibility also for his
19    recovery in the sense that I try to, I'm trying
20    to help him in his recovery and to do better in
21    life.   I can't explain how I fell, I fell into
22    all this situation.   But maybe it was all for
23    the good now because I've addressed all these
24    issues.   I've tackled them in the best of my
25    ability to get an understanding as I say, not
26    only for myself but the social, the social
27    environment that I was in and endeavored to

1  bring a higher consciousness to the community

2  that I come from.  So as we say in recovery,

3  we're not responsible for our addiction but

4  we're responsible for our recovery.  So I can't

5  explain how I got there.  I know there was a lot

6  of pain and suffering and abuse and other things

7  that happened.  But I don't want to excuse it

8  either, you know.  So --

9          PRESIDING COMMISSIONER SAWYER:  I guess

10  my question to you is, do you recognize how you

11  got here?

12          INMATE HERNANDEZ:  Yes.

13          PRESIDING COMMISSIONER SAWYER:  Okay,

14  good.  When did your father Guadalupe and

15  Dolores Megaia separate?

16          INMATE HERNANDEZ:  They're still together

17  to this day.

18          PRESIDING COMMISSIONER SAWYER:  Oh they

19  are?

20          INMATE HERNANDEZ:  Yes.

21          PRESIDING COMMISSIONER SAWYER:  Because

22  in your future plans it talks about Guadalupe

23  and Lolita Hernandez.

24          INMATE HERNANDEZ:  Yes, I noticed the

25  difference.  I'm not sure if I was born out of

26  wedlock and my parents weren't legally or

27  married through the church at that time.

1              PRESIDING COMMISSIONER SAWYER:  Well no I

2       mean, I'm looking at the first name Lolita.  Is

3       that --

4              INMATE HERNANDEZ:  That's another thing I

5       don't understand if it was, if it's a Spanish

6       thing as a nickname or a name that related to

7       the actual name.  But her name is Lolita and

8       she's the same person, Dolores.

9              PRESIDING COMMISSIONER SAWYER:  Oh, okay.

10      That's what I'm trying to get at is a.  So

11      they're still together.

12             INMATE HERNANDEZ:  Yes.

13             PRESIDING COMMISSIONER SAWYER:  And how

14      old are they now?

15             INMATE HERNANDEZ:  About eighties,

16      pushing 80.

17             PRESIDING COMMISSIONER SAWYER:  And did I

18      hear their health was poor?

19             INMATE HERNANDEZ:  Yes.  They are both

20      survivors of cancer.  And my father seems to

21      have recovered fairly well.  My mother has had

22      to have surgery twice.  And her health is

23      deteriorating.

24             PRESIDING COMMISSIONER SAWYER:  Did you

25      grow up in this house on Edgar (phonetic)

26      Street?

27             INMATE HERNANDEZ:  Yes.

1        PRESIDING COMMISSIONER SAWYER:   So that's

2   their family home, huh?

3        INMATE HERNANDEZ:   Yes it is.

4        PRESIDING COMMISSIONER SAWYER:   Okay.

5   You'd live with your parents.   As an alternate

6   address as a residence with your sister Hope

7   Hernandez in Selma.

8        INMATE HERNANDEZ:   Yes.

9        PRESIDING COMMISSIONER SAWYER:   Okay,

10  Your main desire is to work as a counselor in

11  recovery with youth and drug offenders with

12  violence intervention.   However it does not

13  offer any letters of interest from any potential

14  employers indicating job offers.   Have you been

15  through any courses, classes counseling

16  certificates or anything?   Have you had any

17  formal education in counseling?

18       INMATE HERNANDEZ:   Not formally, but I've

19  participated in numerous programs.   One of them

20  I guess I would say I'm proudest of is the

21  Relapse Prevention class where I was a

22  facilitator and main speaker of the course.   As

23  well as I've spoken and given presentations for

24  the cause and prevention of communicable

25  diseases.   And done other things where I get up

26  and speak before a group.

27       PRESIDING COMMISSIONER SAWYER:   Uh-hum.

1    Good, that's always the hardest part isn't it?

2         **INMATE HERNANDEZ:**  Yeah.

3         **PRESIDING COMMISSIONER SAWYER:**  Yes.

4    Okay, I have a letter from Glen E. Davis

5    (phonetic) chaplain for Fresno County Jail.  He

6    says he corresponded with you for years while

7    you've been in prison.  He's trying to improve

8    himself.  To be a responsible citizen.  His last

9    letter was very positive.  He's shown me that

10   not only is he trying to make a change but he is

11   supplying himself with tools to make him, to

12   help him make changes that he needs in his life.

13   Should the Parole Board see fit to release Mr.

14   Hernandez to a rehabilitation program I believe

15   he would be best to successfully graduate from

16   the program.  If there is anything I can do to

17   help Mr. Hernandez get into West Care Program in

18   Fresno, I would be willing to help in any way I

19   could.  Seems to be genuine concern for his

20   family.  Very desirous of being able to fulfill

21   his role in supporting and caring for his

22   family.  I believe he would do his best to make

23   a success on the outside not only for his own

24   good but for the welfare of his family.  Signed

25   Glen Davis, September 7th 2005.  What's the West

26   Care Program?

27        **INMATE HERNANDEZ:**  S, O, S?

24

1          PRESIDING COMMISSIONER SAWYER:  West

2   Care --

3          INMATE HERNANDEZ:  Oh, West Care.  That's

4   basically a drug recovery program.

5          PRESIDING COMMISSIONER SAWYER:  And he's

6   involved in that somehow?

7          INMATE HERNANDEZ:  Actually he's the

8   chaplain of the jail.

9          PRESIDING COMMISSIONER SAWYER:  Right.

10          INMATE HERNANDEZ:  And somehow comes to

11   the awareness of this program.

12          PRESIDING COMMISSIONER SAWYER:  Okay.

13   Have you applied for that?

14          INMATE HERNANDEZ:  I have and did not

15   receive a response.  The most information I got

16   from them is I would have to be out there and

17   have done a period of time out there in the

18   community before going, being accepted at this

19   place as well as an in-person interview.

20          PRESIDING COMMISSIONER SAWYER:  Okay.  I

21   have a letter from July 20, 2005 from Janie

22   (phonetic) Hernandez.  A letter of

23   recommendation in regards to Mr. Hector

24   Hernandez.  My understanding is Hector will be

25   going before the Parole Board for a possible

26   release.  I will be speaking on behalf of Hector

27   and give my opinion, reason and aspect why he

25

1    should be considered for parole.  My name is
2    Janie Hernandez and also the mother of Hector's
3    four children, which are now adults.  Knowing
4    Hector from the past to the present I feel I
5    know Hector quite well.  I speak on his behalf
6    solely because I'm convinced that Hector is a
7    changed man.  Not the man I knew approximately
8    20 years ago.  I've seen maturity in Hector.
9    His ways of thinking are different.  In my
10   opinion I have been writing to Hector on and off
11   during all these years.  I see Hector a changed
12   man.  Even though communication is through
13   letters I believe when Hector says he feels
14   shame and regret and remorse for his criminal
15   history, not to mention the neglect of his own
16   family, I know it hurts Hector when I mention
17   that his family, what his family does and what
18   goes on in the lives of his children and
19   grandchildren, I know he longs to be involved in
20   their lives as part of the upbringing of
21   grandchildren.  And I believe that he's truly
22   sorry and ready to move with his life as a
23   positive and productive citizen if given the
24   opportunity.  I believe he's ready to work and
25   contribute back to the community and family.  I
26   strongly believe he can do good things for
27   himself and for the community whether it be

1    through the church he'll attend in trying to

2    reach the youth at risk, be a father and

3    grandfather needed in his own family, mend

4    things up if possible. Please if you may look

5    at his efforts while incarcerated see for

6    yourself that he's done a lot to rehabilitate

7    himself. Allow Hector to leave California

8    Department of Corrections after 20 years. He's

9    still motivated to do his part in his community.

10   May he be allowed to prove his abilities and

11   dedication for a productive life. And then she

12   thanks us for our consideration. Sounds like a

13   nice lady.

14        INMATE HERNANDEZ: I don't know what to

15   say because I feel their pain. I know she

16   suffered so much. And I feel responsible for a

17   lot of that suffering. And I'm just so grateful

18   that she, she's still, still has compassion. I

19   don't know what to say, that's just, yeah she, I

20   wish I could do, there's not enough I could do

21   for her. I just look forward to doing something

22   to somehow help her.

23        PRESIDING COMMISSIONER SAWYER: What does

24   she do for a living?

25        INMATE HERNANDEZ: I'm not sure, some

26   form of secretarial work.

27        PRESIDING COMMISSIONER SAWYER: She

```
 1   writes a good letter.  I mean she sounds
 2   intelligent through her communication here.
 3          INMATE HERNANDEZ:  Thank you, thank you,
 4   yes she is.
 5          PRESIDING COMMISSIONER SAWYER:  I have a
 6   letter July 10th 2005 from your mom and dad.  A
 7   letter of support.  Once again as in prior years
 8   we're writing to say our home with food,
 9   clothing, basic necessities and two vehicles for
10   work and errands is open and available for
11   Hector's return.  He's welcome to stay for as
12   long as needed.  He often writes very nice
13   letters to us filled with hope and encouragement
14   to be honest.  We would like to get one every
15   day.  But we just do not have the energy to
16   write back that often.  The older we get the
17   more we need our son here at our side.  We thank
18   God for a new and honest son for the rest of his
19   life.  And that he will be freed to be at our
20   side.  Please accept this humble and sincere yet
21   earnest submission in your consideration of
22   Hector's suitability for parole.  Signed by
23   them, nice letter.  And then I have a letter in
24   Spanish from your mother.
25          INMATE HERNANDEZ:  Yes.
26          PRESIDING COMMISSIONER SAWYER:  I assume
27   it's a support letter.
```

28

1        INMATE HERNANDEZ:  Yes, basically in the

2   same context.

3        PRESIDING COMMISSIONER SAWYER:  And then

4   I have a letter from, a typed letter from June

5   6th 2005 from Tim.  This is your coordinator for

6   the Buddhist Meditation Studies?

7        INMATE HERNANDEZ:  Yes.

8        PRESIDING COMMISSIONER SAWYER:  It is our

9   understanding that attendance in the Buddhist

10  Meditation Studies Program does not entitle the

11  parole candidate to a laudatory chrono.  Since

12  the subject parole candidate has been a faithful

13  attendee and active and serious participant in

14  the program, teachers would like to instead,

15  would instead like to acknowledge his commitment

16  with a letter of commendation.  Okay, he talks

17  in here about your about what the program is

18  about weekly.  You go to it weekly?

19       INMATE HERNANDEZ:  Yes.

20       PRESIDING COMMISSIONER SAWYER:  Guided

21  meditation practices, lectures on practice and

22  Buddhist principle for living an ethical, moral

23  life.  Active class discussion on these topics.

24  Important aspect of the teaching also Buddhist

25  texts and periodicals distributed to

26  participants and readings and discussions based

27  on the literature.  Program began in January of

1   2003 and has met weekly unless prohibited by

2   emergencies procedures.  The parole candidate

3   has been attending for the entire time.  Several

4   of the same teachers have been involved from the

5   beginning and have come to know the parole

6   candidate very well in the classroom context

7   over the past two and a half years.

8   Mr. Hernandez's participation in the class, the

9   insight and care he has shown in spoken and

10  written word has been exemplary.  He speaks from

11  the heart.  We do not, and we have no question

12  that he's found new peace in his life.  And that

13  he is determined not to repeat his past

14  mistakes.  Although the teachers know very

15  little about the circumstances of

16  Mr. Hernandez's incarceration, based solely on

17  his behavior and attitude in the study program

18  we believe the candidate deserves the highest

19  consideration by the Parole Board.  Nice letter.

20          INMATE HERNANDEZ:  Thanks.

21          PRESIDING COMMISSIONER SAWYER:  Nice

22  letter.  Are you still in the program?

23          INMATE HERNANDEZ:  Still there.

24          PRESIDING COMMISSIONER SAWYER:  So this

25  is what's helped you with your inner peace

26  and --

27          INMATE HERNANDEZ:  To this day that's

30

1    been the biggest, yes the biggest and best

2    aspect that has helped me in all this things

3    I've been dealing with and coping with.

4         PRESIDING COMMISSIONER SAWYER:  And who

5    do you share this with?

6         INMATE HERNANDEZ:  Everyone that would

7    like to hear it, that needs to hear it and would

8    welcome it.

9         PRESIDING COMMISSIONER SAWYER:  Do you

10   share it on the yard?

11        INMATE HERNANDEZ:  Yes.

12        PRESIDING COMMISSIONER SAWYER:  Very

13   good.  Do you have anything additional that I

14   might have missed?

15        INMATE HERNANDEZ:  No, not --

16        PRESIDING COMMISSIONER SAWYER:  I mean

17   we're not into your chronos and things yet.  But

18   in terms of your future plans.

19        INMATE HERNANDEZ:  I believe that's it.

20        PRESIDING COMMISSIONER SAWYER:  Okay.

21   Very good, I'm going to turn it over to

22   Commissioner Rothlisberger.

23        DEPUTY COMMISSIONER ROTHLISBERGER:  I'll

24   still say good morning for another three

25   minutes, good morning Mr. Hernandez.  I'm going

26   to cover your post-conviction factors from the

27   time of your last hearing on July 1st 2004 to

1    the present.  Now the, in doing so I considered
2    your Central File.  I also reviewed the Life
3    Prisoners Evaluation Report prepared for the
4    July 2005 calendar by Correctional Officer,
5    Correctional Counselor I, H. Staten, S-T-A-T-E-
6    N.  The post-conviction progress reports
7    covering the period of July 1, '04 to the
8    present by the same CCI.  And the psychological
9    evaluation prepared for the June 2006 calendar
10   by Doctor M. Macomber, Ph.D., that's M-A-C-O-M-
11   B-E-R.  At the time of your last hearing, last
12   July 1st, you were housed here at CTF, correct?
13           INMATE HERNANDEZ:  Correct.
14           DEPUTY COMMISSIONER ROTHLISBERGER:  And
15   the Board took action to deny parole for one
16   year and recommended that you remain
17   disciplinary-free, upgrade educationally with
18   self-study and participate in self-help and
19   therapy if available.  Also at the time of your
20   last hearing your classification score was a 19,
21   which it remains today.  So the lowest minimum
22   mandatory.  And your prior custody level was a
23   Medium-A as it is today.  I did not see any gang
24   affiliation or vocational instruction.  However
25   I do see you do have, it kind of falls into it,
26   they don't call it vocational, they call it
27   academic, the PIA workshops you've been taking.

32

1   And that was your furniture shop and you
2   received satisfactory to above average on that.
3   Your work participation has been solid.  It
4   appears that, let's see, since the last hearing
5   you've been assigned to PIA furniture, earned
6   satisfactory to above average work grades.  And
7   supervisor's comments were, Hernandez continues
8   to work well with others.  From December 16th
9   '04 to April 7th '05 the work record was you
10  were assigned to PIA wood furniture factory
11  assembly shop.  And there were no work
12  supervisor reports in it for that period.
13  However the latest one 4/8/05 to 5/4/06, PIA
14  wood furniture factory assembly shop, earned
15  satisfactory to above average work grades per
16  work supervisors' reports dated 6/1/05 and
17  9/1/05.  And you also received a 128(b), 12/9/05
18  for participating in two hours of video
19  instruction and discussion related to community
20  reentry.  This program is provided through the
21  PIA inmate employability program.  I also have
22  some that you brought with you today some
23  additional work supervisors' reports.  This one
24  dated, let's see, 12/1/05 where you were
25  assigned to the desk line and will train as
26  necessary.  The next one dated 3/1/06 in which
27  you received a pay status raise.  And you're

33

1   doing a good job on the desk line.  And this

2   last one dated actually, 6/1/06, very recent, a

3   hard worker as the supervisor calls you.  You

4   are doing a good job and you're doing quite well

5   on your pay scale.

6       INMATE HERNANDEZ:  Thank you.

7       DEPUTY COMMISSIONER ROTHLISBERGER:  So I

8   do want to commend you on that.  In addition on

9   your group activities since your last hearing

10  you, let me see, participated in Narcotics

11  Anonymous for the first, second, third, fourth

12  quarters of 2004 as well as also elected by the

13  group back then as its co-chairperson, all

14  right.  And then more recently participated in

15  NA group meetings dated with 128(b)'s dated

16  6/28/05, 1/21/05, 1/6/06, 4/3/06, I think didn't

17  I see another one, yes I do, 5/11/06 and

18  received a 128 for participating in, I'm sorry,

19  attended Narcotics Anonymous meetings.

20  Completed ten weeks of hepatitis C group

21  meetings with staff psychologist C. Brown, Ph.D.

22  And that's per the 128(c), dated 8/20/, 5/05.

23  You also received a letter of commendation which

24  I believe the Commissioner read from the

25  Buddhist Meditation and Ethical Practices dated

26  6/6/05.  So I commend you on your participation

27  in NA.  How long you been involved in NA?

34

1           INMATE HERNANDEZ:  Eleven years.

2           DEPUTY COMMISSIONER ROTHLISBERGER:  How

3    old were you when you started using heroin?

4           INMATE HERNANDEZ:  I·was probably 21

5    maybe.  I started maybe that's late for some

6    people.

7           DEPUTY COMMISSIONER ROTHLISBERGER:  Yeah.

8           INMATE HERNANDEZ:  Yeah.

9           DEPUTY COMMISSIONER ROTHLISBERGER:  What

10    about when did you start sniffing glue and

11    paint?

12           INMATE HERNANDEZ:  That was at a young

13    age.

14           DEPUTY COMMISSIONER ROTHLISBERGER:  As a

15    kid?

16           INMATE HERNANDEZ:  Yes.

17           PRESIDING COMMISSIONER SAWYER:  Laudatory

18    chronos, I believe there's eight of them.  I

19    just read one from the, the latest one from

20    5/11/06.  You've also got the NA groups on

21    4/3/06, 1/6/06 NA.  And here's the inmate

22    employability program and that's from the Prison

23    Industry Authority.  You've also got three hours

24    of IEP video review inmate employability.  And

25    that was also from Prison Industry Authority

26    dated December 9th 2005.  Again your third

27    quarter laudatory chrono for 2005 from NA, NA

35

1   laudatory chrono 6/28/05.   Laudatory chrono

2   3/28/05 for NA and 10/1/04, well that was after

3   your last hearing on the third quarter NA.  When

4   you think of being released how important do you

5   feel it's going to be to continue with your

6   involvement with NA?

7       INMATE HERNANDEZ:  One hundred percent

8   is --

9       DEPUTY COMMISSIONER ROTHLISBERGER:   And

10  why is that?

11      INMATE HERNANDEZ:  Pretty much my whole

12  life of recovery and just remaining alive has to

13  be with staying sober.

14      DEPUTY COMMISSIONER ROTHLISBERGER:   I've

15  read some of the things that you've written and

16  they're quite eloquent.  Do you share those with

17  others?

18      INMATE HERNANDEZ:  Yes.

19      DEPUTY COMMISSIONER ROTHLISBERGER:   Do

20  you think of doing something with your writing?

21      INMATE HERNANDEZ:  Yes, absolutely, I try

22  to share in publications like before I used to

23  contributed to the Soledad Star.

24      DEPUTY COMMISSIONER ROTHLISBERGER:   Uh-

25  hum.

26      INMATE HERNANDEZ:  And then I've also

27  contributed some to the Santa Cruz National

36.

 1  Public Radio Program. Poetry --

 2          **DEPUTY COMMISSIONER ROTHLISBERGER:**

 3  Excuse me.

 4              (The tape was turned over.)

 5          **DEPUTY COMMISSIONER ROTHLISBERGER:**  We're

 6  back on record and you were saying about the

 7  Santa Cruz Public Radio?

 8          **INMATE HERNANDEZ:**  Yes, poetry, they have

 9  a poetry show segment on Sunday nights.  And I

10  contributed several of my poems to them.  And

11  other places that would benefit by the format

12  that I write in as far as recovery and other

13  things in living better, basically.

14          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Very

15  good.  Disciplinary, your most recent was a 115

16  was on a July 1990 for disrespect towards staff.

17  You had seven total 115's in the 20 years you've

18  been down.  And 128(a)'s counseling chronos,

19  you've had 11 with the most recent being in the

20  year 2000 regarding yard call.  So I do also

21  look at your history doesn't show other than the

22  instant offense any real violence.  You know

23  your 128's and your 115's, you had a utility

24  knife or something.  I don't know if that could

25  be construed as a weapon or what.  This

26  correctional counselor recommended after your

27  last hearing that you remain disciplinary-free

37

1    which it appears you have.  Participate in self-

2    help and substance abuse, which you've been

3    doing.  And cooperate with the psychiatrist or

4    psychologist on a new report.  And that also you

5    did.  As a matter of fact Dr. Macomber writes,

6    that your Axis I is no mental disorder, your

7    Axis II is no personal disorder, your GAF score

8    is a 90 which is very high and states that in

9    considering potential for dangerous behavior in

10   the institution he agrees with the prior

11   evaluator that said that your potential is below

12   average in comparison to other inmates.  And you

13   apparently told that evaluator that in 1991 or

14   you told this doctor you underwent serious life

15   changes.  And since that time he's been trying

16   to live a law-abiding life.  Sounds to me that's

17   when you got clean and sober.

18        INMATE HERNANDEZ:  Yes that's it.

19        DEPUTY COMMISSIONER ROTHLISBERGER:  In

20   considering potential for dangerous if released

21   to the community the level of service inventory

22   revise was administered.  And on that you

23   obtained a score of 4.2 cumulative frequency for

24   prison inmates.  This score means that if one

25   hundred men were released on parole you would be

26   expected to do better on parole than 95.8 of

27   them.  And Dr. Macomber also agrees with the

38

1  prior evaluator that stated you did not pose any

2  more risk to the community at this time in his

3  life than the average citizen.  In fact he poses

4  less risk due to his growth, maturity and

5  improvement.  And he did not find any

6  significant risk factors in this case.  The

7  doctor writes that you have excellent wood

8  working skills.  Would be able to obtain

9  employment immediately in the community.

10  Considerable family support and your level of

11  insight and self-understanding is impressive.

12  He obviously has undergone significant, mental,

13  spiritual and emotional changes over the years

14  of incarceration.  And the prognosis for

15  successful adjustment in the community is

16  excellent.  You know something that I was very

17  impressed with your meditation.  I also

18  participate in that.  And I encourage many of

19  the men who appear before me that perhaps that's

20  something they might want to consider.  I hope

21  you do continue to share your insight on the

22  yard.  Have I missed anything counsel?

23        ATTORNEY TARDIFF:  No I don't believe so.

24        DEPUTY COMMISSIONER ROTHLISBERGER:  All

25  right, commissioner.

26        PRESIDING COMMISSIONER SAWYER:  Thank

27  you.  What kind of vocational programs have you

1  completed?

2      INMATE HERNANDEZ:  Mill and cabinet.

3  I've also formerly had a completion in arc

4  welding.

5      PRESIDING COMMISSIONER SAWYER:   Arc

6  welding?

7      INMATE HERNANDEZ:  Yes.

8      DEPUTY COMMISSIONER ROTHLISBERGER:   And

9  there are certificates in the C File.

10     PRESIDING COMMISSIONER SAWYER:  Okay.

11 How about vocational graphic arts and printing?

12     INMATE HERNANDEZ:  I have some experience

13 in that.

14     PRESIDING COMMISSIONER SAWYER:

15 Experience but no completions.

16     INMATE HERNANDEZ:  I wouldn't say, I

17 don't know if it would qualify for a job.  I can

18 probably enter as a lay person.  But as far as

19 skills on a qualified level I can't claim that.

20     PRESIDING COMMISSIONER SAWYER:  Now your

21 arc welding did you receive a state

22 certification on that?

23     INMATE HERNANDEZ:  Yes.

24     PRESIDING COMMISSIONER SAWYER:  Okay.

25 Miss Tardiff do you have any questions?

26     ATTORNEY TARDIFF:  No I don't.

27     PRESIDING COMMISSIONER SAWYER:  Do you

40

1  have any additional questions?

2      **DEPUTY COMMISSIONER ROTHLISBERGER:**  No I

3  don't, thank you.

4      **PRESIDING COMMISSIONER SAWYER:**  Thank

5  you.  Miss Tardiff.

6      **ATTORNEY TARDIFF:**  Thank you.  I think

7  that the bottom line here is basically that Mr.

8  Hernandez would probably continue to be a danger

9  to society if he returned to substance abuse. .I

10 think that everything is key to that.  In from

11 what the reports indicated, in his own testimony

12 and his commitment to the Twelve Step Program I

13 don't think that he will return to the use of

14 drugs or alcohol.  I think that he realizes the

15 damage it has done, not only to his life, but

16 more importantly, to the taking of the victim's

17 life in this case.  He's clean and sober for 11

18 years.  At that point he made a commitment, a

19 real commitment to deal with his abuse of drugs.

20 And I think it shows.  He's prepared himself for

21 the outside by obtaining a vocation in mill and

22 cabinet.  And currently he's in PIA furniture.

23 Both of those are very employable skills.  He

24 also takes a leadership role in his Narcotics

25 Anonymous meetings as co-chair.  He receives

26 excellent work reports, satisfactory to above

27 average.  He completed his GED.  He has strong

41

1    support out in the community from his family as
2    well as his ex-wife or common law wife.  His
3    last two psych evals are supportive of release.
4    The most recent which a lot of that has been
5    gone over but I'd like to add that it states his
6    judgement was intact.  His insight and self-
7    awareness was excellent.  He has spent a great
8    deal of time in introspection and analysis of
9    his life.  At this point in his life alcohol and
10   drugs is no longer a serious problem.  He has no
11   longer no sort of Axis I diagnosis which would
12   relate to substance abuse.  No personality
13   disorder and a high GAF score of 90.  Under
14   review of the life crime that he accepts full
15   responsibility for the death of the victim and
16   his actions during the commitment offense.  It
17   states, he has spent a great deal of time
18   thinking about his life.  He did express
19   feelings of sorrow and remorse at the victim's
20   death as well as the victim's family's loss by
21   suffering and grief.  He stated that he wants to
22   atone for this offense in any way that he can.
23   It is apparent that this man has gone through
24   some serious self-exploration and serious life
25   changes.  His feelings appear to be quite
26   sincere and genuine.  He seems to be trying to
27   lead a good, productive, helpful life, good,

42

```
1   productive, helpful to others life.  And the
2   inventory we went through that.  The testing
3   procedure is very low in terms of his
4   dangerousness.  I agree with the prior evaluator
5   that stated that he did not pose any more risk
6   to the community at this time in his life than
7   the average citizen.  In fact he probably poses
8   less risk due to his growth, maturity and
9   improvement.  He concludes that he has excellent
10  wood working skills, considerable family support
11  and his level of insight and self-awareness is
12  impressive.  His prognosis is excellent.  And in
13  terms of the second most recent which was done
14  in '99, it's stated that his level of insight
15  and judgement in general and specifically
16  regarding his commitment offense are good and
17  support a causative prediction of successful
18  adaptation to community living.  He did appear
19  to be general penitent for his crimes.  His
20  level of dangerousness is no more than the
21  average citizen in the community.  And basically
22  that this is the, his prior criminal history is
23  mainly property crimes and drug related.  Since
24  he's been incarcerated he hasn't had any 115's
25  which were violent in nature or showed any
26  tendencies towards violence or threats of
27  violence.  I think at this time that he has made
```