# EXHIBIT 15
# Part 3 of 7

43

1  himself suitable.  I don't think further

2  incarceration would be of any benefit in terms

3  of preparing him for the community and for

4  helping him to remain clean and sober.  He's

5  been incarcerated since '85.  Twenty-one years

6  on a second degree, I think the amount of time

7  is certainly sufficient at this point.  And I

8  would submit that he is suitable.  Thank you.

9        PRESIDING COMMISSIONER SAWYER:  Thank

10  you.  Mr. Hernandez this is your opportunity to

11  tell this panel why you feel you're suitable for

12  parole today.

13        INMATE HERNANDEZ:  Yes sir I didn't know

14  how the hearing would go but I did prepare a

15  statement I'd like to give.  In preparation for

16  this hearing I was asked for documentation of

17  upgrading and educational, vocational and

18  chronos of attendance in self-help, group

19  therapy, job offers et cetera.  There seems to

20  be very little I have to offer in those regards.

21  And left me myself feeling as if I've wasted my

22  time.  The fact is I've made countless and

23  invaluable contributions of the heart, religious

24  and spiritual in nature that are mostly

25  undocumentable (sic).  On top of that I'm caught

26  between a rock and a hard spot because my goals

27  are twofold in that I wish to do good deeds

1    while being anonymous about it or at least being

2    humble, leaving no room for vain pride. Yet I

3    want to give my full respect to this panel and

4    all concerned. Therefore at the risk of trying

5    to make myself look good I'll endeavor to show

6    I'm good and ready for parole. Starting with

7    the 12 Step Program. Not only have I attended

8    consistently I've given myself to serving the

9    program by first of all staying clean and sober

10   and caring and sharing the message to the still

11   suffering addict that recovery is possible.

12   This I do not only at meetings but I could say

13   my entire life 24/7 is geared towards clean and

14   sober living. I'll give you only one example.

15   T is a person who was suffering from drugs and

16   alcohol addiction. When I recently got T's

17   address I wrote several letters of which spoke

18   exclusively on how good living clean and sober

19   is. This person is now off drugs and alcohol

20   and steadily getting their life in order. On

21   another subject I've been told that my writing

22   skills are good enough that I can find

23   employment in doing so. Yet for now I've' not

24   only been concentrating on upgrading and

25   improving, I've been using my present writing

26   abilities for inspiring and encouraging as many

27   people as possible on living and doing better.

45

1. For the sake of being brief I'd like to give one
2. example. My son who recently became the legal
3. age of an adult finally started responding to my
4. letters. So I gave him all wisdom and
5. experience I have in an encouraging way. I know
6. I contributed something to his becoming a
7. responsible and respectful adult. Another
8. aspect of my life is caring for or being of
9. service to the elderly as well as to the dying.
10. Two brief examples are I visited a friend and
11. member of the recovery fellowship and gave him
12. my kind and concerned friendship as he was
13. dying. And when living in the same cell with an
14. elderly man I previously never met I gave him
15. all the respect and consideration I could as
16. well as doing cell cleaning chores in order to
17. make his life a little easier. In order to give
18. a better explanation of my life and why I mouth
19. this way allow me to back track to some of my
20. main turning points. I realize all too well
21. that I was selfish, a user and destroyer, an
22. addict and no good for anything, the bottom. I
23. mean what skills, gifts and abilities did I
24. have, none. Not only that but I was a grown man
25. with children whom I should have been protecting
26. and providing for. Even now I have to attribute
27. the very fact that I am even alive is only due

46

```
 1   the mercy, goodness and compassion of the
 2   Almighty which I'll call my higher power.  Not
 3   only did I stop asking my wife for money because
 4   obviously the kids needed it more than me.  I
 5   stopped asking for things period and became
 6   determined to provide not only for myself but to
 7   become a giver, builder, healer, maker and
 8   contributor.  And it was rough because for one
 9   reason jobs were scarce even here in prison.
10   And my own regrets of wasting precious time and
11   energy and opportunities and in order to pay my
12   debts for it I exercised extremely, getting
13   myself conditioned for hard work.  Along the way
14   I experienced hardships in various forms.  Yet I
15   remained determined to stay clean, away from
16   crime and selfish ways.  The eleventh step is a
17   good description of how I went about my
18   transformation.  I quote, sought through prayer
19   and meditation to improve my conscious contact
20   with God whom my understanding praying only for
21   knowledge of his will for me and the power to
22   carry it out.  In this sense I admitted to God,
23   to myself and to others the wreckage I'd done in
24   my life and have been sorry for it all.  Praying
25   that I didn't want to be that way ever again.
26   And asking for the skills and abilities to be a
27   selfless, builder, giver and provider.  Here is
```

47

1  one of my best examples that have resulted from

2  this prayer and meditation.  My writing skills

3  and abilities are another direct of this too.

4  In the past when asked how I was going to earn a

5  living when out of prison I responded by saying,

6  God would provide.  And perhaps that sounded

7  naïve.  Yet I know in my heart that I was, that

8  my life was in absolute wreckage.  And only by

9  placing my entire focus on my higher power is

10  how I was restored to sanity and became fully

11  functional.  That will be my stand for the rest

12  of my life.  Nevertheless I hold respect to the

13  here and now, everyday responsibilities.  As my

14  work and vocational records shows I am a

15  responsible, good and hard worker.  More so than

16  could be documented I have good work ethics and

17  habits.  In fact I actually view all work and

18  service as being sacred.  In closing on another

19  basic yet profound aspect that is mostly

20  undocumentable concerns religion, spirituality.

21  I have devoted lots of my time and energy in

22  search and understanding of these great

23  mysteries which I know now could never be fully

24  found and understood.  Nevertheless I have

25  absolutely no regrets.  In fact I have come

26  closer to the truth with improved conscious

27  contact with God as I understand him.  For your

48

1    information I find this in education and

2    skillful ways of living.  In building, making

3    and creating.  In art and beauty, in healing,

4    kindness and compassion.  In nature, in

5    nutrition, in people and pretty much everywhere.

6    And I'm evermore most grateful for this and will

7    continue this way for the good of all.  Thank

8    you.

9         **PRESIDING COMMISSIONER SAWYER:**  Thank

10   you.  It's 24 minutes past 12 and we will recess

11   for deliberations.

12                    **R E C E S S**

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

49

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3          PRESIDING COMMISSIONER SAWYER:  Fifty-

4     six, 12:56 in the afternoon and everyone has

5     returned to the room in the matter of

6     Mr. Hernandez.  The panel has reviewed all of

7     the information received from the public and

8     relied on the following circumstances in

9     concluding the prisoner is suitable for parole.

10          INMATE HERNANDEZ:  Thank you, thank you,

11    thank you.

12          PRESIDING COMMISSIONER SAWYER:  And would

13    not pose an unreasonable risk of danger to

14    society or a threat to public safety if released

15    from prison.  Congratulations.

16          DEPUTY COMMISSIONER ROTHLISBERGER:  You

17    okay, want some Kleenex?

18          INMATE HERNANDEZ:  I'll be fine thank

19    you.

20          PRESIDING COMMISSIONER SAWYER:  Is it

21    sinking in?

22          INMATE HERNANDEZ:  Thank you very much.

23          PRESIDING COMMISSIONER SAWYER:  You've

24    never heard that before have you?

25          INMATE HERNANDEZ:  Never have, no.

26          PRESIDING COMMISSIONER SAWYER:  You did a

27    HECTOR HERNANDEZ  D-33689  DECISION PAGE 1  06/08/06

50

1    remarkable job.

2         INMATE HERNANDEZ:  Thank you sir.  Thank

3    you sir.  I want to look you in the eye and tell

4    you thank you.  Thank you, thank you.

5         DEPUTY COMMISSIONER ROTHLISBERGER:  Your

6    welcome.  You earned it.  You've gone down a

7    long road.  You're still on that journey.

8         INMATE HERNANDEZ:  Yes.  And I will

9    remain on it too.

10        PRESIDING COMMISSIONER SAWYER:  The

11   prisoner has no juvenile record of assaulting ·

12   others.  While in prison he's enhanced his

13   ability to function within the law upon release

14   through participation in educational programs.

15   He's attained his GED.  Probably one of the

16   things that we feel very strongly about in this

17   case is your Buddhist Meditation, the last three

18   years and the letter of commendation from Tim.

19   That was pretty compelling.  Because not only

20   did we read that letter and think, okay, letter

21   of commendation.  This guy really likes him.

22   But I think you displayed it here today.  I knew

23   you displayed it.  We both feel you displayed

24   it.  You're not just telling us that you believe

25   this, you're showing us.

26        DEPUTY COMMISSIONER ROTHLISBERGER:  You

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 2  06/08/06

51

1    live it.

2         PRESIDING COMMISSIONER SAWYER:    So that

3    was very compelling.    As well as your closing

4    speech.    I can honestly tell you I've been doing

5    these for eleven months.    I started last July

6    1st.    And I've never, ever heard a closing

7    remark better than yours.    That was well thought

8    out.    It was well read.    And it was very

9    sincere.    You're a very serious guy.    And I

10   think you have the courage of your convictions.

11   I really do.    And so let the record reflect that

12   you, during your speech that you did not falter

13   and during your speech pulled some beaded

14   artwork from around your neck and displayed that

15   with an eagle and an American flag and a bear on

16   the back and even turned it around.    I mean you

17   could probably use both hands huh?    You can eat

18   with both hands right (laughter from inmate)?

19   If you played golf you'd hit either side of the

20   ball, it doesn't matter.    Very articulate.

21   Another issue in self-help programs and this is

22   very meaningful as you got 11 years in NA.

23   You've clearly articulated to us how important

24   that is.    You're also the co-chairman.    How long

25   have you been the co-chairman?

26         INMATE HERNANDEZ:    Off and on for quite a

27   HECTOR HERNANDEZ   D-33689   DECISION PAGE 3   06/08/06

52

1   while.

2        PRESIDING COMMISSIONER SAWYER:   Yeah,

3   because I saw it back in the history there too.

4   You've had ten weeks of hep C.   You've had a 13-

5   week course of IMPACT and these are just the

6   most recent courses.  We're not going all the

7   way back to the beginning here.   Through PIA

8   viewed the inmate employability program.   Some

9   very important issues in terms of your

10  vocational programs.  Your vocational welding,

11  arc welding certificate.  That's a marketable

12  skill that can be used in your future.   You do

13  have some, well you don't have a certificate,

14  you've got vocational graphic arts and printing.

15  That was in about three years ago.   Currently

16  you're working in the furniture factory with

17  above average work reports for PIA.   And you

18  have a certificate in mill and cabinet, right?

19        INMATE HERNANDEZ:   Yes.

20        PRESIDING COMMISSIONER SAWYER:   Okay.

21  You've received numerous laudatory chronos

22  behind your NA.  That's so important given your

23  history and the commitment offense.   Your

24  involvement with NA is very, very important.

25  You committed the crime as a result of a

26  significant stress in your life.   This is not an

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 4  06/08/06

53

1    excuse.  We're not in any way, shape or form

2    saying that you had stress in your life.  But

3    you were out of control.  You started at 11

4    years of age burglarizing.  You didn't have any

5    respect for anybody's stuff or yourself more

6    importantly.  And that stress was self-induced,

7    substance abuse.  It looks like you've done just

8    about everything.  Paint, glue, you're lucky to

9    be alive today.

10          INMATE HERNANDEZ:  Yes.

11          PRESIDING COMMISSIONER SAWYER:  Because

12   we know horror stories about paint and glue.

13   You lack a significant criminal history of

14   violent crime.  You got lots of substance abuse

15   history.  You've got a lot of burglaries.  Again

16   taking people's stuff when they weren't looking.

17   Going to the markets, going into a pharmacy or

18   doctor's office and taking money.  You have

19   realistic parole plans.  While they do not have

20   a job offer you have a tremendous amount of

21   family support.  You've got two places to live,

22   one in Sanger, one in Selma with your mom and

23   dad in Sanger, the old family homestead.  And

24   with your sister in Selma.  What with your arc

25   welding this is for the record, these are both

26   farming communities.  And mill and cabinet work,

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 5  06/08/06

54

1  woodwork as well as arc welding clearly are

2  marketable skills and could very valuable in

3  those areas.  Do you agree?

4          INMATE HERNANDEZ:  I agree.

5          PRESIDING COMMISSIONER SAWYER:  So we

6  don't feel that given your what we've seen here

7  today as well as the skills that you have, we

8  don't have a problem that you can get out there

9  and get a job.  You're still young enough to do

10  that.  You don't have any physical maladies and

11  so you're in good shape there.  We feel that

12  because of your maturation, your growth, greater

13  understanding and your age at this time which is

14  not prohibitive in terms of working, this has

15  reduced your probability of recidivism.  We

16  don't think you're going to come back.  We feel

17  comfortable that we release you, you're going to

18  be a success in whatever you endeavor.

19  Institutional behavior, while you do have seven

20  115's, none, none of them are violent.

21          INMATE HERNANDEZ:  Okay.

22          PRESIDING COMMISSIONER SAWYER:  And the

23  last one was in 1999.  It was for long hair and

24  that's a violation of the rule, clearly.  You've

25  had eleven 128's.  The last one being in the

26  year 2000.  So you've distanced yourself from

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 6  06/08/06

55

1    any of the discipline problems that you had.

2    You had some streaks there.  You weren't

3    programming well.  You weren't doing anything

4    well.  But you've certainly gotten the handle on

5    that.  We feel you show a sign of remorse.  It

6    indicates that you understand the nature and the

7    magnitude of the offense, accepts responsibility

8    for the criminal behavior and has the desire to

9    change towards good citizenship.  Give me an

10    affirmative.

11        INMATE HERNANDEZ:  That's an affirmative,

12    that's obviously a duty.

13        PRESIDING COMMISSIONER SAWYER:  Okay.

14        INMATE HERNANDEZ:  Absolutely.

15        DEPUTY COMMISSIONER ROTHLISBERGER:  The

16    tape machine doesn't read your nods though

17    (laughter by all).

18        PRESIDING COMMISSIONER SAWYER:

19    Commissioner Rothlisberger.

20        DEPUTY COMMISSIONER ROTHLISBERGER:

21    Absolutely, Dr. Reed back in 1999 which is your

22    prior psych report had written that your

23    violence potential within a controlled setting

24    is considered to be below average.  Released to

25    the community violence potential is considered

26    to be no more than the average citizen.  But did

27    HECTOR HERNANDEZ  D-33689  DECISION PAGE 7  06/08/06

56

1  say that heroin abuse did present a significant

2  risk factor.  And this inmate does appear to

3  have a heroin abuse problem.  This was in '99

4  and you continued participation in NA during

5  your incarceration as well as a contingency of

6  parole is suggested.  And Dr. Macomber in his

7  most recent psychological evaluation states of

8  course on the Axis I, you have no mental

9  disorder, Axis II, no personality disorder.  He

10  agreed with Dr. Reed and says that the potential

11  for dangerousness behavior in the institution

12  agrees with the prior evaluator, below average

13  in comparison to other inmates.  Never received

14  any disciplinaries for aggressive, violent or

15  dangerous behavior.  And stated again that in

16  1991 when you underwent serious life changes.

17  When you got clean and sober.

18      INMATE HERNANDEZ:  That's it.

19      DEPUTY COMMISSIONER ROTHLISBERGER:  And

20  considering potential for dangerous when

21  released to the community, the level of service

22  inventory revised, you retained a score of 4.2.

23  Means that if a hundred men were released on

24  parole you're expected to do better on parole

25  than 95.8 of them.  But agrees also with the

26  prior evaluator that you do not pose any more

27  HECTOR HERNANDEZ   D-33689   DECISION PAGE 8   06/08/06

57

1    risk to the community at this time in his life

2    than the average citizen.  In fact probably

3    poses less risk due to is growth, maturity and

4    improvement.  And found no significant risk

5    factors.  Again I believe we have this on the

6    record before but you have excellent wood

7    working skills.  You are able to obtain

8    employment.  Considerable family support.  And

9    your level of insight and self-understanding is

10   impressive.  I know it impressed the panel.  You

11   obviously have undergone significant mental,

12   spiritual and emotional changes over the years

13   of incarceration.  And the doctor concludes with

14   the prognosis for successful adjustment in the

15   community is excellent.  Commissioner.

16        PRESIDING COMMISSIONER SAWYER:  Thank

17   you.  And it's okay to smile a little

18   (laughter).  You don't have to be so stoic.

19        DEPUTY COMMISSIONER ROTHLISBERGER:

20   You're so serious.

21        PRESIDING COMMISSIONER SAWYER:  Okay the

22   base term of confinement, we're going to do the

23   numbers here.  In fact I've given --

24        DEPUTY COMMISSIONER ROTHLISBERGER:

25   Counsel.

26        PRESIDING COMMISSIONER SAWYER:  Counsel,

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 9  06/08/06

58

1  a copy of this for you.    The base term offense

2  for which the prisoner has been convicted is

3  murder in the second degree, PC 187, 12022., in

4  addition 12022.5.    The offense occurred on 8/15

5  of 1985.    The term is derived from the matrix

6  located in the California Code of Regulations,

7  Title 15 at 2403(c), second degree murder.

8  Offense committed on or after 11/8 of 1978.    The

9  panel finds the Category 1C is appropriate.    1

10  would be participating victim, victim was an

11  accomplice or otherwise implicated in a criminal

12  act with the prisoner during which the result of

13  the death occurred, drug dealer.    There was an

14  illegal act going on here.    And that led up to

15  this particular murder.    The C is severe trauma,

16  death resulted from severe trauma inflicted with

17  deadly intensity, a shotgun.    A shot to this

18  victim and killing him.    We have a choice of

19  three numbers.    A mitigating number, a middle

20  number or an aggravated number.    Given the

21  circumstances of this case we're going to take

22  the middle number of 18 years.    We assess 216

23  months which is 18 years for the base offense.

24  And this is how it comes out.    We're adding

25  because you used a weapon in this 12022.5 charge

26  on that, 24 months.    So now that brings up to

27  HECTOR HERNANDEZ    D-33689    DECISION PAGE 10  06/08/06

59

 1    240 months.  Which is in my head 20 years.

 2         DEPUTY COMMISSIONER ROTHLISBERGER:  Yes

 3    (laughter).

 4         PRESIDING COMMISSIONER SAWYER:  Okay.

 5    Post-conviction credit, post-conviction credit

 6    from the date the life term started, that's

 7    12/22 of 1986 to today's date, 6/8 of '06 is 60

 8    months.  Do you know what the post-conviction

 9    credit is?  Do you know what I'm talking about

10    here?

11         INMATE HERNANDEZ:  Generally, not

12    exactly.

13         PRESIDING COMMISSIONER SAWYER:  You get

14    four months a year for every year you don't have

15    a 115.

16         INMATE HERNANDEZ:  All righty.

17         PRESIDING COMMISSIONER SAWYER:  And you

18    got five years.  Now some years you had two

19    115's so it's not, we're not taking seven years

20    off.  What we're taking is, what did we took,

21    took five, four or five.

22         DEPUTY COMMISSIONER ROTHLISBERGER:  How

23    did we get to 60?

24         PRESIDING COMMISSIONER SAWYER:  We added

25    the, he had --

26         ATTORNEY TARDIFF:  He had seven, okay --

27    HECTOR HERNANDEZ  D-33689  DECISION PAGE 11 06/08/06

60

1          PRESIDING COMMISSIONER SAWYER:  He had

2  seven 115's but some of them were multiple --

3          DEPUTY COMMISSIONER ROTHLISBERGER:  Were

4  in the same year.

5          ATTORNEY TARDIFF:  So it was more than

6  five years or whatever.  How many years were --

7          DEPUTY COMMISSIONER ROTHLISBERGER:  What

8  did I do with the --

9          PRESIDING COMMISSIONER SAWYER:  It was 76

10  months total.

11          DEPUTY COMMISSIONER ROTHLISBERGER:  Oh,

12  here we go.  Yeah it was 76 months minus 16.

13          PRESIDING COMMISSIONER SAWYER:  Minus 16.

14  We gave you four years because --

15          DEPUTY COMMISSIONER ROTHLISBERGER:

16  Right.

17          PRESIDING COMMISSIONER SAWYER:  These

18  seven 115's occurred --

19          DEPUTY COMMISSIONER ROTHLISBERGER:

20  Didn't all happen in different years.

21          PRESIDING COMMISSIONER SAWYER:  -- over a

22  four year period.

23          DEPUTY COMMISSIONER ROTHLISBERGER:

24  Right.

25          ATTORNEY TARDIFF:  So he didn't get the

26  credit for four years.

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 12 06/08/06

61

1          PRESIDING COMMISSIONER SAWYER:    He didn't

2    get the credit for four years.

3          DEPUTY COMMISSIONER ROTHLISBERGER:

4    Right.

5          PRESIDING COMMISSIONER SAWYER:    He lost

6    16 months.

7          DEPUTY COMMISSIONER ROTHLISBERGER:

8    Right.

9          PRESIDING COMMISSIONER SAWYER:    So he had

10   76 months of credit.  We took 16 months off of

11   that which gives you 60, five years.  So we're

12   going from 20 years down to five years.  Twenty

13   years minus five years gives you a total of 118

14   -- of a 180 months, which is 15 years

15   essentially, 15 or 14.

16         ATTORNEY TARDIFF:    Wait a minute, the

17   credit is four --

18         PRESIDING COMMISSIONER SAWYER:    Fifteen

19   years.

20         ATTORNEY TARDIFF:    -- four months off for

21   each year of no 115's.  How many years was he

22   115 free?

23         PRESIDING COMMISSIONER SAWYER:    Well we

24   figured his time at 19 years because it'll be 20

25   years in December.

26         ATTORNEY TARDIFF:    Okay.

27   HECTOR HERNANDEZ   D-33689   DECISION PAGE 13 06/08/06

62

1          DEPUTY COMMISSIONER ROTHLISBERGER:

2     Right.

3          PRESIDING COMMISSIONER SAWYER:    If we

4     figured his time at 19 years that he's been

5     down.

6          ATTORNEY TARDIFF:    And five years.    He

7     wasn't credited with five years.

8          PRESIDING COMMISSIONER SAWYER:    He was

9     credited for five years.

10          DEPUTY COMMISSIONER ROTHLISBERGER:    He

11     was.

12          PRESIDING COMMISSIONER SAWYER:    He was

13     given five years credit, 60 months.

14          ATTORNEY TARDIFF:    No, but how many years

15     of 115's?

16          DEPUTY COMMISSIONER ROTHLISBERGER:    Well

17     I have times four, 19 years times four.

18          ATTORNEY TARDIFF:    That would be 15 years

19     of good time.

20          PRESIDING COMMISSIONER SAWYER:    That's

21     correct.

22          DEPUTY COMMISSIONER ROTHLISBERGER:

23     That's correct.

24          ATTORNEY TARDIFF:    Times four gives him,

25     that's how you got the 60.

26     //

27     HECTOR HERNANDEZ   D-33689   DECISION PAGE 14 06/08/06

63

1          DEPUTY COMMISSIONER ROTHLISBERGER:

2     That's how we got there.  We just -- Right.

3          PRESIDING COMMISSIONER SAWYER:   There are

4     several ways you can go.

5          ATTORNEY TARDIFF:  Okay.  You went the

6     other way.

7          DEPUTY COMMISSIONER ROTHLISBERGER:   Thank

8     you counsel.

9          ATTORNEY TARDIFF:   Thank you.

10          PRESIDING COMMISSIONER SAWYER:   I move

11     slow (laughter).

12          ATTORNEY TARDIFF:   That's where the 60

13     months comes in.

14          PRESIDING COMMISSIONER SAWYER:   Okay so

15     you have 180.  Your date then would be 15 years

16     from 12/22 of 1986.

17          INMATE HERNANDEZ:  Okay, very good.

18          PRESIDING COMMISSIONER SAWYER:   So you've

19     served that 15 years plus.  All right.  Let's

20     finish your conditions for you.  And I'm going

21     to ask you at the end of this if there is, if

22     you have any problem with any of these

23     conditions.  These are imposed.  Do not use

24     alcoholic beverages.  Submit to alcohol testing,

25     submit to anti-narcotic testing, submit to THC

26     testing, participate in substance-abuse programs

27     HECTOR HERNANDEZ  D-33689  DECISION PAGE 15 06/08/06

64

1  such as AA or NA.  Attend outpatient clinic.  Do
2  you have any problems with any of those?
3        INMATE HERNANDEZ:  I have no problem with
4  any of that.
5        PRESIDING COMMISSIONER SAWYER:  I would
6  imagine.  Okay.  We don't have any other special
7  conditions of parole.  The biggest single item,
8  issue is the NA and we're going to be testing
9  you while you're on parole.  And of course it
10  goes without saying that there are going to be
11  other parole conditions.  For example if your
12  father, if you go to live your father and he has
13  a gun in the house he's going to have to remove
14  it, okay.  Because you can't ever possess a gun
15  as an ex-felon.  You'll always unfortunately be
16  an ex-felon, okay.  But in the free world that's
17  not so bad.  So do you have any questions of me
18  or us?
19        INMATE HERNANDEZ:  No questions.
20        PRESIDING COMMISSIONER SAWYER:  Okay.
21  Counsel?
22        ATTORNEY TARDIFF:  I have none.
23        PRESIDING COMMISSIONER SAWYER:  Okay.
24        ATTORNEY TARDIFF:  Thank you.
25        PRESIDING COMMISSIONER SAWYER:  Your
26  welcome.  Oh, now, as was, as you've heard
27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 16 06/08/06

65

1    before, this decision goes to the Decision

2    Review Unit at the Board of Prison (sic)

3    Hearings.  That's our legal folks who will look

4    over and make sure all of our calculations are

5    correct and we've done everything that we need

6    to do by law and regulation.  Then it's sent

7    over to the Governor's Office.  And the Governor

8    and his staff, his staff will make

9    recommendations to him whether to let it go or

10   let it happen or reverse it.  If it is reversed

11   you'll be notified and then it comes back to the

12   Board.  There's 12 commissioners, 11 other

13   commissioners and myself in the state.  We meet

14   once a month and we look at anything the

15   Governor has concerns about.  We meet and

16   discuss those.  And we can send it back from

17   that meeting to the Governor and say we don't

18   agree with you Governor.  Which we do, which we

19   do often.  So it's, we send it back and forth.

20   The Governor can do what he wants at that point.

21   He can reverse your decision.  Let me, let me

22   tell you, if for some reason something happens

23   at the state level and it comes back it's

24   reversed don't get discouraged.  Don't get

25   discouraged.  Sometimes that's not officially a

26   test but that is a test.  That's testing you to

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 17 06/08/06

66

1    see if you are really going to be able to put up

2    with some stress.  Having a date, getting it

3    reversed, oh, so, you know, your character will

4    show at that point.  You don't want to get any

5    115's between now and ever.  You get a 115 or

6    have a problem along the line, I'd also advise

7    you not to, try to keep it under your hat.  It's

8    not easy to do I know.  The rumors run around

9    here all the time.  But try to keep it under

10   your hat as much as you can so nobody gets

11   jealous.  And --

12          DEPUTY COMMISSIONER ROTHLISBERGER:  Tries

13   to sabotage you.

14          PRESIDING COMMISSIONER SAWYER:  Yes

15   sabotage your date.  Getting you into a mutual

16   combat --

17          DEPUTY COMMISSIONER ROTHLISBERGER:  And

18   they will.

19          PRESIDING COMMISSIONER SAWYER:  -- or

20   something like that.  You know how to handle

21   that.  You've never had a mutual combat, okay.

22   So what we're saying is walk on eggs for a

23   while.  You'll probably hear in about three or

24   four months.  By law they're supposed to let you

25   know within 120 days but sometimes that doesn't

26   happen because we're doing an awful lot of

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 18 06/08/06

1   hearings now.  We're really cranked up on

2   hearings.  And I can tell you that out of the

3   dates I've given I've had the Governor reverse

4   two of them and I won both of those at the Board

5   meeting.  And I've given a number of dates.  So

6   I've got -- He's letting mine go through for

7   some reason or another.  Some people get more.

8   What can I say?  So we're optimistic for you

9   Mr. Hernandez.  We're hoping that you get your

10  date and go live with your mom and dad and your

11  sister and you reunite yourself with your

12  children and your grandchildren and live a

13  successful life.  We've got all the confidence

14  in you.  We don't think we'll be reading about

15  you in the newspaper doing something bad.  Maybe

16  we'll be reading some of your literature.

17          INMATE HERNANDEZ:  Hopefully yes.

18          PRESIDING COMMISSIONER SAWYER:  Okay.

19          INMATE HERNANDEZ:  Absolutely.

20          PRESIDING COMMISSIONER SAWYER:  All

21  right, that concludes -- Do you have anything

22  you'd like to say?

23          DEPUTY COMMISSIONER ROTHLISBERGER:  No,

24  just to wish you all the best of luck.

25          INMATE HERNANDEZ:  Thank you very much.

26  //

27  HECTOR HERNANDEZ  D-33689  DECISION PAGE 19 06/08/06

68

```
 1        DEPUTY COMMISSIONER ROTHLISBERGER:  Carry

 2   your message always.

 3        PRESIDING COMMISSIONER SAWYER:  Okay,

 4   we're 17 minutes past one and that concludes

 5   this hearing.

 6                    --oOo--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE GRANTED                    OCT  16  2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 20 06/08/06
```

**BOARD OF PRISON TERMS**                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

{ } **PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison.................................................... _____ Months

| Case # | Count # | Offense |
|--------|---------|---------|

B. Time for using a weapon............................................. + _____ Months

C. Time for other crimes.................................................. + _____ Months

| Case # | Count # | Offense | Months |
|--------|---------|---------|--------|

| Case # | Count # | Offense | Months |
|--------|---------|---------|--------|

| Case # | Count # | Offense | Months |
|--------|---------|---------|--------|

D. Total term............................................................... = _____ Months

E. Time credit from _____ to _____ - _60_ Months
        (Life term start date)  (Date of hearing)

F. ......................................................................... = _180_ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

| HEARING PANEL |
|---------------|

Name _____  Date _____

Name _____  Date _____

Name _____  Date _____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|

BPT 1005(a)(REV. 01/02)

Distribution: White –C. File
Canary- BPT
Pink- Prisoner

69

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 68, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of HECTOR HERNANDEZ, CDC NO. D-33689, on JUNE 8, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated July 3, 2006, at Sacramento County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "2"

HECTOR HERNANDEZ

---

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff          ACTION NUMBER   336275-3

vs.                                                       REPORT AND RECOMMENDATION OF THE
                                                          PROBATION OFFICER

          HECTOR HERNANDEZ          Defendant             Probation No.   82028
                                                          CII  A05400164    FBI  0827976V3
                                                          ///SO  139961     DA   85S0435
                                                          Race:  Mexican

TO THE HONORABLE JUDGE OF THE ABOVE ENTITLED COURT:

    Pursuant to the statutes and at the direction of the court, your probation officer
hereby respectfully submits the following report and recommendation as to the above named
defendant, after ( ) conviction in court trial (X) verdict in jury trial ( ) plea: Guilty

| 942 Edgar Street, Sanger, CA | PC 187, Second Degree Murder w/PC 12022.5, |
|---|---|
| Address | Charge(s)   Use of Gun |

| 27 (2-28-59)  /   518 days | August 15, 1985 |
|---|---|
| Age          Time in Custody | Date of Offense |

| Lucile Wheaton, Public Defender | September 5, 1985 |
|---|---|
| Attorney | Date of Arrest |

| June 10, 1986              8:30 a.m. | John Fitch          Twelve |
|---|---|
| Date of Sentencing          Time | Judge          Dept. |

BRIEF SUMMARY OF FACTS:

    On August 15, 1985, defendant Hernandez shot and killed Silvestere (Odulio)
    Bustos.

    NOTE:  Defendant Hernandez was, on October 23, 1984 under Fresno Municipal
    Court #675358, placed on two years formal probation on misdemeanor violations
    of CVC 23152a, Driving while Intoxicated, H&S 11550a, Under the Influence of a
    Controlled Substance, and PC 148, Resisting Arrest.

On May 13, 1986, defendant Hector Hernandez was found guilty by a jury trial in Department Twelve of the Fresno County Superior Court of a felony violation of Section 187, Murder in the Second Degree, as charged in Count One of the First Amended Information. Additionally, the jury found the defendant guilty of an enhancement within the meaning of Penal Code Section 12022.5, Personal Use of a Gun, as charged within Count One.

A referral was then directed to the probation officer for the preparation of a presentence investigation report, and sentencing was calendared for June 10, 1986 at 8:30 a.m. in Department Twelve of the Fresno County Superior Court. The probation officer was instructed to file a written report on June 7, 1986.


CIRCUMSTANCES OF THE OFFENSE

The defendant was convicted by jury trial on May 13, 1986, and the information presented to the jury which resulted in the conviction of the defendant was not made available to your officer. Therefore, the circumstances of the offense were obtained from the preliminary hearing transcript, the Fresno County Sheriff's Department Crime Report, Case #85-16278, and from the Fresno County District Attorney's file #85S0435:

On August 15, 1985 at approximately 3:56 a.m., Officer F. Lopez was dispatched to 2448 South Eleventh #4, Calwa, regarding an injured person and there met with four Mexican males and one female who were standing outside the residence. The officer entered the front living room area of the apartment and observed a Mexican male subject lying on the living room floor with a large pool of blood under the chest and face area. Paramedics and American Ambulance personnel arrived at the scene and advised Officer Lopez that the victim was deceased. The victim was subsequently identified as being Silvestere Odulio Bustos. Subsequent investigation determined that the victim had been shot at close range by a shotgun and at the time that he was shot, the victim was wearing a watch, two gold-colored rings on each hand and had his car keys and currency in his pocket. Officers made contact with Eleno Santa Maria Mojica, Genaro Flores, Doroteo Juarez, Enrique Casias and Mary Lopez.

Enrique Casias was given immunity by the prosecution and then testified that he had been living with the victim at the apartment on South Eleventh Street for approximately one month, that he knew the man killed as being Odulio Bustos with a nickname of "Lolo", and that victim Bustos was the one renting the apartment. Casias testified that at 3:00 a.m. on August 15, 1985, there was a knock on the door, at which time Casias looked out the window and observed defendant Hernandez, who asked Casias if he "had some" (meaning heroin) and then gave Casias $20.00. Casias said he then told defendant Hernandez, "Let me see if my friend has some," referring to victim Bustos. Casias was getting "pieces" from victim Bustos' boots when the defendant

kicked open the door ...ered with a shotgun and st.. ..., "Give me the gun."
Victim Bustos was asleep, however, the defendant again repeated, "Give me the
gun." The defendant also asked victim Bustos for the "chiva", which means
heroin. As soon as defendant Hernandez said, "Give me the gun," the defendant
shot Bustos. Casias stated that defendant Hernandez had pointed the gun at
Casias first and as Casias ran backwards with his hands up and stayed in the
background, he heard the gun go off. Casias then ran and hid in the next room
with his friends. Casias stated that Bustos had been sleeping on the sofa
facing up with a gun tucked into and sticking from his waistband and that
defendant Hernandez did not get any heroin that night because Casias did not
have time to give it to him. Casias further related that victim Bustos only
had two or three pieces in his boot that he sold for $10.00 and that Bustos
told Casias that if someone came to the home and the victim was asleep, Casias
could obtain two or three pieces from victim Bustos' boot.

Witness Casias testified that when Bustos went to sleep, he would put two or
three $10.00 pieces into his boot and as Casias was bending over the victim on
the night of the instant crime, the defendant came in with his weapon and
said, "la chiva". Witness Casias had seen the defendant there at the house
three or four days before and had seen the defendant at the apartment for a
total of four or five times. Casias testified he had sold drugs to the
defendant for Bustos at those times but denied knowing that it was heroin that
he was selling and that Bustos had never given Casias any money for having
sold the "chiva". Casias testified that he and his friends continued to hide
in the bedroom for about ten minutes, then after being convinced that the
defendant left the apartment telephoned the authorities.

Witness Eleno Santa Maria Mojica told the officers and later testified that he
had been staying at the house of the victim approximately three days prior to
the shooting. On the night of the instant crime, while sleeping on the floor
in the kitchen, he heard an argument and sat up. Mojica testified that the
defendant pointed a gun at Mojica and said, "Don't move." At the sound of the
shot, Casias and Mojica ran and remained in a bedroom. Mojica also testified
that he had been awakened by people talking, however, was not sure that an
argument had ensued.

An additional witness, Doroteo Juarez, told the officers and later testified
that he was living at another house, however, on the night of the instant
crime spent the night at victim Bustos' residence and was sleeping in the
kitchen when he heard a knock on the door and then saw defendant Hernandez
come into the residence with a shotgun. He testified that before the
defendant shot Bustos, defendant Hernandez said, "Give me the gun" twice to
victim Bustos. He testified that when the defendant said that, victim Bustos
got up and pulled the gun from his waistband, at which time defendant
Hernandez took the gun from the victim, and witness Juarez ran and hid.

Two unexpended shotgun shells were observed near the victim's left knee, and a
partially filled box of nine millimeter ammunition was on the floor near the
victim's head. A smear of possible blood was located on the inside windowsill
on the west window and on a chair outside of the door which had been entered.
Each item was taken as evidence, and it was believed that the defendant had
left the residence through the window rather than the door. Foot tracks found

-3-

outside indicated that one suspect ran northbound through an alley to an intersecting alley, then ran westbound through the alley to Tenth Street. The foot tracks were followed southbound on Tenth to the intersection of Burns. At that location, a small piece of chewed gum was observed where the suspect possibly stopped for a short time. The gum was also taken as evidence, however, the shoe tracks could not be followed from the intersection. Three shoe tracks were additionally found near the victim.

On August 15, 1985 at approximately 7:00 a.m., Detective J. Rascon interviewed witness Maria Lopez, who was statedly a friend of victim Bustos, and to the other witnesses in the case who had contacted her at her residence. Witness Lopez advised the officer that from the description provided by the witnesses, she believed the suspect to be a subject she knew from Sanger, however, was unable to remember the name. She further related that she frequented the victim's residence, knew the victim was dealing narcotics and had seen the subject from Sanger at the victim's residence on numerous occasions buying drugs. Lopez stated that in fact a few days prior to the shooting, she heard the victim and the suspect arguing at the victim's residence over money and later told the officer that the suspect's name was Hector Hernandez and identified a photograph as being defendant Hector Hernandez. On August 15, 1985, witness Casias, who had had prior contacts with the defendant as he had sold the defendant heroin on five occasions face-to-face, was shown a single photograph by Detective Rascon of suspect Hernandez, at which time Casias identified defendant Hector Hernandez as the person who shot and killed victim Bustos. On August 15, 1985, witness Flores was provided with three photograph albums of booking photographs from the Sheriff's Department booking files, at which time he selected the photograph of defendant Hector Hernandez as the subject from Sanger who was constantly buying narcotics from victim Bustos.

On September 5, 1985 at approximately 2:25 p.m., officers from the Fresno County Sheriff's Department were conducting a surveillance on the residence of 1315 Faller in Sanger when a 1976 dark blue Ford T-Bird arrived at the residence, which was a vehicle occupied by Fidencio Martinez, who then entered the residence and exited along with Juanita Hernandez, wife of the defendant. Both Martinez and Hernandez proceeded out of Sanger and went to the area of Chestnut and King Canyons Avenue, where Hernandez exited the vehicle, used the telephone located there and then she and Martinez drove to the area of Maple and Shields Avenue. Juanita Hernandez then exited the vehicle and made contact with a male subject standing near a convenience store located at the northeast corner of Maple and Shields, who then got into the vehicle, as did Juanita Hernandez. The vehicle was followed to the area of Barton and Nevada, where a felony vehicle stop was conducted after defendant Hector Hernandez had been identified as being the wanted suspect. All occupants were arrested and taken into custody.

Defendant Hernandez was subsequently Mirandized and after waiving his rights, he agreed to talk to Detectives Trevino and Morrison, however, denied knowing the victim, having purchased heroin from the victim or having committed the instant crime. He then invoked his right to have an attorney, and the interview was terminated.

-4-

DEFENDANT'S STATEMENT

As of the date of dictation, defendant Hernandez had failed to supply your officer with a defendant's statement. However, during an interview with the defendant at the Fresno County Jail on May 21, 1986, the defendant stated that the victim was his connection for heroin and that he had thought for some time that the victim was "pinching" on his buys and that he had talked to him before about it prior to the commission of the instant crime. The defendant stated to your officer that he had been involved in at least two arguments with the victim because of his shorting the supply of purchased heroin. The defendant made no other statements regarding the instant crime.

## VICTIM STATEMENT AND ASSESSMENT

A referral has been directed to the Victim Services Unit by your officer in an attempt to have contact made with the victim's mother, who is said to be residing in Mexico. Their report should be provided to the Court by the date of sentencing.

## STATEMENT OF THE DISTRICT ATTORNEY

A letter requesting a statement of views has been directed to the Fresno County District Attorney's Office. As of the date of dictation, no reply has been received at the Probation Office. Should one be received prior to sentencing, it will be attached to the report for the Court's consideration.

## DEFENSE STATEMENT

A statement of views has been received from the Fresno County Public Defender's Office. It has been read and considered and is attached to this report for the Court's consideration.

Attached for the Court's consideration is a letter from the Defense Attorney, dated December 30, 1985.

## RESTITUTION

Restitution may be an issue in this matter due to the fact that the victim's body was transported to Mexico for burial.

## PRIOR JUVENILE RECORD

The following information was obtained from the defendant's prior juvenile record:

7-31-70   Referred informal probation without ...tion by probation
          officer: Section 602: Burglary, until January 31, 1971.

The circumstances of the above offense were that on July 28, 1970, defendant Hernandez at approximately 5:30 p.m. broke into the office of Dr. R. Lee at Tenth and "N" Streets in Fresno and from there removed $80.00 in cash.

10-5-70   Petition Filed: Section 602: Burglary.

10-23-70  Hearing: Allegations true; placed on probation without wardship until April 23, 1971.

The circumstances of the above offense were that on September 22, 1970, the defendant entered the residence located at 15570 East Anadale, Sanger, and from there removed property valued at approximately $515.00. The property included a .410 shotgun, a .20 gauge shotgun, a .218 caliber rifle, a .22 caliber pistol, a Winchester rifle, a .22 semiautomatic rifle, a .22 caliber bolt-action, single shot rifle, a Polaroid camera and a radio.

5-19-71   Order: Dismissed.

4-22-71   Petition Filed: Section 602: Burglary.

5-19-71   Hearing: Adjudged ward of the Court, on probation until further order of the Court; released to parents.

The circumstances of the above offense were that on April 7, 1971, the defendant entered the Mission Baptist Church at 1417 "J" Street in Sanger and from there removed $10.50.

9-23-71   Petition Filed (Subsequent): Section 602: Petty Theft.

10-14-71  Hearing: Allegations true; remain ward of the Court, on probation until further order of the Court; pay restitution; work program at Sanger Police Department.

The circumstances of the above offense were that on July 26, 1971, defendant Hernandez in association with the co-defendant stole approximately $190.00 belonging to Luallen's 76 Service Station at 466 Academy in Sanger, California. As a condition of probation, the defendant was ordered to work six weekends at the Sanger Police Department and was placed on intensive supervision and ordered to pay restitution through the probation officer.

6-29-72   Petition Filed (Subsequent): Section 602: Burglary.

7-18-82    Hearing    ...egations true as amended;    ...    ward of the Court,
on proba... ...n until further order of the ...ourt; commit to Youth
Center, suspended.

The circumstances of the above offense were that on June 26,
1972 at approximately 10:15 p.m., the defendant and a
co-defendant were found inside the closed business of Padilla's
Market at 85 Acacia Drive in Sanger.

10-27-72   Petition Filed (Subsequent): Section 602: Burglary.

11-16-72   Hearing: Remain ward of the Court, on probation until further
order of the Court; commit to Youth Center; detain Juvenile Hall
pending transfer.

The circumstances of the above offense were that on October 25,
1972, the defendant entered the residence located at 1131 "N"
Street in Sanger and from there removed a purse from a victim
which contained approximately $20.00. The defendant was
committed to the Fresno County Youth Center for a period not to
exceed 180 days.

10-31-73   Petition Filed (Subsequent): Section 602: Burglary.

11-6-73    "A" Petition Filed: Section 602: Burglary.

11-28-73   Disposition Hearing: Remain ward of the Court; commit C.K.
Wakefield School; detain Juvenile Hall pending transfer.

The circumstances of the above offenses were that on October 25,
1973, the defendant entered the residence at 1201 Rawson,
Sanger. Further investigation determined that no property was
lost as the defendant and a co-defendant were discovered during
the commission of the crime and had fled. The circumstances of
the "A" petition were that on November 5, 1973, the defendant in
association with a co-defendant removed a hasp and lock from a
garage located at 1211 "P" Street, Apartment "A", in Sanger,
where the defendant was observed and subsequently apprehended.
On November 28, 1973, after both petitions were found true, the
defendant was committed to the C.K. Wakefield School for a
period not to exceed 180 days, however, on May 24, 1974, the
Court ordered that the commitment to C.K. Wakefield be
terminated. The defendant was continued on probation until
further order of the Court.

11-6-74    Petition Filed (Subsequent): Section 602: Joyriding; Count
Two: Section 602: Carrying a Concealed Firearm.

11-7-74    Detention Hearing: Allegations true Count Two; detained
Juvenile Hall pending adjudication on Count One November 19,
1974.

11-19-74    Adjud:    and Disposition Hearing    ...egations true both
            counts.

12-3-74     Disposition Hearing: Remain ward of the Court, in charge of
            probation officer, commit to California Youth Authority; County
            pay maintenance; detain Juvenile Hall pending transfer by Fresno
            Sheriff's Office.

            The circumstances of the above offenses were that on November 4,
            1974, the defendant in association with an unidentified person
            took a 1955 Chevrolet pickup without the consent of the owner.
            Additionally, on November 5, 1974, the defendant was found to be
            in possession of a firearm with a barrel of less than twelve
            inches without having a license to carry such a firearm.

11-12-75    Petition Filed (Subsequent): Section 602: Armed Robbery; Count
            Two: Section 602: Resisting an Officer.

11-13-75    Detention Hearing: Count Two true; detain Juvenile Hall pending
            adjudication.

11-25-75    Adjudication Hearing: Count One dismissed; detain Juvenile Hall
            pending disposition on Count Two.

            The circumstances of the above offense were that at
            approximately 4:50 p.m. on October 22, 1975, Mrs. Lozada along
            with Mr. Higaneda and Mr. Gutierrez arrived at the Sanger Police
            Department and contacted Officer Ramirez and Sergeant Padilla.
            Mr. Gutierrez reported that on October 21, 1975 at approximately
            9:30 p.m., he was home cleaning the dishes when six young
            subjects came into his home, told him that he owed someone some
            money and was asked by the suspects where his check was.
            Gutierrez stated three of the suspects held him at knifepoint
            while they took his wallet, and then three suspects had gone
            into the bedroom where Mr. Higaneda was lying in bed. Gutierrez
            stated that the three suspects who entered the bedroom were
            armed with two pipes and a large stick. Mr. Higaneda stated
            that the three suspects who entered his bedroom had ransacked
            his room and had found his wallet, which contained $246.00.
            After the suspects found his wallet, one of them had struck him
            on the head with a pipe. After he was struck with the pipe, Mr.
            Gutierrez told the suspects not to hit him. At that point, one
            of the suspects struck Gutierrez in the left eye with his closed
            hand. Higaneda stated that one of the suspects had placed a
            knife to Mr. Gutierrez's neck and had told him to shut his mouth
            or he would "get it". Higaneda stated that the suspects had
            taken the money from him and Mr. Gutierrez and had left.
            Gutierrez stated that the suspects had stolen approximately
            $79.00 from his wallet.

-8-

11-26-75    Petitic   54-A Filed:  Section 602:      Robbery.

12-22-75    Petition 38154-B Filed:   Section 602:   Armed Robbery;   Count
            Two:   Section 602:   Assault with Deadly Weapon.

12-30-75    Adjudication Hearing:   Allegations true "A" petition and Count
            Two "B" petition; Count One in "B" petition untrue.

1-12-76     Disposition Hearing:   Remain ward of the Court, in charge of
            probation officer;   recommitted to California Youth Authority;
            detain Juvenile Hall pending transfer by Fresno Sheriff's Office.

            On December 22, 1975, a Supplemental "B" Petition was filed
            alleging Assault with a Deadly Weapon.   The circumstances of the
            offense were that on October 27, 1975, the defendant returned to
            the residence of Mr. Higaneda and stabbed him on the left thigh
            with a knife.   On December 30, 1975, a hearing was held, at
            which time the Armed Robbery in the "A" petition was found true,
            and the Assault with a Deadly Weapon in the "B" petition was
            found true.   A dispositional hearing was calendared for January
            12, 1976.   On that date, the defendant was committed to the
            California Youth Authority.

            On February 20, 1976, a rehearing was held in Department Eight
            of the Fresno County Superior Court, at which time defendant
            Hernandez was again committed to the California Youth Authority
            and was ordered detained in the Fresno County Juvenile Hall
            pending transfer to the Fresno County Sheriff's Office.   On
            February 23, 1976, the defendant was successful in escaping from
            the Fresno County Juvenile Hall.   Subsequent to the defendant's
            arrest on the instant offense, he appeared in the Fresno County
            Juvenile Court, at which time he was remanded to the custody of
            the Fresno County Sheriff awaiting transfer to the California
            Youth Authority per orders of the Juvenile Court, dated January
            12, 1976 and February 20, 1976.

## PRIOR CRIMINAL RECORD

The following is the defendant's prior criminal record as provided by the
California Identification and Investigation Bureau and from the United States
Department of Justice:

| DATE | ARRESTING AGENCY | CHARGE | DISPOSITION |
|------|------------------|--------|-------------|
| 12-2-74 | CYA Perkins | Juv Tk Veh Tmp Use Carry Concl Wpn on Person/Vehicle | 7-29-75: paroled |

3-13-78       PD San.                     H&S 11350, Pos        5-16-78 Fresno SC
                                          Narc Contrld Suus     #228480-0; comm
                                                                CYA

The circumstances of the above offense were that on March 12, 1978, defendant
Hernandez was booked in to the Sanger Police Department on other charges and
on March 13, 1978, the defendant's property was searched. Found therein was
aluminum foil containing .32 grams of heroin.

3-12-78       PD Sanger                   PC 245a, Asslt        5-8-78 Sanger JC
                                          with Deadly Wpn       #C-879, PG PC 246
                                          PC 246                1 yr BP; 364 ds
                                          VC 12025              w/cred 57 ds
                                          VC 12031

The circumstances of the above offense were that on March 12, 1978 at
approximately 9:46 p.m., Sanger Officers were dispatched to the area of Faller
and Eleventh Street regarding subjects in a white vehicle shooting firearms in
the area. There they observed a white 1965 Pontiac and saw a flash of a
weapon and three explosions as the vehicle slowly turned southbound onto
Faller Avenue. The shots came from the vehicle and from the direction of the
muzzle flashes, the officers felt they were directed in an easterly direction
towards Eleventh Street. The officers pursued the vehicle, stopped it and
arrested the driver, Jose Ramirez, and the passenger, Hector Hernandez, who
was holding a handgun in his right hand at the time of the vehicle stop. Both
subjects then ran from the officers and after an extensive chase with several
officers in pursuit, defendant Hernandez was found hiding in a large dog
house. The handgun was subsequently located in one of the yards through which
the defendant had run. When the defendant was en route to the police vehicle,
he kicked out at a bystander and struck him in the head with the tip of his
shoe. The defendant was then placed into a police unit and while en route to
the police department, defendant Hernandez kicked out the rear window of the
police unit.

NOTE: On April 12, 1978, the defendant appeared in the Sanger Justice Court
and entered a guilty plea to a violation of Health and Safety Code Section
11350a, and the matter was certified to the Fresno Superior Court under
Information #22848-0. The change of plea transcript indicated that upon the
defendant's plea of guilty to Criminal Complaint #C-857 and further, upon the
defendant's plea of guilty to Count One of Criminal Complaint #C-850, alleging
a misdemeanor violation of Penal Code Section 246, the following agreements
were made with the District Attorney: That a motion would be made to dismiss
Count Two of Criminal Complaint #C-850, alleging a violation of Penal Code
Section 245; Count Three, alleging a violation of Penal Code Section 594c; and
Count Four, alleging a violation of Penal Code Section 148. The District
Attorney agreed further to motion the Court to dismiss Criminal Complaint
#C-830, alleging in Count One a violation of Penal Code Section 245a and in
Count Two, a violation of Penal Code Section 415. The Court granted the
motions of the District Attorney, and no other promises or agreements were
made in regard to sentencing under Fresno Superior Court #22848-0.

| 3-14-79 | CYA Pe<br>&A 09111 | 1) H&S 11350,<br>Narc Contr Subst | 12-17-79, paroled<br>2-16-82, discharged |

Your officer notes that on May 16, the defendant was ordered committed to the California Youth Authority under Action #22848-0. However, on May 8, 1978, the defendant was ordered to serve one year in custody of the Fresno County Sheriff on a misdemeanor violation of Penal Code Section 246. In a letter dated December 15, 1978, the Youth Authority reported to the Court that it had been over six months since the defendant's case was referred by the Court to the Youth Authority and that he had never been delivered to them. A check with the Fresno County Jail revealed that the defendant had timed out on the aforementioned Sanger Justice Court case on January 9, 1979 and was then presently pending transportation to the California Youth Authority. On February 23, 1979 under Fresno Superior Court #228480-0, the Court ordered the defendant recommitted to the California Youth Authority.

| 10-6-81 | CAUS MO100<br>USM<br>LA, CA 8112-1006 | 1) Acc Aft Fact,<br>18USC3<br>2) Conc Pers Frm<br>18USC1701 | 12-8-81, PG bth cts;<br>sent 179 ds ea ct to<br>srvd consec |

| 2-22-82 | TX071017C<br>Latuna Fed Corr<br>74322-012 | 1) Acc Aft Fact<br>2) Conc Pers Frm<br>Arrest | 7-23-82, discharged;<br>rel exp to comm in<br>Sanger, CA |

The circumstances of the above offense were that from November 16, 1980 to December 1, 1980, defendant Hernandez, having knowledge that Jose DeLeon was under judgment of conviction and a ten-year prison sentence and knowing that DeLeon was a fugitive from said commitment, aided and assisted DeLeon from being apprehended by the U.S. Marshall's Office. Further information was developed by the U.S. Marshall's Office to the effect that during November of 1980 through December of the same year, defendant Hernandez rented a house trailer in the rural outskirts of Fresno and was told by the landlord that Jose DeLeon also resided in that trailer for approximately two to three weeks. In September of 1981, the U.S. Marshall's Office centered their investigation in the southern California area as they had received information to the effect that defendant Hernandez as well as Jose DeLeon were residing in a religious retreat in San Bernardino County. On October 6, 1981, the U.S. Marshall's Office with assistance from numerous law enforcement agencies converged on the religious retreat called Victory Outreach located in a deserted, unpopulated area of San Bernardino and arrested both defendant Hernandez and Jose DeLeon.

| 10-26-84 | SO Fresno | 1) H&S 11550(a),<br>Use/Und Inf Contr<br>Substance<br>2) PC 148, Resist<br>Officer | 10-23-84 MC Fresno<br>#675358; PG H&S<br>11550; 2 yrs FP;<br>180 ds ss exc 90<br>w/31 ds cred; DWI;<br>no alc; $110 fn ss;<br>OAL; PG VC 23152a;<br>180 das ss exc 90<br>conc; $673 fn ss exc<br>$130 |