# EXHIBIT 15
# Part 4 of 7

The circumstances of     above offense were that .   ebruary 10, 1984, a California Highway Patrolman was southbound on Belmont Avenue when he observed a vehicle being driven in a slow manner and weaving. After making a traffic stop and contacting the driver, who was defendant Hernandez, it was noted that Hernandez was unsteady on his feet, his eyelids were drooped, and the officer noted an injection site on the defendant's left arm which had scarring.  His right arm had several non-hygenic sites, one of which was still bleeding.  The officer questioned the defendant about his drug usage, at which time the defendant stated he started on the Methadone Program that day.  The officer then had the passengers in the vehicle get out and as they were so doing, the defendant ran.  The officer did not chase the defendant, however, filed a complaint against him.

NOTE:  Your officer notes that the defendant has outstanding failures to appear under Fresno Court #644637 and 674429 for CVC 12951a (two counts) and VC 5200.  Additionally, the defendant has a failure to appear under Sanger Court #10680 for VC 12951a and VC 27360a.


PROBATION HISTORY

The defendant's juvenile probation history has been covered under that section of this report.  The following information was obtained from the defendant's adult probation file:

On May 8, 1978, defendant Hernandez was placed on one year bench probation on a misdemeanor violation of PC 246 under Sanger Justice Court #C-879 and was ordered to spend 364 days in custody with credit for time served of fifty-seven days.  On October 23, 1984 under Fresno Municipal Court #675358, the defendant was placed on two years formal probation on a misdemeanor violation of H&S 11550a, CVC 23152a and PC 148.  The defendant was ordered to spend 180 days in custody, all of which was suspended except ninety days, with thirty-one days credit for time served for the H&S 11550a violation.  In addition, he was to enroll himself in the DWI Program, was ordered not to consume alcohol, to pay a fine of $110.00, which was suspended, and ordered to obey all laws.  On his violation of CVC 23152a, the defendant was ordered to spend 180 days in jail, all of which was suspended except ninety days which was to run concurrent with the time being served on the H&S 11550a violation.  The defendant was ordered to pay a fine of $673.00, all of which was suspended with the exception of $130.00.  On May 14, 1985, the defendant's probation was revoked and a bench warrant issued.  On June 10, 1985, the defendant's probation was reinstated with the same terms and conditions.

On August 27, 1984 under Fresno #714123, the defendant was placed on two years bench probation on a misdemeanor violation of CVC 146011.

PAROLE HISTORY

On December 28, 1974, the defendant was committed to the California Youth Authority for Joyriding and Carrying a Concealed Weapon and was paroled on July 29, 1975. On January 12, 1976, the defendant was committed to the California Youth Authority on petitions alleging Assault with a Deadly Weapon and Armed Robbery, however, on February 20, 1976, a rehearing was held in Department Eight of the Fresno Superior Court, at which time the defendant was again committed to the California Youth Authority. The defendant was ordered detained in the Fresno County Juvenile Hall pending transfer by the Fresno County Sheriff's Office. On February 23, 1976, the defendant was successful in escaping from the Fresno County Juvenile Hall. On May 16, 1978 under Fresno County Superior Court #228480-0, the defendant was committed to the California Youth Authority on a felony violation of H&S 11350a, however, due to the fact that he was on May 8, 1978 under Sanger Case #C-879 ordered to spend 364 days in custody at the Fresno County Jail on a misdemeanor violation of PC 246, the defendant was on February 23, 1979 recommitted to the California Youth Authority under Superior Court #22848-0 and was on December 17, 1979 paroled. On February 16, 1982, the defendant received a dishonorable discharge as a result of his having been committed to federal prison on February 22, 1982 for Harboring a Federal Fugitive and Accessory After the Fact. The defendant was discharged from federal prison on July 23, 1982.

## SOCIAL HISTORY

The following information was obtained from the defendant during an interview with your officer at the Fresno County Jail on May 21, 1986:

FAMILY HISTORY

Hector Hernandez, age twenty-seven, was born February 28, 1959 in Fresno, California, where he has lived most of his life. The defendant lived last with his parents at 942 Edgar in Sanger, California.

The defendant is one of eight children born of the marriage between Guadalupe Hernandez and Dolores Mejia. The natural father is employed as a machinist, and the natural mother is employed by the Barr Packing Shed in Sanger. The defendant has six brothers and one sister, and the defendant is the seventh child.

The defendant's brother, Guadalupe, Jr., has for the past five years been in Soledad State Prison on a charge of murder. According to the defendant, he was ordered to serve twenty-nine years to life. No other history of family criminality or mental illness was noted by the defendant.

The defendant comple.    the tenth grade at Sanger . ... School in 1975 and obtained his G.E.D. while incarcerated in federal prison in 1982.    The defendant has received additional vocational training at the Valley Technical and Trade School in Fresno during 1980 or 1981 in welding and stated the course consisted of three months, which he successfully completed.    The defendant has never been in any branch of the United States military, is involved in no community organizations, however, irregularly attends the Pentecostal Church.    The defendant lists as his recreational interests reading, handball, jogging, lifting weights, calisthenics, music, camping, television, parks, picnics and spending time with his family.

## MARITAL HISTORY

Hector Hernandez married Janie Ramirez on October 3, 1982 in San Bernardino, California by whom four children have been born:  Christina (age 5); Rebecca (age 4); Corina (age 2); and Hector, Jr. (age 6 months).  The defendant's wife and children currently reside with her family in Sanger and are supported by funds from the Aid to Families with Dependent Children and food stamp programs.  The defendant related that he was having problems with his wife prior to the commission of the instant crime but that his marriage was intact.

## EMPLOYMENT HISTORY

The defendant was last employed as a field laborer from June, 1985 through August 1985 for a man named "Polo", who was said to be a field contractor. The defendant also during that same period of time was employed by another contractor named Esteban.  The defendant stated that he has done mostly field work, some gardening, packing shed and agricultural ranch work.

## FINANCIAL STATUS AND REPORT FEES

Attached hereto and to be considered a part of this report unless waived is the form containing a recommendation in regard to Presentence Investigation Report fees, pursuant to Section 1203.1b of the Penal Code.

The defendant stated that he has no assets, however, that he owes fines in Sanger for traffic matters.

## USE OF ALCOHOL/CONTROLLED SUBSTANCES

The defendant drinks four or five beers or wine every other day and on weekends drinks heavier.  The defendant does not consider himself to have an alcohol problem and stated that he first began using alcohol at the age of twelve years.  The defendant denies having received any type of treatment for alcohol.

The defendant last use_ _roin approximately nine mo_ _ _ ago, stating he was using shortly before and after the commission of the instant crime. The defendant denies that he was under the influence of any drug when he committed the instant crime, however, estimated that he had a daily heroin habit of $20.00 to $40.00 for the past two years. The defendant was involved in the Methadone Detox Program for twenty-one days in 1985 and stated he went three or four times and completed their program. The defendant has smoked marijuana on an average of once a day since he was twelve years of age. He tried PCP four to five times when he was approximately sixteen years of age. During the same period, the defendant also experimented with LSD. The defendant last used cocaine in August of 1985, stating he used "a few bags", and first used cocaine in 1981. As a youth, the defendant used paint "a lot". Defendant Hernandez stated that, "I did crank for awhile", for about three months in 1979 on a daily basis but not since that date.

## PSYCHOLOGICAL OR MEDICAL HISTORY

The defendant considers himself to be in fair health and currently has venereal disease for which he is receiving treatment while incarcerated. Defendant Hernandez related that he has had venereal disease for about two years and that he has received treatment on an off and on basis during that time. The defendant has also been obtaining counseling from a psychologist while in jail due to a condition of being unable to sleep, depression and anxiety. The defendant was, during his current incarceration, taking the drugs Synaquat and Milloril, however, currently receives no type of medication.

Attached for the Court's consideration is a letter from Dr. Howard B. Terrell, dated January 13, 1986.

## STATEMENT OF REFERENCES AND INTERESTED PARTIES

At the time of dictation, the defendant had failed to supply your officer with a character reference form.

## CUSTODY

Defendant Hernandez was arrested on the instant crime on September 5, 1985 and has remained in custody since that date. Therefore, by the date of sentencing on June 10, 1986, the defendant will have served 279 days, is entitled to good time credits of 139 days, for total confinement credits of 518 days.

## FACTORS AFFECTING PROBATION

Defendant Hernandez is statutorily ineligible for probation under Penal Code Section 1203.06(a)(1)(i).

(The recommended application of the following factors and circumstances is set forth in the Conclusion section of this report.)

## CIRCUMSTANCES IN MITIGATION

Your officer finds no factors in mitigation relating to the crime as set forth in Rule 423a.

Under Rule 423b, facts relating to the defendant, your officer notes that the defendant was suffering from a mental or physical condition that significantly reduced his culpability for the crime due to his stated use of the drug heroin one day prior to the commission of the crime (Subsection 2).

## CIRCUMSTANCES IN AGGRAVATION

Regarding factors in aggravation relating to the crime as set forth in Rule 421a, your officer notes that the victim was particularly vulnerable in that the defendant entered the victim's home and shot him while he was lying on his couch and awakened by the defendant (Subsection 3). The planning, sophistication and professionalism with which the crime was carried out indicated premeditation (Subsection 8).

Under Rule 421b, facts relating to the defendant, your officer notes that defendant Hernandez has engaged in a pattern of violent conduct which indicates that he is a serious danger to society; the defendant's prior convictions as an adult or adjudications of commissions of crime as a juvenile are numerous and increasingly serious in nature; the defendant has served prior prison terms, whether or not charged or chargeable as an enhancement under Section 667.5; the defendant was on probation when he committed the instant crime; and the defendant's prior performance on probation and on parole was unsatisfactory (Subsections 1, 2, 3, 4 and 5).

## ENHANCEMENTS

Penal Code Section 12022.5 mandates that the sentence be enhanced by two years and consecutive to the punishment prescribed for the instant crime.

CONCLUSION

Appearing before the Court is a twenty-seven-year-old defendant who was convicted by jury of Second Degree Murder and Use of a Shotgun. As previously noted, the defendant has an extensive criminal record, both as a juvenile and as an adult, involving serious property crimes and burglaries where the defendant has removed many guns in addition to a serious record of assaultive behavior, demonstrating his past and current propensity for violence.

Pursuant to Section 1203.06(a)(1)(i), defendant Hernandez is ineligible for a grant of probation. Additionally, Penal Code Section 190 mandates that the defendant be committed to the California Department of Corrections for a term of fifteen years to life. PC 12022.5 mandates that the sentence be enhanced by two years in addition and consecutive to the sentence imposed by the Court on the instant crime.

RECOMMENDED PRISON TERM

| CRIME | MIT/MID/AGG | BASE TERM | ENHANCEMENTS | CONSEC/CONCURR |
|---|---|---|---|---|
| PC 187, 2nd Degree | 15 yrs. to life | 15 yrs. to life | Yes/PC 12022.5/ 2 yrs. | Yes    N/A |

TOTAL YEARS:  SEVENTEEN YEARS TO LIFE

RECOMMENDATION

It is hereby recommended that probation be denied and that the defendant, Hector Hernandez, be committed to the California Department of Corrections for the indeterminate term of imprisonment of fifteen years to life in Count One.

It is further recommended that the defendant's term of imprisonment be enhanced for a period of two years pursuant to PC 12022.5 and that this term be served prior to the indeterminate sentence.

It is further recommended that the defendant be committed to the California Department of Corrections for a total term of seventeen years to life with credit for 518 days time served (279/139).

In compliance with Government Code Section 13967, it is respectfully recommended that a restitution fine of $1,000.00 be imposed.

The attorney hours    ot appear on the Court 1;    ol to the Probation
Department.

Respectfully submitted,

DON HOGNER, CHIEF PROBATION OFFICER

By: _____
    Evelyn H. King, Deputy

Dated:   June 3, 1986

Read and Approved:

_____
Supervising Probation Officer
jm

***************

The foregoing report has been read and considered.

Dated: June 10, 1986

/s/ John Fitch
JUDGE OF THE SUPERIOR COURT

The foregoing instrument is a
correct copy of the original on
file in this office.

ATTEST: JUN 17 1986

GALEN LARSON, County Clerk
State of California, County of Fresno
By _____ DEPUTY

-18-

EXHIBIT    "3"

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**HECTOR HERNANDEZ, D-33689**
**SECOND-DEGREE MURDER**

AFFIRM: _____

MODIFY: _____

REVERSE: _____X_____

On August 15, 1985, Hector Hernandez shot to death Sylvestre Bustos while attempting to purchase heroin. Early that morning, Mr. Hernandez went to Mr. Bustos' home to buy heroin. He knocked on one of the windows, waking Mr. Bustos' roommate, Enrique Casias. Mr. Casias went to the window and saw Mr. Hernandez standing outside. Mr. Casias opened the window and talked with Mr. Hernandez, agreeing to sell him heroin for $20. Mr. Hernandez paid the money and Mr. Casias went to retrieve some heroin. The heroin was inside Mr. Bustos' boots, which were next to the couch in the living room. Mr. Bustos was asleep on the couch with a gun tucked into his waistband.

While Mr. Casias bent over Mr. Bustos' boots, Mr. Hernandez forced his way through the front door of the residence, armed with a sawed-off shotgun. He demanded Mr. Bustos' gun and heroin. When Mr. Bustos rose from the couch, Mr. Hernandez shot him one time from a distance of approximately seven or eight feet. He took Mr. Bustos' gun and fled the scene.

Mr. Hernandez was subsequently arrested. Following a jury trial, he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life for murder, plus two consecutive years for the firearm enhancement. The judgment was affirmed on appeal.

During his incarceration for the life offense, Mr. Hernandez was disciplined seven times for rules violations involving grooming standards, possession of inmate manufactured alcohol, possession of a utility knife blade, stealing food, improperly loaning personal property, and disrespecting staff. He was also counseled 12 times for minor misconduct, most recently in 2000.

I considered various positive factors in reviewing whether Mr. Hernandez is suitable for parole at this time. Mr. Hernandez made efforts to enhance his ability to function within the law upon release. He earned his GED in 1998, and he took additional adult basic education courses and infectious disease courses. He completed vocational training in graphic arts, and in mill and cabinet work. He held institutional jobs as a furniture assembler, industry worker, teacher's aide, boiler room operator, and machine operator, among other things. In addition, he availed himself of an array of self-help and therapy, including the Employability Program, Anger Management, Impact, Character Development, Life Skills, Responsibility for Self-Determination, Mind Transformation, Chemical Dependency, Red Road, Alcoholics Anonymous, and Narcotics Anonymous. He maintains seemingly solid relationships and close ties with supportive family and friends, and he received some positive evaluations from mental-health and correctional professionals over the years.

Hector Hernandez, D-33689
Second-Degree Murder
Page 2

Mr. Hernandez also made plans upon his release to live with family in Fresno County, the county of last legal residence. Although he has marketable skills, he has not secured a job offer in Fresno County. Having a legitimate way to provide financial support for himself immediately upon release is essential to Mr. Hernandez's success on parole.

Despite the positive factors I have considered, the second-degree murder for which Mr. Hernandez was convicted was especially grave, in part because of the callous manner in which it was carried out. According to the probation report, Mr. Bustos was asleep on his couch when Mr. Hernandez kicked open the door and entered with a sawed-off shotgun. The probation officer noted that Mr. Bustos "was particularly vulnerable" when Mr. Hernandez entered the home and shot Mr. Bustos just after waking him up. There is also evidence in the record before me that the murder involved some level of premeditation. According to the Court of Appeal opinion, Mr. Hernandez testified at trial that he purchased heroin from Mr. Bustos on several prior occasions. One witness testified that, days before the murder, she heard Mr. Hernandez arguing with Mr. Bustos over the quantity of the heroin he received. On the night of the murder, Mr. Hernandez went to Mr. Bustos' residence armed with the shotgun. Mr. Hernandez then forced his way through the front door of the residence and shot Mr. Bustos when he got up off the couch. The gravity of the second-degree murder committed by Mr. Hernandez is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

Mr. Hernandez says he is remorseful and accepts responsibility for his actions. But in his statement summarized in the 2006 Life Prisoner Evaluation, he said, "the actual gunshot which took [Mr. Bustos'] life was fired in self defense." Likewise, according to his statement as summarized in the 2006 mental-health evaluation, Mr. Hernandez claimed that Mr. Bustos pulled his gun and fired before Mr. Hernandez shot him. But at least two witnesses reported in the Fresno County Sheriff's report that they heard one gunshot the night of the murder. They testified similarly at trial, according to the Court of Appeal opinion. According to the probation report, one witness also saw Mr. Hernandez take the gun from Mr. Bustos after Mr. Bustos removed it from his waistband.

In any event, Mr. Hernandez took a sawed-off shotgun to Mr. Bustos' home, kicked open the door to the residence, and according to the Court of Appeal opinion, pointed the gun at everyone inside. The 2003 Board asked, "what would you expect [Mr. Bustos'] reaction to be if he's confronted with a man with a shotgun?" Mr. Hernandez later responded, "[p]robably everything that happened."

When he committed this crime, Mr. Hernandez was 26 years old and already had an extensive criminal record, including juvenile adjudications for armed robbery, assault with a deadly weapon, burglary, petty theft, carrying a concealed firearm, joyriding, and resisting an officer. His criminal behavior continued into adulthood, as he was convicted of discharging a firearm at an occupied dwelling/vehicle, harboring a federal fugitive, being under the influence of a controlled substance, and driving under the influence of a controlled substance. He also admitted to the probation officer that he routinely abused heroin, and he used cocaine, LSD, marijuana and PCP prior to the life offense. Mr. Hernandez's criminal history, which began at a young age and includes incidents of violent and assaultive behavior toward others, demonstrates his inability or unwillingness to conform his behavior to the rules of society, and this weighs against his parole suitability at this time.

Hector Hernandez, D-33689
Second-Degree Murder
Page 3

The 2006 Board noted Mr. Hernandez's prior criminal history and drug abuse when it found that he
"committed the crime as a result of significant stress in [his] life." The Board, however, also said
that the stress was "self-induced," and that "[w]e're not in any way, shape or form saying that you
had stress in your life." While Mr. Hernandez was indeed abusing heroin at the time, he was also
aware of available treatment programs in the community. He told the probation officer that he
completed a Methadone treatment program in 1985, the same year that he murdered Mr. Bustos.
Even if Mr. Hernandez was under stress when he perpetrated the life offense, I believe that factor
alone is presently insufficient to mitigate the nature and circumstances of the murder.

I note that the Fresno County District Attorney's Office opposed parole with the 2006 Board based,
in part, on the gravity of the offense, Mr. Hernandez's lengthy criminal and drug abuse history, his
lack of insight into the nature of his offense, and his failure to establish concrete parole plans.

At age 47 now, after being incarcerated for more than 21 years, Mr. Hernandez made some
creditable gains in prison. But given the current record before me, and after carefully considering
the very same factors the Board must consider, I find that the negative factors weighing against
Mr. Hernandez's parole suitability presently outweigh the positive ones. Accordingly, because I
believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE
the Board's 2006 decision to grant parole to Mr. Hernandez.

Decision Date: 11-02-2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT 4

D 33cf59

COURT OF APPEAL FIFTH APPELLATE DISTRICT

FILED

JAN 25 1988

KEVIN A. SWANSON - CLERK

by_____
                  DEPUTY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

Besemer

DOCKETED
SACRAMENTO                     NO
No. SA86DA0978
Date 1/8/6 By K.B

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | F007304 |
| | ) | |
| v. | ) | (Super. Ct. No. 336275-3) |
| | ) | |
| HECTOR HERNANDEZ, | ) | O P I N I O N |
| | ) | |
| Defendant and Appellant. | ) | |

APPEAL from a judgment of the Superior Court of Fresno County. John Fitch, Judge.

Berman & Glenn and Mark D. Warshaw, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, J. Robert Jibson and Kate Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant was charged with violation of Penal Code[1]/ section 187 (murder), and violation of section 211 (robbery). It was alleged he used a handgun during commission of the offenses within the meaning of section 12022.5. A special circumstance was also alleged pursuant to section 190.2, subdivision (a)(17)(i) (murder during commission of or in immediate flight after a robbery or attempted robbery). Defendant pled not guilty and denied the special allegations. A jury trial followed.

The jury found defendant guilty of second degree murder, and found true the special allegation he used a firearm during the commission of the crime. However, defendant was found not guilty of robbery.

Defendant was sentenced to 17 years to life: 15 years to life for the murder plus 2 years for the firearm use enhancement. He received appropriate credits.

FACTS

The murder victim in this case was Sylvestre Bustos. Paramedics pronounced him dead at his home on South Levit Street in Fresno, in the early morning hours of August 15, 1985. A pathologist testified that, based upon the autopsy he performed on the victim, the cause of death was a shotgun wound to the thoracic aorta. The wound was consistent with a shot from a sawed-off shotgun, and the entry was to the upper left chest, with a trajectory which was, from front to rear, 20 percent downward in an individual who was standing upright. The pathologist estimated

---

[1]/    All statutory references are to the Penal Code unless otherwise indicated.

2.

the gun was fired from a distance of approximately seven to eight feet, and that it was unlikely the victim was lying down when shot.

A deputy with the Fresno County Sheriff's Department, Scott Morrison, investigated the homicide. He discovered a window on the west side of the building was opened, and a cooler which had apparently been in the window had fallen over. The platform hiding the cooler was collapsed. He found no firearms in the house or on the victim's body, which was found face-down on the floor in a pool of blood.

Morrison did find, however, two shotgun rounds on the floor near the body. One was near the victim's knee, and the other was near his feet. The victim was by a couch. A box of .9 millimeter ammunition, typically used in a semiautomatic handgun, was found by the couch. He found the victim's car key in his pocket and, after going to the car, found $400 in cash under a floor mat.

Another deputy from the sheriff's department, Deputy Rascon, searched the victim's boots and found no heroin inside them, although some had apparently been there prior to the shooting. Rascon observed footprints near the body and followed them to the window where the cooler had been knocked down. There was blood in the area of the window. He then left the house and followed the footprints through two alleys and up to an intersection. The prints appeared to go in different directions at the intersection, which Rascon thought was consistent with someone pacing. Car tire tracks were near where the trail of footprints ended. The footprints Rascon found outside the residence matched the footprints he saw near the body.

3.

A number of people were in the residence at the time the
shooting occurred:  Dortheo Juarez; Eleno Santa Maria Mojica; and
Enrique Casias.  All three testified at trial about what they saw
and heard on the evening of the shooting.

Juarez and Mojica were asleep on the floor in the kitchen
when Jaurez was awakened by a knock on the door.  As Casias went to
open the door, defendant came in wielding a short-barrelled shotgun
and exclaimed, "Give us the chivas."  He then told everyone not to
move, pointed the gun at Juarez and Casias, and told the victim to
"Give him the gun."  The victim, who had been sleeping on a couch
in the living room, started to rise.  He was wearing pants and had
a gun under his belt.  Juarez ran to the side of the room in order
to hide, and noticed that by the time he left the room the victim
was standing.  He did not hear the victim say anything, and saw no
struggle.  After hearing the shot, Juarez ran from the house.
According to Juarez, the victim was a drug dealer.

Mojica testified he, too, was asleep in the kitchen and
was awakened by the sound of people arguing.  He looked into the
living room, only to see defendant pointing a weapon at him.
Defendant told him not to move.  He heard a shot, and ran into the
bedroom.  He did not see a gun on the victim.

Casias testified he had been given immunity from
prosecution for testifying about the events which took place on
August 15th.  He lived with the victim, who was a drug dealer, and
at times helped him sell drugs.

Casias was awakened when he heard a knock on the window.
He went to the window, opened the curtain and looked out, and
recognized defendant, who was standing outside.  He opened the

4.

window and defendant asked Casias if he would sell him drugs.
Casias agreed and defendant handed him $20 through the window.
Casias told defendant to wait at the window while he got the
drugs.  He went to retrieve the heroin, which was inside one of
the victim's boots next to the couch in the living room.

As Casias was bending over the victim's boots, the front
door flew open and defendant came in with a shotgun.  Defendant
demanded the victim give him his gun, which was under his belt.
Although there was no argument or fight, Casias heard a gun go
off.  He ran and hid in a side room with the others who were
present that evening.

In addition to the gun in the victim's belt, the
defendant demanded heroin.  At all times, Casias intended to
provide defendant with the heroin he requested.  The last time
Casias saw the victim, he was alive and standing near the couch
with defendant pointing the gun at him.  He did not see the victim
reach for his gun.  After defendant left, the three remaining
people in the house contacted the sheriff's office.

There was also testimony from Mary Lopez, who stated that
prior to the shooting, probably the Monday before, she heard
defendant and the victim arguing at the residence.  Defendant was
angry with the victim over the quantity of heroin the victim was
providing him.  The victim told the defendant to go to hell if he
did not like the amount he was receiving.

A number of individuals, including defendant, testified
for the defense.  Joseph Maldonado testified he had purchased
heroin from the victim in August, and that the victim came out of
his house and approached the car in which Maldonado was a

5.

passenger. The victim drew a gun and told Maldonado he did not want him smoking marijuana, which Maldonado was doing at the time, around his house. Maldonado testified he was a heroin addict who was in custody in the Fresno County Jail. He also testified that this was the only time he purchased heroin from the victim.

Mike Lopez testified he purchased heroin from the victim on several occasions. He also knew Maldonado. According to Lopez, the victim always carried a gun tucked in his pants, and had pulled the gun on him more than once, without provocation. The victim usually pulled the gun after he had been drinking, and the first time he did so he warned Lopez not to think about trying to rob him or rip him off. Lopez testified he personally was never armed and had never threatened the victim in any way.

Defendant testified he had purchased heroin from the victim on several occasions, and that he was addicted to the drug. In fact, he had used it earlier on the day of the shooting. Problems developed in his relationship with the victim because the victim began carrying a gun, and because defendant believed the quality of the heroin was poor or the quantity was less than the victim agreed to supply.

Defendant went to the victim's residence on August 15 with the intent of purchasing more heroin. He took a gun with him because he felt threatened by the victim and thought the victim would treat him differently knowing he was armed. He knocked on the door but received no reply. He then went to the window and spoke with Casias. A sale was negotiated and Casias left.

Afraid the victim or Casias was tampering with the heroin in order to shortchange him, defendant forced his way into the

6.

residence through the front door. He saw four or five people in
the room, one of whom was the victim. He was lying on the couch
and Casias was standing next to him. He demanded they "give [him]
the chiva," at gunpoint. Defendant saw the victim handing Casias
the heroin and intercepted it. He also demanded the victim give
him the gun which was tucked in the victim's pants. He did so in
order to disarm him. He had noticed the gun when he first entered
the room.

Casias appeared to be backing away from the victim, and
defendant told him not to move. Nevertheless, Casias continued to
move. At this point, according to defendant, the victim "made his
move" by simultaneously standing up and drawing his gun.
Defendant actually believed the victim shot him prior to firing
his own gun. After firing a shot at the victim, defendant picked
up the victim's gun and fled from the house. He left through the
window. Whoever had given him a ride to the victim's home was no
longer in the area, so defendant walked to the home of an
unidentified friend.

Defendant stated he threw the victim's gun into a river
about two days later. The sawed-off shotgun was given to another
unidentified friend, after the friend advised him the gun should
be disposed of.

DISCUSSION

I.  DOYLE ERROR.

Defendant first finds error in the following exchange
between the prosecutor and defendant while defendant was
testifying:

7.

prior to leaving the victim's home, and that he threw it in a river a few days later. This too was proof defendant attempted to suppress evidence. If the victim's gun had remained at the murder scene, it may have shown the victim never drew it from his belt, as defendant claimed. In addition, the jury would have had the benefit of knowing whether the gun was loaded at the time of the shooting, and if a shot had been fired from it by the victim (recalling defendant initially testified he believed he was shot at the time he pulled the trigger).

Finally, even assuming it was error to give the instruction, the error was not prejudicial. Defendant has failed to show it is reasonably probable the result would have been more favorable to him absent the error. (<u>People</u> v. <u>Watson</u> (1956) 46 Cal.2d 818, 836.)

The judgment is affirmed.

_____
                                    Acting P.J.

WE CONCUR:

_____
                                    J.

_____
                                    J.

19.

EXHIBIT    "5"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION
HEARING #5
FEBRUARY 2004 CALENDAR

# ADDENDUM

HERNANDEZ, HECTOR                                              D33689


On March 23, 2004, I issued Inmate Hernandez a copy of his Board Report for his scheduled
Board of Prison Terms hearing scheduled for calendar February 2004. Inmate Hernandez
indicated he disagreed with his board report in the following section(s)

**PRISONER's** Version, **AGGRAVATING/MITIGATING** Circumstances, **FUTURE PLANS,**
and the **SUMMARY.**

Hernandez disagreed with the Prisoner's Version, which reads:

1.)    **Prisoner's Version:** "In order to make a statement that would give some clarity and
       resolution, I would practically have to answer the question of, "What is the meaning of
       Life and Death." As difficult and at times overwhelming as this task is what I've
       endeavored to do.

       I could say my opponent (who became the victim) had been stealing from me and
       threatening my life, and the actual gun shot which took his life was fired in self-defense.
       All of which is true. Yet in order to reach a greater and healthier understanding, I would
       first have to admit responsibility, which is what I've done. A few of the areas I've
       addressed (in order to gain a deeper understanding of the crime I committed) include my
       childhood, peer environment and spirituality. Only after extensive self-examination in
       those areas have I reached, the conclusion that I needed a major adjustment in the way I
       relate to others, which entails developing a greater integrity for morals and ethics. This is
       an ongoing process with continual room for improvement. May it suffice self-
       examination in those areas have I reached to the conclusion that I needed a major
       adjustment in the way I relate to others, which entails developing a greater integrity for
       morals and ethics. This is an ongoing proves with continual room for improvement. May
       is suffice to say that this journey of recovery and healing is something I'll be doing for
       the rest of my life."

63

1    And if you do that, that bodes well for you.  You

2    may have a date in your future.  Thank you for

3    being here this morning.  Ms. Garner-Easter, any

4    comments you wish to make?

5            DEPUTY COMMISSIONER GARNER-EASTER:  I have

6    none.

7            PRESIDING COMMISSIONER MUNOZ:  We appreciate

8    your taking part in this hearing, sir.  This is

9    your copy.  It's 19 minutes after 10 a.m.  And that

10   concludes the hearing for Mr. Hernandez.

11           ATTORNEY SPOWART:  Thank you.

12           PRESIDING COMMISSIONER MUNOZ:  All right,

13   sir.  Thank you.

14                       --oOo--

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   FINAL DATE OF THIS DECISION_____          MAY 2 1 2003

27   HECTOR HERNANDEZ  D-33689  DECISION PAGE 6  2/20/03

EXHIBIT   "6"

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
June, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006

C-file copy

NAME:                 HERNANDEZ, HECTOR
CDC#:                 D-33689
DOB:                  2/28/59
OFFENSE:              PC 187 MURDER, SECOND DEGREE
DATE OF OFFENSE:      8/15/85
SENTENCE:             17 YEARS TO LIFE
MEPD:                 4/21/97
EVALUATION DATE:      5/20/06


I.    IDENTIFYING INFORMATION:

Mr. Hector Hernandez is a 47 year old, first term, separated, Hispanic male from
Fresno County. He is a Christian. He has served 20 years in custody on this
offense.

SOURCES OF INFORMATION:

This evaluation is based upon a single 90 minute interview, plus review of the
central and medical files.

The psychological evaluation, dated 7/1/99, by Dr. Reed, Psychologist, at CTF-
Soledad, contains a Psychosocial Assessment. This information was reviewed
with the inmate and is still current and valid. As a result, this information will not
be repeated at this time.

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Hernandez related during the interview in a serious, thoughtful, open and cooperative manner. There was no evidence of any defensiveness or hostility. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or depression. His eye contact was good. Intellectually, he is functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness was excellent. He has spent a great deal of time in introspection and analysis of his life.

Mr. Hernandez has been certified in Vocational Mill and Cabinet. He continues to work in PIA Furniture Factory, where he is improving his skills in wood working. He is also accomplished in furniture making. He continues to attend Alcoholics Anonymous on a regular basis. He has been attending Alcoholics Anonymous continuously for 15 years. He acknowledges that he had a serious heroin addiction prior to the commitment offense. This drug addiction was related to the commitment offense in that the victim was a drug dealer. He stated that he has been clean and sober for 11 years. He has made a vow to his family that he will not relapse or go back into heroin use. He is very aware of the destructive effects of drug abuse. He is also suffering from Hepatitis C, due to his years of drug use. He is very aware that any use of alcohol or drugs would seriously impair his health. At this point in his life, this is no longer a serious problem.

### CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | Hepatitis C |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 90 |

### XIII.  REVIEW OF LIFE CRIME

Mr. Hernandez accepts full responsibility for the death of the victim and his actions during the commitment offense. He described his life at that time as being

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 3

out of control and spiritually and morally bankrupt. He had just purchased some heroin from the drug dealer who refused to give him the drug. The victim had a history of taking his money without delivering the product. He stated that the victim was lying on the couch, but he was not asleep. The victim had a gun which he drew and shot. At that point, Mr. Hernandez said that he shot the victim.

Mr. Hernandez has spent a great deal of time thinking about his life, trying to understand life in general, and developing religious and spiritual depth. He fully acknowledged his own sinfulness and wrongfulness in the commitment offense. He fully understands the wrongfulness of his lifestyle at that time and his behavior at that time. He did express feelings of sorrow and remorse at the victim's death, as well as the victim's family's loss by suffering and grief. He has participated in the Impact Program which explores the victim's family's grief and losses at length. He stated that he wants to atone for this offense any way that he can. He stated that the only way that he can atone for it, other than apologizing to the family, is to try to do good to others who are suffering that he meets along the way through life. He spoke about trying to lay down his life for another's sake and to learn to die to oneself and one's own selfish motives in order to be able to reach out and help others in any way that he can. He seems to be very sincere in these statements. It is apparent that this man has gone through some serious self-exploration and serious life changes. His feelings appear to be quite sincere and genuine. He seems to be trying to lead a good, productive, helpful to others life.

XIV. **ASSESSMENT OF DANGEROUSNESS**

A. In considering potential for dangerous behavior in the institution, I agree with the prior evaluator that stated that his potential for dangerous behavior is below average in comparison to other inmates. He has never received any disciplinaries for aggressive, violent or dangerous behavior or acting out. He stated that in 1991, he underwent serious life changes, and since that time he has been trying to live a law abiding life.

B. In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, disciplinary history, substance abuse problems, current attitude and other factors to determine current risk level on parole. He obtained a score of 4.2 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would be expected to do better on parole than 95.8 of them. I agree with the prior evaluator that stated that he did

HERNANDEZ, HECTOR
D-33689
5/20/06
PAGE 4

not pose any more risk to the community at this time in his life than the average citizen. In fact, he probably poses less risk, due to his growth, maturity and improvement.

C.  At this point in time, there are no significant risk factors in this case.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine release planning. This man has excellent wood working skills. He will be able to obtain employment immediately in the community. He also has considerable family support in the community. He plans on living with his parents when he is released. This man's level of insight and self-understanding is impressive. He obviously has undergone significant mental, spiritual and emotional changes over the years of his incarceration. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/20/06
T:    5/21/06

EXHIBIT    "7"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 14, 1999

This is a psychological evaluation for the Board of Prison
Terms on inmate Hector Hernandez. This report is based upon
a personal clinical interview of the inmate, conducted on
06/14/99, as well as a review of his Central file and unit
health record. This clinical interview and a review of all
pertinent documents were for the express purpose of
preparing this report.

I.   IDENTIFYING INFORMATION:

     Inmate Hernandez is a 40-year-old, separated, Hispanic
     male who was born on 02/28/59. He has no stated
     religious preference, but does believe in God. He has
     no obvious unusual physical characteristics and he
     denied having any nicknames or aliases.

II.  DEVELOPMENTAL HISTORY:

     Inmate Hernandez denied any history of birth defects or
     developmental problems, a history of cruelty to animals
     or arson, or any significant childhood medical
     illnesses. He also denied a history of physical or
     sexual abuse as either a perpetrator or a victim.

III. EDUCATIONAL HISTORY:

     Inmate Hernandez attended public school and completed
     the tenth grade. He ultimately received his GED in
     1992 at CTF. In 1999, his measured grade level
     (T.A.B.E.) was 12.9. He denied any history of special
     education or academic or behavioral problems in school.
     His current educational activities include adult
     education classes involving writing and poetry.

IV.  FAMILY HISTORY:

     Inmate Hernandez stated that he has one brother who is
     currently incarcerated in the California Department of
     Corrections. He has one sister and one brother who
     have substance abuse histories. He has maintained good
     relationships with all of his family members.

HERNANDEZ    D-33689    CTF-CENTRAL    07/01/99    gj

HERNANDEZ, HECTOR
CDC NUMBER:  D-33689
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

This inmate is a heterosexual male.  He denied any
history of high-risk sexual behavior or sexually
aggressive behavior.

VI.   MARITAL HISTORY:

Inmate Hernandez has been married only one time.  He
and his wife separated due to incarceration-related
problems.  He has four children, ranging in ages from
13 to 18.  His current relationships with his wife and
children are good, but distant.

VII.  MILITARY HISTORY:

Inmate Hernandez denied any history of military
service.

VIII. EMPLOYMENT AND INCOME HISTORY:

Before his current incarceration, inmate Hernandez did
factory work, landscaping and welding.  While
incarcerated, he became certified in mill and cabinet
making.  His current interests include cabinet making.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Hernandez acknowledged having a substance abuse
history involving heroin dependence.  He has attended
Alcoholics Anonymous since 1995.  He demonstrated good
understanding of three of the 12 steps incorporated in
the AA doctrine.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Hernandez has prior psychiatric diagnoses of
polysubstance abuse, opioid dependence and antisocial
personality disorder.  He denied any history of medical
or psychiatric hospitalizations, a history of serious
accidents or head injuries, a history of suicidal or
homicidal assaultive behavior (excluding the committing
offense), or a history of seizures or other
neurological conditions.  He denied any significant
disabilities, impairments or illnesses.  He is not
currently taking any medication.

HERNANDEZ       D-33689      CTF-CENTRAL      07/01/99      gj

HERNANDEZ, HECTOR
CDC NUMBER:  D-33689
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE


XI.   PLANS IF GRANTED RELEASE:

      If granted parole, he plans to live in Fresno County
      with his parents, who have agreed to this arrangement.
      His financial and vocational plans include furthering
      his education, writing, cabinet making, welding and
      landscaping.  He has sponsors who have promised to aid
      him in getting employment and counseling.  His
      prognosis for successful community living is very good.

                     CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

      During the clinical interview, inmate Hernandez was
      alert and oriented to person, place and time.  He was
      well dressed and groomed.  His speech was articulate
      and context ally meaningful.  His mood and affect were
                        ly limits and his behavior was appropriate
                        ng.  No evidence of a mood or thought
                         demonstrated.  His estimated level of
                         functioning was within the average range.

                    OSTIC IMPRESSIONS:

                      ioid Dependence, in sustained full
                     remission in a controlled environment.
      AXIS II:   Antisocial Personality Disorder, improving.
      AXIS III:  No Contributory Physical Disorder.
      AXIS IV:   Incarceration.
      AXIS V:    GAF = 90.

      In addition to attending Narcotics Anonymous, inmate
      Hernandez has also participated in several self-help
      programs.  He has attended Religious Science of Mind
      programs.  He has also attended the Native American
      Spiritual Traditions programs.  He has also attended
      the Unitarian Universal Endeavors programs.

      His current level of insight and judgment in general
      and specifically regarding his commitment offense are
      good and supports a positive prediction of successful
      adaptation to community living.



HERNANDEZ, HECTOR
CDC NUMBER:  D-33689
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

XIII. REVIEW OF LIFE CRIME:

Inmate Hernandez descri          s
surrounding his commitme           epts full
responsibility for the             He stated
that he was under the i           nd that he
was morally and spiritu___, _____,, ___ver, in
mitigation, he stated that the victim shot first and
that he was acting in self-defense.  He stated that
growing up in a rough community played a substantial
role in leading to the crime.  He demonstrated limited
empathy for the victim, whom he related to as a drug
dealer, and somewhat more empathy for the victim's
family.  He did appear to be genuinely penitent for his
crimes.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting
    is considered to be below average relative to this
    Le___ __ _____ _____ation.  He received six CDC-
    1]                    d of 1990 to 1992, and he also
    re                    in 1999 for unacceptable hair
    le                    ived 13 CDC-128s.  However, he
    ha                    disciplinary free since 1994.

B.  I]                    mmunity, his violence
    p(                    ed to be no more than the
    a\                    e community.

C.  Heroin abuse does present a significant risk factor
    which may be precursor to violence for this
    individual.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1)  This inmate is competent and responsible for his
    behavior.  He has the capacity to abide by
    institutional standards and has largely done so
    during much of his incarceration period.

2)  This inmate does not have a mental disorder which
    would necessitate treatment either during his
    incarceration period or upon parole.

HERNANDEZ, HECTOR
CDC NUMBER:   D-33689
        PSYCHOLOGICAL EVALUATION


        This inmate does appear to have a heroin abuse
        problem and continued participation in Narcotics
        Anonymous during his incarceration and as a
        contingency of parole is suggested.


*Joe Reed*

JOE REED, Ph.D., J.D.
Staff Psychologist
Correctional Training Facility, Soledad


*Bruce Bakeman Ph.D.*

BRUCE M. BAKEMAN, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

JR/gj

d:   06/16/99
t:   07/01/99

# EXHIBIT "8"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2003 CALENDAR

HERNANDEZ, HECTOR                                                    D33689

I.      COMMITMENT FACTORS:

        A.      Life Crime: All relevant documents from the previous hearings have been
                considered, and that information appears valid. The writer has no further
                information to add.

        B.      Prisoner's Version: In an interview for this report, Inmate Hernandez indicated
                that his version remains the same as stated in the previous hearings.

        C.      Aggravating and Mitigating Circumstances: Remain the same as stated in the
                previous hearing.

II.     PRECONVICTION FACTORS: Documents from the previous hearings have been
        considered, and that information appears valid. The writer has no further information to
        add.

III.    POSTCONVICTION FACTORS: Documents from the previous hearings have been
        considered, and the information remains valid. During the period of time since the last
        hearing, the prisoner's behavior has remained the same, in that he has continued to
        remain disciplinary free, maintained his record of participation in the NA group and has
        remained enrolled in the Vocational Offset Press/Graphic Arts program. See
        Postconviction Progress Report for details.

IV.     FUTURE PLANS: Remain the same as indicated in the previous Board Report.

V.      SUMMARY:

        A.      Considering the commitment offense, prior record and prison adjustment, this
                writer believes that the prisoner would probably continue to pose a low degree of
                threat to the public at this time, if released from prison.

        B.      Prior to release, the prisoner could benefit from completing his vocational
                education program, continuing his participation in NA group and remaining
                disciplinary free.

        C.      This Board Report is based upon a one-hour interview, a thorough review of the
                Central File, and 19 months incidental contact in the housing unit. Inmate

HERNANDEZ, HECTOR        D33689                    CTF-Soledad              JAN/2003

LIFE PRISONER EVALU~..  . REPORT                                                  2
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2003 CALENDAR

        Hernandez was afforded an opportunity to review his Central File, per the Olson
        Decision, on 1/28/03.

**D.**     No accommodation for the purposes of effective communication was required per
        the Armstrong Remedial Plan.

HERNANDEZ, HECTOR     D33689          CTF-Soledad        JAN/2003

_____    1/29/03
G. Peabody                           Date
Correctional Counselor I


_____    1/29/03
C. Plymesser                         Date
Correctional Counselor II


_____    1/29/03
L. Trexler                           Date
Facility Captain


_____    1·29·03
D.S. Levorse,  COPR                  Date
Classification and Parole Representative


HERNANDEZ, HECTOR    D33689              CTF              JAN/2003

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [ ] DOCUMENTATION HEARING
- [x] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING                    (Life term began 12/22/86)

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 12/01 to 12/02 | | | **PLACEMENT**: CTF Central. <br> **CUSTODY**: Medium A. <br> **VOCATION**: Assigned as a student in the Vocational Print Program with satisfactory assessments and positive ratings on CDC 128-E chronos dated 12/31/01, 3/31/02, 6/30/02 and 9/30/02. <br> **ACADEMIC**: None during this period. <br> **WORK**: See VOCATION, above. <br> **GROUP ACTIVITIES**: Participated in the CTF NA group per CDC 128-B chronos dated 12/26/01, 1/17/02, 4/1/02 (two separate chronos have that date), 6/26/02, 7/24/02 and 10/02/02. <br> **PSYCH TREATMENT**: None during this period. <br> **PRISON BEHAVIOR**: Remained disciplinary free during this period. <br> **OTHER**: TB Alert Code 22 dated 5/6/02. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                          DATE  1/29/03

HERNANDEZ, HECTOR        D33689                  CTF-SOLEDAD              JAN/2003

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 12/02 to Present (1/28/03) | | | **PLACEMENT**: CTF Central. **CUSTODY**: Med A. **VOCATION**: Assigned as a student in the Vocational Print Program during this period. **ACADEMIC**: None during this period. **WORK**: See VOCATION, above. **GROUP ACTIVITIES**: Participated in the CTF NA group, although there are no CDC 128-B chronos in the file for this period. **PSYCH TREATMENT**: None during this period. **PRISON BEHAVIOR**: Remained disciplinary free during this period. **OTHER**: None. |

ORDER:
- [ ] BPT date advanced by        months.
- [ ] PBR date advanced by        months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify

- [ ] Schedule for Progress Hearing on appropriate institutional calendar

HERNANDEZ, HECTOR          D33689                    CTF-SOLEDAD                    JAN/2003

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                          Page _2_