# EXHIBIT 20





**H**
Crater v. Galaza
C.A.9 (Cal.),2007.

United States Court of Appeals,Ninth Circuit.
Andrew Cortez CRATER, Petitioner-Appellant,
v.
George M. GALAZA, Respondent-Appellee.
**No. 05-17027.**

Argued and Submitted Oct. 17, 2006.
Filed July 9, 2007.

**Background:** State prisoner whose murder conviction was upheld by the California Supreme Court petitioned for writ of habeas corpus. The United States District Court for the Eastern District of California, Morrison C. England, J., 2005 WL 2417651, denied the petition, and petitioner appealed.

**Holdings:** The Court of Appeals, O'Scannlain, Circuit Judge, held that:

(1) section of the Anti-terrorism and Effective Death Penalty Act (AEDPA) limiting the grounds for federal habeas relief for prisoners convicted in state court does not violate the Suspension Clause;

(2) section of the AEDPA limiting the grounds for federal habeas relief for prisoners convicted in state court does not violate the separation of powers;

(3) petitioner was not entitled to habeas corpus relief based on his claim that trial judge should have recused himself for bias based on judge's remarks at in camera pretrial conference which sought to persuade petitioner to accept plea bargain; and

(4) petitioner was not entitled to habeas corpus relief based on his claim that publicity surrounding the case required a change of venue.

Affirmed.
West Headnotes
**[1] Habeas Corpus 197 ⚷912**

197 Habeas Corpus
197V Suspension of Writ
197k912 k. Constitutional and Statutory Provisions. Most Cited Cases
Section of the Anti-terrorism and Effective Death Penalty Act (AEDPA) limiting the grounds for federal habeas relief for prisoners convicted in state court does not violate the Suspension Clause by either expressly or impliedly stripping federal courts of habeas jurisdiction, or by effectively suspending the writ. U.S.C.A. Const. Art. 1, § 9, cl. 2; 28 U.S.C.A. § 2254(d)(1).

**[2] Constitutional Law 92 ⚷2373**

92 Constitutional Law
92XX Separation of Powers
92XX(B) Legislative Powers and Functions
92XX(B)2 Encroachment on Judiciary
92k2373 k. Habeas Corpus. Most Cited Cases

**Habeas Corpus 197 ⚷205**

197 Habeas Corpus
197I In General
197I(A) In General
197I(A)1 Nature of Remedy in General
197k205 k. Constitutional and Statutory Provisions. Most Cited Cases
Section of the Anti-terrorism and Effective Death Penalty Act (AEDPA) limiting the grounds for federal habeas relief for prisoners convicted in state court does not violate the separation of powers by unconstitutionally infringing upon the role of federal courts in rectifying constitutional errors that are challenged by prisoners in collateral habeas corpus proceedings. U.S.C.A. Const. Art. 3, § 1 et

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

seq.; 28 U.S.C.A. § 2254(d)(1).

**[3] Habeas Corpus 197 ⚿467**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General
197k467 k. Courts; Judges, Magistrates, or Officers. Most Cited Cases

Petitioner was not entitled to habeas corpus relief based on his claim that trial judge should have recused himself for bias based on judge's remarks at in camera pretrial conference which sought to persuade petitioner to accept plea bargain; conclusion of California Court of Appeals that the law did not compel disqualification for presumed judicial bias accorded with clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C.A. § 2254(d)(1).

**[4] Habeas Corpus 197 ⚿444**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(A) Ground and Nature of Restraint
197k443 Jurisdictional Defects
197k444 k. Personal Jurisdiction; Venue. Most Cited Cases

Petitioner was not entitled to habeas corpus relief based on his claim that publicity surrounding case required a change of venue; conclusion of California Court of Appeals that publicity surrounding case did not require a change of venue accorded with clearly established federal law, as determined by Supreme Court of the United States. 28 U.S.C.A. § 2254(d)(1).

***1120** Victor S. Haltom, Sacramento, CA, Attorney at Law, argued the cause for petitioner-appellant Andrew Cortez Crater and filed briefs.
Brian R. Means, Sacramento, CA, Supervising Deputy Attorney General of the State of California, argued the cause for respondent-appellee George M. Galaza; Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General of the State of California, and Mary Jo Graves, Senior Assistant Attorney General of the State of California, were on the brief.

Appeal from the United States District Court for the Eastern District of California; Morrison C. England, District Judge, Presiding. D.C. No. CV-01-01893-MCE/GGH.

Before: MELVIN BRUNETTI, DIARMUID F. O'SCANNLAIN, and STEPHEN S. TROTT, Circuit Judges.
O'SCANNLAIN, Circuit Judge:
We are asked, once again, whether the Anti-terrorism and Effective Death Penalty Act is unconstitutional, this time by another habeas corpus petitioner convicted of murder in a California state court.

***1121** I

On June 8, 1995, Andrew Cortez Crater and Thomas Crater Robinson went on an armed crime spree in Sacramento, California. In the course of a few hours, the two men robbed a college student, a man and his sister-in-law, and a group outside a café . During the third robbery, Robinson fatally shot James Pantages. The Sacramento community expressed sorrow and dismay. James Pantages had been a beloved local musician. Numerous news reports were written on the crime.

Crater and Robinson were tried for robbery, attempted robbery, and murder. The charges included a special circumstance allegation for murder committed during a robbery. The prosecutor pursued the death penalty only for Robinson. Crater sought a change of venue and severance of his trial from that of Robinson, and the judge granted the latter.

Tried first, Robinson was convicted on all counts. The jury hung with regard to the death penalty, and the prosecutor did not pursue it further. Before Crater's trial began, the prosecution proposed the following bargain: If Crater would plead guilty, the District Attorney's office would drop the special circumstance allegation. After learning that Crater was reluctant to accept this deal, the judge gathered

the attorneys and the defendant *in camera* and explained that he considered the plea proposal to be a "major concession" by the prosecution. Despite the judge's encouragement to accept the agreement, however, Crater did not plead guilty. Instead, he moved to "peremptorily excuse" the judge under Cal.Civ.Proc.Code § 170.6, based on the judge's *in camera* advice. The judge denied Crater's motion, explaining that "in terms of my ability to try the case, regardless of whether you can peremptorily excuse me, if I felt that I could not give your client a fair trial, I would excuse myself."

The day before his trial began, Crater moved for a continuance and a change of venue. The judge declined both motions. Seventeen days later, the jury found Crater guilty on all counts and found the special circumstance to be true. Accordingly, the judge sentenced Crater to life in prison without the possibility of parole.

On direct appeal, Crater claimed that the denial of his motions for recusal and change of venue violated due process and that the jury instructions regarding the special circumstance prescribed too low a burden of proof. The California Court of Appeal consolidated his appeal with Robinson's and rejected it in an unpublished decision. The California Supreme Court denied his petition for review without comment.

Crater then turned to the federal courts. He reiterated his claims regarding recusal and venue in a habeas petition to the Eastern District of California. A magistrate judge recommended granting the petition based upon evidence of judicial bias, but the district judge disagreed, finding no evidence that the state judge harbored " prejudicial bias and should have recused himself." Applying the standard of review set forth in the Anti-terrorism and Effective Death Penalty Act (" AEDPA"), Pub.L. 104-132, 110 Stat. 1214, the district court concluded that "the state court's application of Supreme Court precedent was objectively reasonable" and denied Crater's habeas petition on September 30, 2005.

Crater timely appealed.

## II

### A

Crater first raises a frontal attack on the constitutionality of AEDPA. He claims that 28 U.S.C. § 2254(d)(1), a provision of AEDPA limiting the grounds for federal habeas relief for prisoners convicted***1122** in state court, violates the Suspension Clause and interferes with the independence of federal courts under Article III. In his intertwined constitutional arguments, Crater invokes the writ of habeas corpus both as an individual right [FN1] and as a power of the federal courts.

FN1. We do not attempt to answer the question of whether the Suspension Clause creates an individual right or sets a congressional limit, a point of recent disagreement in the D.C. Circuit. *See Boumediene v. Bush,* 476 F.3d 981, 993 (D.C.Cir.2007) ("[T]he dissent offers the distinction that the Suspension Clause is a limitation on congressional power rather than a constitutional right. But this is no distinction at all."). Because Crater is an American citizen, the Suspension Clause applies under either view.

#### 1

Our analysis begins with the statutory text. We agree with Crater that § 2254(d) as a whole markedly reduces the availability of federal habeas relief for prisoners contesting their detention after state adjudication on the merits. Before AEDPA was enacted, federal courts could grant relief if the state adjudication did not meet the standards of federal law. *See Williams v. Taylor,* 529 U.S. 362, 400, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring) (noting that under prior law "a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred on a question of constitutional law or on a mixed constitutional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question"). After AEDPA, however, courts may not grant relief unless a state adjudication either

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).FN2

> FN2. The two clauses of § 2254(d)(1) impose distinct limitations:
> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.
> *Williams,* 529 U.S. at 412-13, 120 S.Ct. 1495.

The Supreme Court has underscored the magnitude by which § 2254(d)(1) has altered prior standards and procedures for granting habeas relief: "the only question that matters [now] under § 2254(d)(1) [is] whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law." *Lockyer v. Andrade,* 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see also Early v. Packer,* 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (noting that a "merely erroneous" state decision does not warrant relief unless it is also " 'an *unreasonable* application' of clearly established federal law" (emphasis in original)).

The Court has recognized that § 2254(d)(1) "places a new constraint on the power of a federal habeas court" and "restricts the source of clearly established law to this Court's jurisprudence." *Williams,* 529 U.S. at 412, 120 S.Ct. 1495; *see also id.* at 403, 120 S.Ct. 1495 (rejecting the view that "§ 2254(d)(1) does not alter the previously settled rule of independent review" and "does no more than express a mood that the Federal Judiciary ***1123** must respect" (citation and internal quotation marks omitted)). Recently, the Court explained that if habeas relief depends upon the resolution of "an open question in [Supreme Court] jurisprudence," § 2254(d)(1) precludes relief. *Carey v. Musladin,* --- U.S. ----, 127 S.Ct. 649, 653, 654, 166 L.Ed.2d 482 (2006). Applying this standard in *Musladin,* the Court denied relief because "[g]iven the lack of holdings from this Court ... it c [ould] not be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' " *Id.* at 654 (citing § 2254(d)(1)). The Court's decision in *Musladin* underscores that § 2254(d)(1) tightly circumscribes the granting of habeas relief.

2

In evaluating the validity of these constraints upon the writ, we must look, of course, to the text and structure of the Constitution. Article III states that " [t]he judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." U.S. Const. art. III, § 2, cl. 1. In defining the judicial power, Article III provides for one Supreme Court with original jurisdiction over an enumerated category of cases affecting state parties and certain public officials. *Id.* In "all the other cases," the Supreme Court has only "appellate jurisdiction, both as to law and fact, *with such exceptions, and under such regulations as the Congress shall make.*" U.S. Const. art. III, § 2, cl. 2 (emphasis added).

The Constitution does not expressly create inferior federal courts or prescribe their original or appellate jurisdiction. Indeed, the Constitution permits Congress to choose not to establish inferior federal courts at all: "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress *may* from time to time ordain and establish." U.S. Const. art. III §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1, cl. 1 (emphasis added). Some have argued that the legislative authority to create the lower courts necessarily includes the "lesser" power to control such courts. But such legislative power would appear to contradict the separation of powers integral to the Constitution. *See* U.S. Const. arts. I-III (separating and distinguishing the powers of the executive, legislative, and judicial branches). Thus, the Supreme Court has found it necessary to set bounds upon congressional control of the courts. *See City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (striking down the Religious Freedom Restoration Act, because the statute "contradicted vital principles necessary to maintain separation of powers and the federal balance"). Both constitutional text and structure define congressional authority in relation to the courts.

The federal courts enjoy specific powers under the Constitution's tripartite division of authority. One such power is the ability to hear petitions for writs of habeas corpus, originally designed as a means for enabling prisoners to challenge the legality of their detention. *See Lonchar v. Thomas,* 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996). Section 9 of Article I (the "Suspension Clause") mandates that the writ remain available in times of peace: "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it. " U.S. Const. art. I, § 9, cl. 2. But the clause does not specify in which courts jurisdiction over the writ must lie.[FN3] The Constitution leaves such ***1124** matters to legislation. *See Ex Parte Bollman,* 8 U.S.(4 Cranch) 75, 94, 2 L.Ed. 554 (1807).

FN3. State courts have the power to entertain petitions from prisoners in state detention, but lack the power to entertain petitions for writs of habeas corpus from prisoners in federal detention. *See Ableman v. Booth,* 62 U.S.(21 How.) 506, 515-16, 16 L.Ed. 169 (1858); *Tarble's Case,* 80 U.S. (13 Wall.) 397, 411-12, 20 L.Ed. 597 (1871).

Congress has given the federal courts original habeas jurisdiction under 28 U.S.C. § 2241 and appellate habeas jurisdiction under 28 U.S.C. § 2255 .[FN4] Such grants derive from distant historical origins: "Federal courts have been authorized to issue writs of habeas corpus since the enactment of the Judiciary Act of 1789, and § 2241 of the Judicial Code provides that federal judges may grant the writ of habeas corpus on the application of a prisoner held 'in custody in violation of the Constitution or laws or treaties of the United States.' " *INS v. St. Cyr,* 533 U.S. 289, 305, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citation omitted). Congress thus has filled out the general provisions for habeas corpus set forth in the Constitution. The question is whether AEDPA impermissibly alters the constitutional framework.

FN4. This appellate jurisdiction extends over a different set of cases than those encompassed by the Court's original jurisdiction and includes matters whose disposition is "necessary to enable[the Court] to exercise appellate jurisdiction." *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 175, 2 L.Ed. 60 (1803) (ruling that because writs of mandamus were not specifically enumerated as part of the Court's original jurisdiction, they could be recognized only if part of or incident to its appellate jurisdiction).

3

[1] We construe Crater's claim that § 2254(d)(1) violates the Suspension Clause as an assertion that AEDPA either expressly or impliedly strips the federal courts of habeas jurisdiction. *See St. Cyr,* 533 U.S. at 305, 121 S.Ct. 2271 (noting that " serious Suspension Clause issue[s]" arise if Congress attempted to bar all habeas jurisdiction). The plain text defeats any suggestion that § 2254(d)(1) eliminates habeas jurisdiction entirely. The text of the provision merely sets forth standards for granting relief to state petitioners and does not even apply unless jurisdiction exists. Where a habeas statute "contains no explicit provision barring habeas review," habeas jurisdiction remains intact. *Demore v. Kim,* 538 U.S. 510, 517, 123

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 1708, 155 L.Ed.2d 724 (2003).[FN5]

FN5. The Supreme Court has explained that suspension of the writ does not occur unless a statute expresses Congress's "clear and unambiguous" intent to remove all federal habeas jurisdiction. *St. Cyr,* 533 U.S. at 305, 121 S.Ct. 2271. In *St. Cyr,* the Court addressed the constitutionality of a provision of AEDPA titled "Elimination of Custody Review by Habeas Corpus." *Id.* at 308, 121 S.Ct. 2271. The Court read the provision narrowly and concluded that it only reduced habeas jurisdiction: "The actual text of § 401(e), unlike its title, merely repeals a subsection of the 1961 statute amending the judicial review provisions of the 1952 Immigration and Nationality Act. Neither the title nor the text makes any mention of 28 U.S.C. § 2241." *Id.* at 309, 121 S.Ct. 2271 (citation omitted). The Court explained that this narrow reading was warranted to avoid "a serious Suspension Clause issue" that could arise if all habeas jurisdiction were repealed. "The necessity of resolving such a serious and difficult constitutional issue-and the desirability of avoiding that necessity-simply reinforce the reasons for requiring a clear and unambiguous statement of congressional intent." *Id.* at 305, 308-09, 121 S.Ct. 2271.

Greater attention must be given to Crater's apparent view that § 2254(d)(1) constrains relief so dramatically that it *effectively* suspends the writ. [FN6] Under ***1125** § 2254(d)(1), relief remains available, but is reserved for cases where a state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." A crucial distinction lies between § 2254(d)(1)'s constraint on granting relief and an effective suspension of the writ. In *Felker v. Turpin,* the Court upheld the constitutionality of 28 U.S.C. § 2244(b) of AEDPA, which bars successive habeas petitions, based upon this essential distinction:

FN6. The brevity of Crater's argument causes us some confusion as to the precise premise for his Suspension Clause claim. The Fourth Circuit encountered a similar problem when addressing a Suspension Clause challenge to § 2254(d)(1), and " confess[ed] to confusion over [the petitioner's] abbreviated argument on this score." *Green v. French,* 143 F.3d 865, 875 (4th Cir.1998), *cert. denied* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999). "Apparently, [the petitioner]'s argument" here, as in *Green,* "is that any statutory modification of the availability of habeas relief that 'sharply limits' a federal court's power to grant the writ 'threatens a violation of the Suspension Clause.' " *Id.*

We hold that the Act does not preclude this Court from entertaining an application for habeas corpus relief, although *it does affect the standards governing the granting of such relief.* We also conclude that the availability of such relief in this Court obviates any claim by petitioner under the Exceptions Clause of Article III, § 2, of the Constitution, and that the operative provisions of the Act do not violate the Suspension Clause of the Constitution, Art. I, § 9.
518 U.S. 651, 654, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (emphasis added).

Relying heavily on the Court's analysis in *Felker,* the Fourth Circuit rejected a Suspension Clause challenge to § 2254(d)(1), and explained: "From our review of the few precedents interpreting the Suspension Clause, we conclude that amended section 2254(d)(1) does not suspend the privilege of the writ, but rather, represents *a modest congressional alteration of the standards* pursuant to which the writ issues." *Green v. French,* 143 F.3d 865, 875 (4th Cir.1998), *cert. denied* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999) (emphasis added).[FN7]

FN7. In *Williams,* the Supreme Court rejected the part of *Green* that concluded that a state decision is an "unreasonable application" only if "all reasonable jurists"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would consider it such. The Court explained that while "[t]he Fourth Circuit's interpretation of the 'unreasonable application' clause of § 2254(d)(1) [wa]s generally correct," 529 U.S. at 407, 120 S.Ct. 1495, the "unreasonable application" clause requires only objective unreasonableness, not judicial consensus. *See id.* at 410, 120 S.Ct. 1495. The Court did not discuss whether the Fourth Circuit was correct in its rejection of Green's constitutional challenge to § 2254(d)(1). *See Green,* 143 F.3d at 874-76.

Likewise relying on *Felker,* the Seventh Circuit reached the same conclusion: "[T]o alter the standards on which writs issue is not to 'suspend' the privilege of the writ." *Lindh v. Murphy,* 96 F.3d 856, 867 (7th Cir.1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The court emphasized that only a limited class of cases was cognizable on collateral review in 1789. *See id.* at 867-68. The Constitution permitted Congress to grant additional habeas jurisdiction, but such grants were discretionary and could be repealed. *See id.* at 868 (citing *Ex Parte McCardle,* 74 U.S.(7 Wall.) 506, 513-14, 19 L.Ed. 264 (1869) (allowing Congress to remove a prior grant of habeas jurisdiction)). Because AEDPA simply altered Congress's earlier grants of habeas jurisdiction, the Seventh Circuit found no Suspension Clause violation. "Any suggestion that the Suspension Clause forbids every contraction of the powers bestowed [subsequent to 1789] ... is untenable. The Suspension Clause is not a ratchet." *Id.*

We agree with the Fourth and Seventh Circuits. Section 2254(d)(1) simply modifies the preconditions for habeas relief, and does not remove all habeas jurisdiction.***1126** *See Felker,* 518 U.S. at 658, 116 S.Ct. 2333 ("[A]lthough the Act does impose new conditions on our authority to grant relief, it does not deprive this Court of jurisdiction to entertain original habeas petitions."). The validity of such parameters on habeas relief can be verified by consideration of the Court's decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). There, the Court held that "new rules" of constitutional law did not apply retroactively on collateral review, so that certain errors of constitutional law could not be grounds for collateral relief. The Court explained that while such errors had to be reversible on direct appeal, they did not always warrant collateral relief. *Id.* at 302, 109 S.Ct. 1060; *see also Griffith v. Kentucky,* 479 U.S. 314, 322, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication."); *Teague,* 489 U.S. at 306, 309, 109 S.Ct. 1060 (contrasting direct proceedings with the "nature and function of collateral review" and noting that the "interests of comity and finality must also be considered in determining the proper scope of habeas review").

*Teague* highlights an important distinction between the scope of direct and collateral review, and supports the conclusion that restrictions on the grounds for habeas relief-whether set by Congress or the Court-do not constitute suspension of the writ. Both *Felker* and *Teague* confirm our conclusion that § 2254(d)(1) raises no Suspension Clause issue. We reject such challenge to AEDPA.

4

[2] We next consider Crater's claim that § 2254(d)(1) violates the separation of powers by " unconstitutionally infring[ing] upon the role of federal courts in rectifying constitutional errors that are challenged by prisoners in collateral § 2254 proceedings." Section 2254(d)(1) prevents federal courts from granting habeas relief to a state petitioner where the relevant decision is not " contrary to" or "an unreasonable application of" Supreme Court precedent. *See Musladin,* 127 S.Ct. at 654 (denying habeas relief under AEDPA where the issue remained "an open question" under Supreme Court jurisprudence). Thus, § 2254(d)(1) renders decisions by lower courts non-dispositive for habeas appeals.FN8

FN8. In *Casey v. Moore,* 386 F.3d 896 (9th Cir.2004), we explained the reduced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relevance of circuit decisions under the Act:

> [B]ecause these cases are not clearly established law as determined by the United States Supreme Court, they are not controlling precedents under the standard required by AEDPA. Under AEDPA we must look to the direct precedent of the Supreme Court of the United States. Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment.

*Id.* at 907 (citation omitted). These limits on the relevance of circuit precedent were discussed and accepted by the Court in *Musladin. See* 127 S.Ct. at 652-54.

Crater does not specifically claim that AEDPA is unconstitutional because it denies precedential effect to circuit caselaw, perhaps because we already rejected that claim. *See Duhaime v. Ducharme,* 200 F.3d 597, 601 (9th Cir.2000) ("[O]ur cases ... implicitly reject the argument that § 2254's rule directing us to look to Supreme Court law when deciding habeas petitions is unconstitutional under stare decisis principles...."); *see also Planned Parenthood v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (" [T]he rule of stare decisis is not an ' inexorable command,' and certainly it is not such in every constitutional case.").

***1127** Crater invokes a dissenting opinion from the Sixth Circuit to support the "notion that AEDPA ... raises grave constitutional concerns by impinging on the judicial power." *Davis v. Straub,* 430 F.3d 281, 296 (6th Cir.2005) (Merritt, J., dissenting). That dissenting opinion argued for a narrow reading of § 2254(d)(1) in order to uphold its constitutionality, stating that "Congress may not say to the federal courts 'clearly established law' means a case in the Supreme Court directly in point on the facts," because that rule would "prevent[ ] our Court from giving our independent judgment on the legal effect of the evidence before us and by leaving us 'no adjudicatory function to perform.' " *Id.* at 297.

We are not persuaded that AEDPA has this effect. Section 2254(d)(1) does not instruct courts to discern or to deny a constitutional violation. Instead, it simply sets additional standards for granting relief in cases where a petitioner has already received an adjudication of his federal claims by another court of competent jurisdiction. The Constitution does not forbid Congress from establishing such standards, as the Fourth Circuit has eloquently explained:

> In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of habeas cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case. And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy. Under the AEDPA, we are free, if we choose, to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights. Section 2254(d) only places an additional restriction upon the scope of the habeas remedy in certain circumstances.

*Green,* 143 F.3d at 874-75.

Both history and Supreme Court precedent confirm Congress's authority to make such rules: "As the writ has evolved ... Congress, the [Habeas Corpus] Rule writers, and the courts have developed more complex procedural principles that regularize and thereby *narrow the discretion that individual judges can freely exercise.*" *Lonchar,* 517 U.S. at 322, 116 S.Ct. 1293 (emphasis added). Indeed, the Court has considered some aspects of habeas review at the juncture of procedure and substance to be best determined by the legislative branch. *See Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (declining to "create a new judicial rule" where "despite many attempts in recent years, Congress has yet to create a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

congressional statute of limitations for habeas corpus actions"); *see also Hanna v. Plumer,* 380 U.S. 460, 464-65, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ("Undoubtedly most alterations of the rules of practice and procedure may and often do affect the rights of litigants.") (citing *Mississippi Pub. Corp. v. Murphree,* 326 U.S. 438, 445, 66 S.Ct. 242, 90 L.Ed. 185 (1946)).

Prior Supreme Court precedent on AEDPA verifies that § 2254(d)(1) falls well within Congress's constitutional and historical authority to regulate habeas relief:

[W]e have long recognized that "the power to award the writ by any of the courts of the United States, must be given by written law," *Ex parte Bollman,* 4 Cranch 75, 94, 2 L.Ed. 554 (1807), and we have likewise recognized that *judgments about the proper scope of the writ* are "normally for Congress to make." *Lonchar v. Thomas,* 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996).

***1128** *Felker v. Turpin,* 518 U.S. at 664, 116 S.Ct. 2333 (emphasis added) (parallel citations omitted).

We are not persuaded by Crater's analogy between AEDPA and the statutory rule deemed unconstitutional in *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). In *Klein,* the Court reviewed a proviso attached to an appropriations bill that

declare[d] in substance that no pardon, acceptance, oath, or other act performed in pursuance, or as a condition of pardon, shall be admissible in evidence in support of any claim against the United States in the Court of Claims, or to establish the right of any claimant to bring suit in that court; nor, if already put in evidence, shall be used or considered on behalf of the claimant, by said court, or by the appellate court on appeal.

*Id.* at 143. The Court analyzed the proviso in light of the legislative power to govern the "organization and existence" of "those inferior courts which Congress authorizes":Undoubtedly the legislature has complete control over the organization and existence of [such inferior court] and may confer or withhold the right of appeal from its decisions.

And if this act did nothing more, it would be our duty to give it effect. If it simply denied the right of appeal in a particular class of cases, there could be no doubt that it must be regarded as an exercise of the power of Congress to make 'such exceptions from the appellate jurisdiction' as should seem to it expedient.

*Id.* But the Court stated that "the language of the proviso shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. Its great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have." *Id.* at 145. Thus the Court found the proviso to exceed Congress's authority, because it "prescribe[d] a rule for the decision of a cause in a particular way." *Id.* at 146.

The *Klein* decision reiterates that statutes " control[ling] the organization and existence" of the inferior courts fall within congressional power, but that Congress may not predetermine the results in any given case. AEDPA comports with this distribution of constitutional authority. Section 2254(d)(1) does not restrict the federal courts' power to interpret the law, but only sets standards for what state court errors of law require federal habeas relief. As the Seventh Circuit noted when considering § 2254(d)(1), "[r]egulating relief is a far cry from limiting the interpretive power of the courts." *Lindh,* 96 F.3d at 872.

Likewise unavailing is Crater's attempt to analogize AEDPA to the Religious Freedom and Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, deemed unconstitutional in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). RFRA mandated that all federal courts apply Congress's preferred constitutional interpretation of the Free Exercise Clause, which mirrored the older standard set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), rather than the newer one iterated in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *See* 42 U.S.C. § 2000bb.

Concluding that this mandate exceeded the scope of congressional authority, the Court held RFRA unconstitutional. *City of Boerne,* 521 U.S. at 536, 117 S.Ct. 2157. The Court explained that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Congress has no power to "enact legislation that expands the rights [enumerated in the Constitution]," *id.* at 527-28, 117 S.Ct. 2157, or to "define its own powers by altering the [Constitution's] ***1129** meaning," *id.* at 529, 117 S.Ct. 2157. Unlike RFRA, § 2254(d)(1) does not mandate Congress's preferred vision of the law. The provision makes Supreme Court precedent the lynchpin for relief; it never supplants judicial judgment with legislative choice. Crater's separation of powers argument therefore fails.

B

The constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute. Although the Court has not squarely addressed its constitutional validity, for the past eleven years the Court has consistently applied AEDPA's standard of review to appellate habeas petitions. *See Abdul-Kabir v. Quarterman,* --- U.S. ----, 127 S.Ct. 1654, 1664, 1671, 167 L.Ed.2d 585 (2007) (requiring habeas relief because "the provisions of [AEDPA] govern the scope of our review" and the state court decision "was both ' contrary to' and 'involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' "); *Tyler v. Cain,* 533 U.S. 656, 659, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (applying AEDPA's rule against successive habeas petitions to deny federal habeas relief); *Lindh,* 521 U.S. at 336, 117 S.Ct. 2059 (holding that AEDPA applies to habeas petitions filed after April 24, 1996). We consider the Court's longstanding application of the rules set forth in AEDPA to be strong evidence of the Act's constitutionality. *See Marbury v. Madison,* 5 U.S.(1 Cranch) 137, 176, 2 L.Ed. 60 (1803) ("It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule ... must of necessity expound and interpret that rule. So, if a law be in opposition to the constitution ... the constitution, and not such ordinary act, must govern the case....").

The settled law of this circuit also confirms this conclusion. In *Duhaime v. Ducharme,* 200 F.3d 597 (9th Cir.2000), we explained that "our cases ... implicitly reject the argument that § 2254's rule directing us to look to Supreme Court law when deciding habeas petitions is unconstitutional under *stare decisis* principles and Article III, and that such an application runs counter to congressional intent and would disrupt judicial efficiency" and ruled that "§ 2254(d)(1) does not suffer from any Article III constitutional infirmities." *Id.* at 601. *We recently recognized that Duhaime* is the law of this circuit. *See Irons v. Carey,* 479 F.3d 658, 665 n. 5 (2007). Although *Duhaime* offered only a cursory analysis of the constitutionality of § 2254(d)(1), its holding binds us today.[FN9]

FN9. Unfortunately, the peculiar procedural history of *Irons* may have engendered some confusion on this score. The panel issued a sua sponte order for supplemental briefing on the constitutionality of AEDPA, implying that the validity of § 2254(d)(1) remained in question despite *Duhaime.* *See Irons v. Carey,* 408 F.3d 1165, 1165 (9th Cir.2005) . After supplemental briefing, the panel concluded that *Duhaime* settled the matter after all. *Irons,* 479 F.3d at 665 n. 5. But two concurrences raised constitutional objections to AEDPA and one was joined by a majority of the panel. *See id.* at 665 (Noonan, J., concurring) (noting that "if I cannot depart from the law of the circuit, I may still ask the question as to constitutionality in light of governing decisions by the Supreme Court."); *id.* at 670 (Reinhardt, J., concurring) (suggesting that § 2254(d)(1) is "inconsistent with our fundamental obligations as judges" and joining Judge Noonan's "sagacious concurrence"). Although it may have been unusual that a *majority* of the panel challenged the validity of the precedent upon which the court relied, these concurrences simply expressed " strongly-held views about the strictures of the AEDPA, without creating a conflict in the law of this circuit." *Id.* at 671 (Fernandez, J., concurring). The *Irons* opinion leaves no doubt that *Duhaime*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

settles our law with respect to § 2254(d)(1) . *Id.* at 665 n. 5 (majority opinion).

***1130** But we do not rely on principles of *stare decisis* alone. *Compare Irons,* 479 F.3d at 665 n. 5 (concluding that § 2254(d)(1) had to be applied because "*Duhaime* ... answer[ed] the question, correctly or not, for the court"). Our holding that § 2254(d)(1) is constitutionally firm is based upon the constitutional text, the Supreme Court's interpretation of other statutes limiting habeas relief, and the Court's longstanding application of AEDPA. These first principles, as well as the doctrine of *stare decisis,* require us to conclude that § 2254(d)(1) does not conflict with the Suspension Clause or breach the constitutional separation of powers. We therefore must apply § 2254(d)(1) to resolve Crater's remaining claims.

III

A

[3] Crater next argues that due process required recusal of his trial judge. He claims that an impermissible appearance of bias was created when the judge made the following statements to Crater at an *in camera* pretrial conference:

Well, Andrew [Crater], you've been in my court a few times during the trial of your co-defendant, Robinson. So you should know that I'm Judge Park, and I'm going to be trying your case. And I'm going to be sentencing you as well if you're found guilty, which I expect will happen.

I understand that the District Attorney's office has made a major concession in your case, and has made an offer to you which, for reasons I want to talk to you about, you're not so sure you want to accept.

Based upon what I know about this case-and I'm in a very unique position in this case, because I've already heard all of the witnesses, I know everything that happened that night, and I have assessed everything that the witnesses have said, and therefore, I know what they are going to say about you.

And based upon what I've heard about this case, I'm real sure that you're going to be convicted of all of those robberies, that you're going to be convicted of shooting the first robbery victim. You're going to be convicted of all of the attempted robberies, and you're going to be found guilty of murder in the first degree. I'm real sure all that's going to happen. And I suspect Miss Gutowsky [FN10] is real sure of that as well, as I'll bet she has been telling you that. Miss Gutowsky is a very experienced lawyer, and you should listen to her.

FN10. Ms. Gutowsky represented Crater at trial.

The risk you run in going to trial is that the jury may find the special circumstance to be true.... The special circumstance which makes you ineligible for ever getting out of prison is very similar to the felony murder rule, but does require evidence that you acted recklessly that night with respect to the murder of Pantages. That's the only real issue that this jury would decide.... [B]ased upon everything I've heard, that is a monumental risk for you.

A jury is not going to like you. A jury is going to be frightened by what they hear from these witnesses occurring that night. They will put themselves at the ATM. They will put themselves out walking the streets.... You have very little to go on in this case. You might beat the special circumstance; I don't think you will....

And I, as the judge, am supposed to keep an open mind about what sentence to impose.... This much I can tell you, I would have no discretion on first degree murder, none.... I can also tell ***1131** you that most judges looking at what happened that night would probably be inclined to impose consecutive penalties .... So most judges, I think, would throw the book at you.

So in a nutshell, this is an offer which gives you, at some time in your life, an opportunity to get out of prison. If you go before this jury and lose on the special circumstance issue, you will get out of prison someday, but it will be in a pine box. You will die in prison if you are found guilty of the special circumstance....

... [Y]ou have a right to go to trial. In my opinion, it's a mistake for you to take that kind of risk,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because I think all you have is downside and no upside potential.

Crater contends that the foregoing statements made it impossible for that judge to conduct a fair trial.

1

Supreme Court precedent reveals only three circumstances in which an appearance of bias-as opposed to evidence of actual bias-necessitates recusal. First, due process requires recusal of a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [one of the litigants]." *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *see also Ward v. Vill. of Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (citing *Tumey,* 273 U.S. at 523, 47 S.Ct. 437); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821-22, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (same).

2

Second, due process requires recusal if a judge becomes "embroiled in a running, bitter controversy " with one of the litigants. *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). In *Mayberry,* a judge presided over a trial for contempt after being made " the target of petitioner's insolence." *Id.* On review, the Supreme Court noted that the personal nature of the attacks jeopardized the judge's ability to remain fair: "Many of the words leveled at the judge in the instant case were highly personal aspersions, even ' fighting words'-'dirty sonofabitch,' 'dirty tyrannical old dog,' 'stumbling dog,' and 'fool.' He was charged with running a Spanish Inquisition and told to 'Go to hell' and 'Keep your mouth shut. ' " *Id.* at 466, 91 S.Ct. 499.

3

Third, due process requires recusal if the judge acts as "part of the accusatory process." *In re Murchison,* 349 U.S. 133, 137, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The *Murchison* Court rejected a Michigan law authorizing "any judge of its courts of record to act as a so-called 'one-man grand jury.' " *Id.* at 133, 75 S.Ct. 623. In *Murchison,* the judge had acted as a grand jury to bring contempt charges against the petitioners, and had then tried, convicted, and sentenced them. *Id.* at 135, 75 S.Ct. 623. The Supreme Court reversed their convictions, stating: "[O]ur system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Id.* at 136, 75 S.Ct. 623.

B

None of the three circumstances requiring recusal reflects the case at bar. Crater's judge had no " direct, personal, substantial pecuniary interest" in the outcome, as he made clear at the pretrial conference: "If I'm not trying your case, I'll be trying another one.... And frankly, it makes no difference to me.... But I hate to see somebody twenty-one years old with ***1132** your intelligence and potential make what is in a word a stupid decision."

He did not become " 'personally embroiled' " in a controversy with Crater and Crater directed no " highly personal aspersions" against him. *Mayberry,* 400 U.S. at 465-66, 91 S.Ct. 499. The judge's pre-trial comments suggested concern for Crater, not the "open hostility and bias at the beginning of a judicial proceeding" that the Sixth Circuit denounced in *Anderson v. Sheppard,* 856 F.2d 741, 747 (6th Cir.1988), a case that Crater invokes. And Crater's decision to decline the plea bargain may have appeared foolish, but that choice was not the kind of "personal" attack that might incite bias in the judge. *See Mayberry,* 400 U.S. at 466, 91 S.Ct. 499.

Finally, the judge did not perform incompatible accusatory and judicial roles. *See Murchison,* 349 U.S. at 137, 75 S.Ct. 623. He neither acted as a prosecutor nor sought to advance the position of the prosecutor-indeed, he continued to encourage the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plea bargain even after the prosecutor suggested rescinding the proposal due to Crater's lack of remorse. The judge's predictions did not suggest bias. The Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The judge's comments, founded upon his legitimate knowledge of the proceedings and outcome in Robinson's case, offer no evidence to overcome the "presumption of honesty and integrity" that we accord to the determinations of a judge. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Therefore, the California Court of Appeal's conclusion that "the law d[id] not compel disqualification for presumed judicial bias" accords with "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

IV

A

[4] Crater also challenges the California Court of Appeal's conclusion that publicity surrounding the case did not require a change of venue.[FN11] He claims that under federal law, the state court was required to presume that the publicity prejudiced the local jury against him, a constitutional impediment to a fair trial that could only be avoided by a change of venue. To support this claim, Crater argues that the extensive media attention given his case created presumptive bias in local residents. He states that the " 'vast majority' of the members of the panel of prospective jurors ... indicated that they had been exposed to publicity concerning the case" and "eight of the twelve jurors originally seated to hear the case expressly stated that they had been exposed to publicity concerning the case." While this evidence shows that publicity reached many persons *1133 in the community, we disagree that it supports a change of venue as a matter of federal constitutional law. Indeed, the Supreme Court has cautioned against presuming juror bias due to familiarity with news reports:

FN11. The state court considered whether a change of venue was mandatory under state law, which requires the assessment of "five relevant factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." *People v. Sully,* 53 Cal.3d 1195, 283 Cal.Rptr. 144, 812 P.2d 163, 169 (1991). The California Court of Appeal concluded based on these factors that a change of venue was not necessary. Although the court did not cite any federal law, we will not reverse its decision solely for that reason. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication ... scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd,* 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Crater then appeals to *Irvin* 's ultimate conclusion that vacating and remanding was necessary. But the circumstances that ultimately required a change of venue in *Irvin* are distinguishable from those at bar. In addition to a "barrage of newspaper headlines, articles, cartoons and pictures ... unleashed against [the defendant] during the six or seven months preceding his trial," *id.* at 725, 81 S.Ct. 1639, the *Irvin* Court noted a " 'pattern of deep and bitter prejudice' shown to be present throughout the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

community," *id.* at 727, 81 S.Ct. 1639. The Court remarked that eight of the twelve jurors selected thought Irvin was guilty. *See id.* Crater's case offers no similar evidence of media influence. Although Crater asserts that "[n]umerous press accounts were published in which he was characterized as an 'urban predator[,]' a ' cold-blooded killer[,]' and an 'anti-social animal,' " in fact many of those reports came out before the media knew who the suspects were. Once Crater and his co-defendant Robinson were identified, detained, and investigated, the news reports began to contain more specific information, which cast Crater in a relatively favorable light. For example, they described Robinson as an ex-felon who pistol-whipped his victims and fired the fatal shot at Pantages, but portrayed Crater as a promising student with no criminal record. Emphasizing the reported contrast between the defendants, the California Court of Appeal concluded that only Robinson presented a persuasive argument for a change of venue:

Robinson's argument [wa]s more compelling than Crater's because the coverage targeted him, not only as an outsider, but as the person responsible for Pantages's death. Crater's confession implicating Robinson was disseminated widely ... the district attorney explained to the press he was seeking the death penalty against Robinson [but not Crater] because he was the shooter who killed Pantages.... Hence, the coverage portraying Robinson as a violent criminal from Oakland militates toward a change of venue for him. Crater's status was reported somewhat more sympathetically. He was portrayed as an achiever, someone who had succeeded against difficult odds in the inner city, someone without a criminal record. ... Moreover, as a student in Davis, he was not removed from Sacramento geographically or culturally. We conclude the reporting on Crater's background is not a factor necessitating a change of venue for him.

While the state court reached its determination without reference to federal law, we share its conclusion that the news reports did not create presumptive bias.

1

This conclusion is not unsettled by Crater's citation to *1134*Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Sheppard,* the Court concluded that a due process violation occurred when the state trial judge ignored the effects of prejudicial pretrial publicity and failed to restrain disruptive influences in the courtroom. The facts of *Sheppard* are readily distinguishable from those at bar. Sheppard was accused of bludgeoning to death his pregnant wife, and "[f]or months the virulent publicity about Sheppard and the murder had made the case notorious.... Sheppard was examined for more than five hours without counsel during a three day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people." *Id.* at 354, 86 S.Ct. 1507. The Court noted that both the prosecutor and judge were running for judgeships in the upcoming election. *Id.* Even so, the Court was hesitant to require a change of venue based on pretrial publicity alone: "We cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone...." *Id.* Only when the Court also considered "the setting in which the trial was held" and the fact that "bedlam reigned *at the courthouse during the trial* and newsmen took over practically the entire courtroom, hounding most of the participants in the trial" did it conclude that the conviction had to be reversed. *Id.* at 355, 86 S.Ct. 1507 (emphasis added). Crater does not argue that his trial proceedings were similarly influenced by prejudicial media coverage or disrupted by news reporters. The state court aptly remarked that the coverage of Crater's case "was [no] more sensational than the very nature of the crime itself would require." And we add that the media attention in his case lasted for a far shorter period than did the harmful publicity in *Sheppard.* The facts of the cases are not comparable.

2

Nor are we persuaded that a due process violation occurred based upon Crater's citations to *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and *Estes v. Texas,* 381 U.S. 532, 85

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 1628, 14 L.Ed.2d 543 (1965). We see at bar none of the prejudice resulting from news coverage that was obvious in those cases. In *Rideau,* the residents of the county where Rideau was tried "saw on their television sets [a motion picture of] Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725, 83 S.Ct. 1417. This motion picture had been created "with the active cooperation and participation of the local law enforcement officers," *id.,* and two local deputy sheriffs later were seated on Rideau's trial jury for what the Court denounced as "kangaroo court proceedings," *id.* at 726, 83 S.Ct. 1417. Crater presents no similar evidence of prejudicial news coverage or participant bias.

B

Not only do *Sheppard, Rideau,* and *Estes* involve evidence of prejudice absent at bar, but those cases have been limited by subsequent Supreme Court decisions. In *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court addressed a situation where "members of the jury had learned from news accounts about a prior felony conviction or certain facts about the crime with which [the petitioner] was charged." *Id.* at 795, 95 S.Ct. 2031. The Court considered this knowledge acceptable and distinguished the far more problematic media effects in *Rideau, Estes,* and *Sheppard*:

Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. In those cases the influence of the news ***1135** media, either in the community at large or in the courtroom itself, pervaded the proceedings.... In *Rideau* ... the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"-the real trial had occurred when tens of thousands of people ... had seen and heard the defendant admit his guilt before the [news] cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment.

Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival.

*Murphy,* 421 U.S. at 798-99, 95 S.Ct. 2031. The Court limited *Rideau, Estes,* and *Sheppard,* commenting that those cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Id.* at 799, 95 S.Ct. 2031.

And in a later decision, the Court reversed a Third Circuit ruling that adverse pretrial publicity made a fair trial impossible at the original venue. *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). In *Patton,* "publicity revealed Yount's prior conviction for murder, his confession, and his prior plea of temporary insanity, information not admitted into evidence at trial." *Id.* at 1029, 104 S.Ct. 2885. Seventy-seven percent of the veniremen questioned about the case "admitted they would carry an opinion into the jury box." *Id.* Even with this evidence of news influence, the *Patton* Court discerned no need to change venue. The Court rejected the argument that *Irvin* required reversal, noting that *Irvin* had been "a leading[decision] at the time" but was inapposite at bar. *Id.* at 1031-32, 104 S.Ct. 2885. The *Patton* Court also underscored the importance of applying " the statutory presumption of correctness to the trial court's determination of these questions." *Id.* at 1038, 104 S.Ct. 2885.

Crater's survey-based evidence suggesting that many community residents believed that Crater and Robinson committed the crime does not justify a presumption that the jury members ultimately selected shared such preconceptions or were prejudiced by news accounts. No evidence persuades us to doubt the state court's determination of impartiality in a jury winnowed by peremptory and for-cause challenges, including removals based on news exposure. [FN12]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN12. The Court's more recent decision in *Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) reaffirms that a change of venue does not become necessary simply because of extensive news publicity regarding a case. There, although eight of the twelve jurors in the case had "read or heard something about the case," none "indicated that they had formed an opinion based on the outside information, or that it would affect their ability to determine petitioner's guilt or innocence based solely on the evidence presented at trial." *Id.* at 417, 111 S.Ct. 1899. In affirming the decision of the trial court, the majority explained: "A trial court's findings of juror impartiality may be overturned only for manifest error." *Id.* at 428, 111 S.Ct. 1899 (citations and quotation marks omitted). "It is not required ... that the jurors be totally ignorant of the facts and issues involved." *Id.* at 430, 111 S.Ct. 1899 (same). Even though the trial court had refused to conduct individual *voir dire* or to ask any of the petitioner's questions "relating to the content of news items that potential jurors might have read or seen," *id.* at 419, 111 S.Ct. 1899, the *Mu'Min* Court found no due process violation, *id.* at 431-32, 111 S.Ct. 1899.

***1136** The district court's denial of habeas relief is

**AFFIRMED.**

C.A.9 (Cal.),2007.
Crater v. Galaza
491 F.3d 1119, 07 Cal. Daily Op. Serv. 8059

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life Term Parole Consideration Hearing of:

HECTOR HERNANDEZ

CDC Number D-33689

COPY
RECORDS

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 20, 2003

8:50 A.M.

PANEL PRESENT:

LEONARD MUNOZ, Presiding Commissioner
GRETCHEN GARNER-EASTER, Deputy Commissioner

OTHERS PRESENT:

HECTOR HERNANDEZ, Inmate
DAVID SPOWART, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
__✓__ Yes

See Review of Hearing Transcript Memorandum

April Allen — Capitol Electronic Reporting

today's hearing will be the truth, the whole truth, and nothing but the truth?

**INMATE HERNANDEZ:** I affirm.

**PRESIDING COMMISSIONER MUNOZ:** All right, sir. Thank you. And Mr. Spowart, there is an Appellate Court Decision. So I'll read the Statement of Facts that's contained within that decision on page two and on page four. And it reads as follows,

"The murder victim in this case was Sylvestre Bustos, B-U-S-T-O-S, and the first name is spelled S-Y-L-V-E-S-T-R-E. Paramedics pronounced him dead at his home on South Levit, L-E-V-I-T, Street in Fresno in the early morning hours of August 15th, 1985. A pathologist testified that based upon the autopsy he performed on the victim, the cause of death was a shotgun wound to the thoracic aorta. The wound was consistent with a shot from a sawed-off shotgun, and the entry was to the upper left chest with a trajectory which was from the front to rear, 20 percent downward in an individual who was standing upright. The

pathologist estimated the gun was fired from a distance of approximately seven to eight feet, and it was unlikely the victim was lying down when shot."

And then the next couple of paragraphs address some of the investigation that took place at the scene. That's the rest of page three. And then I'll go to the top of page four, which reads -- which gives some of the witness's accounts. And that reads as follows,

"A number of people were in the residence at the time the shooting occurred, Dorotheo, D-O -- or Dortheo, D-O-R-T-H-E-O, Juarez, J-U-A-R-E-Z, Eleno, E-L-E-N-O, Santa Maria Mojica, M-O-J-I-C-A, and Enrique, E-N-R-I-Q-U-E, Casias, C-A-S-I-A-S. All three testified at trial about what they saw and heard on the evening of the shooting. Juarez and Mojica were asleep on the floor in the kitchen when Juarez was awakened by a knock on the door. As Casias went to open the door, the inmate came in wielding a short-barreled shotgun and explained,

quote, 'Give us the chivas,' end quote. And apparently the word chivas is Mexican or Spanish slang for heroin. He then told everyone not to move, pointed the gun at Juarez and Casias, and told the victim to, quote, 'give him the gun,' end quote. The victim who had been sleeping on a couch in the living room started to rise. He was wearing pants and had a gun under his belt. Juarez ran to the side of the room in order to hide and noticed that by the time he left the room, the victim was standing. He did not hear the victim say anything and saw no struggle. After hearing the shot, Juarez ran from the house. According to Juarez, the victim was a drug dealer. Mojica testified he too was asleep in the kitchen and was awakened by the sound of people arguing. He looked into the living room only to see the inmate pointing a weapon at him. The inmate told him not to move. He heard a shot and ran into the bedroom. He did not see a gun on the

victim."

And sir, did you listen to what I read, sir?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Did you understand me as I read it?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Is what I read an accurate reflection of what occurred?

**INMATE HERNANDEZ:** In general.

**PRESIDING COMMISSIONER MUNOZ:** Well, the basic question I have, sir, did you kill Mr. Bustos?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** You seemed uncertain in your response. I want to make sure that -- Are you telling me, yes, you killed Mr. Bustos?

**INMATE HERNANDEZ:** You had asked the question if it was -- what you had read was correct, and there was a statement in there that the victim did not have a gun, and he did have a gun. And he also drew that gun, and I did -- then I fired --

**PRESIDING COMMISSIONER MUNOZ:** Well, first things first. Let's go back to my first question.

**INMATE HERNANDEZ:** Okay.

**PRESIDING COMMISSIONER MUNOZ:** Did you kill

Mr. Bustos?

**INMATE HERNANDEZ:** He died as a result of me shooting him.

**PRESIDING COMMISSIONER MUNOZ:** So you killed Mr. Bustos. Did you or did you not? Let me ask you another question. Did you have a jury trial?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Did the jury find you guilty of murder in the what, second degree?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** All right. So you're convicted for the murder of Mr. Bustos. In the eyes of this Panel, you committed the murder. That's what you're convicted of. We're not here to change the verdict. We can't change the verdict if we wanted to. We're here to delve into your suitability for parole. We're here to try to find out whether you're suitable for parole. We're going to gauge every answer you give us. We're trying to find out whether you accept responsibility for this crime. We're trying to find out if you have any remorse for this crime, and what your level of remorse might be. That's what we're here for.

**INMATE HERNANDEZ:** I understand. I'm just trying to be accurate and truthful.

PRESIDING COMMISSIONER MUNOZ: Yeah. Well, I don't want you to dance around the questions that I ask you. When you start dancing around the questions I ask you, it makes me think, I wonder why he's doing that. Now, did you kill this man or not?

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: Okay. Why did you kill him?

INMATE HERNANDEZ: Defend myself.

PRESIDING COMMISSIONER MUNOZ: Defending yourself?

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: Was this your house you were in?

INMATE HERNANDEZ: No, it wasn't.

PRESIDING COMMISSIONER MUNOZ: How did you get into the house?

INMATE HERNANDEZ: I just ran in there.

PRESIDING COMMISSIONER MUNOZ: Did you kick the door in, sir?

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: Okay. You kicked the door in. And what was your reason for being there?

INMATE HERNANDEZ: Purchasing heroin.

PRESIDING COMMISSIONER MUNOZ: Purchasing

heroin?

**DEPUTY COMMISSIONER GARNER-EASTER:** I need you to speak up some. We're tape-recording. I need you to say that again. The transcriber won't be able to hear you.

**INMATE HERNANDEZ:** Purchasing heroin.

**DEPUTY COMMISSIONER GARNER-EASTER:** Thank you.

**PRESIDING COMMISSIONER MUNOZ:** Did you have a shotgun in your possession?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Why'd you have a shotgun?

**INMATE HERNANDEZ:** For defense.

**PRESIDING COMMISSIONER MUNOZ:** Why?

**INMATE HERNANDEZ:** He had threatened me before with his gun.

**PRESIDING COMMISSIONER MUNOZ:** So why'd you go buy heroin from him if he threatened you?

**INMATE HERNANDEZ:** I was addicted to heroin.

**PRESIDING COMMISSIONER MUNOZ:** Yeah. All right. So you took a shotgun. Are you sure you didn't go there to rip-off his narcotics?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Is that what you went to do?

**INMATE HERNANDEZ:** No.

PRESIDING COMMISSIONER MUNOZ: That's not what you went to do. You went to buy narcotics from him.

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: And then -- And while doing that, you shot and killed him. Is that right? Because you said he drew a gun.

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: Was the gun recovered?

INMATE HERNANDEZ: I don't believe so.

PRESIDING COMMISSIONER MUNOZ: I don't think so either. And how many times did you shoot him?

INMATE HERNANDEZ: Once.

PRESIDING COMMISSIONER MUNOZ: And what did you do after you shot him?

INMATE HERNANDEZ: Pretty much left. Grabbed his gun and left.

PRESIDING COMMISSIONER MUNOZ: You grabbed his gun and left?

INMATE HERNANDEZ: Yeah.

PRESIDING COMMISSIONER MUNOZ: What did you do with his gun?

INMATE HERNANDEZ: Threw it away.

PRESIDING COMMISSIONER MUNOZ: Threw it away. All right. And were you alone, sir?

INMATE HERNANDEZ: Yes.

**PRESIDING COMMISSIONER MUNOZ:** And did you know that the -- Mr. Bustos was dead when you left the house?

**INMATE HERNANDEZ:** I didn't know that.

**PRESIDING COMMISSIONER MUNOZ:** You didn't know that. Did you summon any medical attention for him?

**INMATE HERNANDEZ:** No, I did not.

**PRESIDING COMMISSIONER MUNOZ:** Did you turn yourself in to the police?

**INMATE HERNANDEZ:** No, I did not.

**PRESIDING COMMISSIONER MUNOZ:** When were you arrested for this crime? How soon after this murder were you arrested?

**INMATE HERNANDEZ:** Possibly a week, two weeks.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And why didn't you turn yourself in?

**INMATE HERNANDEZ:** I was addicted to heroin. I was in a bad state of mind.

**PRESIDING COMMISSIONER MUNOZ:** Well, did you think you were going to get away with this murder, sir?

**INMATE HERNANDEZ:** No, I didn't think that.

**PRESIDING COMMISSIONER MUNOZ:** Okay. Tell me how you feel about this loss of life, sir.

**INMATE HERNANDEZ:** I feel terrible.

**PRESIDING COMMISSIONER MUNOZ:** How long you been in prison?

**INMATE HERNANDEZ:** Seventeen years and a half.

**PRESIDING COMMISSIONER MUNOZ:** Seventeen and a half years. And I asked you how you feel about this crime, and you tell me you feel terrible. That's it?

**INMATE HERNANDEZ:** Well, it would take a long time to get into it and fully discuss it. That's the first thing that comes to mind. That's why I answered that.

**PRESIDING COMMISSIONER MUNOZ:** Well, this is your opportunity, sir, to convince us that you're remorseful. If you want to take time, go ahead and take it. We're here to listen to you.

**INMATE HERNANDEZ:** I felt so bad about it that I didn't want to live. And not only because of this crime, but because of all the pain and suffering that it caused to not only the victim's family, but my family and the community and my parents and everybody, the whole world, including God. But that is when I decided to turn my life around and sacrifice, you might say, my life. And that's what I've been doing ever since then, and living as best as I possibly can in order to make amends, in order to be a good father, in order to

be a good citizen, and everything else that I could possibly be, and whether I -- what I can make up for it.

**PRESIDING COMMISSIONER MUNOZ:** Okay. That's a much better answer than your first one, Mr. Hernandez. And when you left the residence, did you take any property from the residence?

**INMATE HERNANDEZ:** I just took the gun.

**PRESIDING COMMISSIONER MUNOZ:** You took the victim's gun. Did you testify to that, that you took the victim's gun?

**INMATE HERNANDEZ:** I think so.

**PRESIDING COMMISSIONER MUNOZ:** Did you tell other Panels that you took the victim's gun? Other Panels here at the institution?

**INMATE HERNANDEZ:** I believe so.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And why'd you take his gun?

**INMATE HERNANDEZ:** Disarm him.

**PRESIDING COMMISSIONER MUNOZ:** Well, you already shot him, right?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Okay. Did you take anything else?

**INMATE HERNANDEZ:** No.

**PRESIDING COMMISSIONER MUNOZ:** Did you take any heroin from him?

INMATE HERNANDEZ: No.

PRESIDING COMMISSIONER MUNOZ: Did you take any money?

INMATE HERNANDEZ: No.

PRESIDING COMMISSIONER MUNOZ: Okay. But you went there to buy heroin.

INMATE HERNANDEZ: Yes.

PRESIDING COMMISSIONER MUNOZ: But you didn't take any heroin.

INMATE HERNANDEZ: No.

PRESIDING COMMISSIONER MUNOZ: Okay. All right.

INMATE HERNANDEZ: May I say that they did take my money?

PRESIDING COMMISSIONER MUNOZ: What do you mean?

INMATE HERNANDEZ: I went there to purchase, and they took my money, but they didn't give me no heroin.

PRESIDING COMMISSIONER MUNOZ: Okay. When you say they, who do you mean?

INMATE HERNANDEZ: There was about five of them, and one of them took my money. But it wasn't the victim that took my money.

PRESIDING COMMISSIONER MUNOZ: Okay. All right. And when you entered the house, where did you have the shotgun?

**INMATE HERNANDEZ:** Right in my hand.

**PRESIDING COMMISSIONER MUNOZ:** Right in your -- In your hands. Okay. Holding it with both hands. What the military calls a port-arm position, sir? Are you familiar with that term?

**INMATE HERNANDEZ:** I can't say that. I don't know that.

**PRESIDING COMMISSIONER MUNOZ:** All right. We may have some questions of you regarding this crime a little later in the hearing, sir. At this point, we're going to move forward a little bit. I want to discuss your -- Well, before I discuss your prior criminality, let me ask Ms. Garner-Easter if she has any questions of you at this point. Any questions of the inmate regarding the crime?

**DEPUTY COMMISSIONER GARNER-EASTER:** I do just on -- Just quickly I do have a question.

**PRESIDING COMMISSIONER MUNOZ:** Okay.

**DEPUTY COMMISSIONER GARNER-EASTER:** I didn't quite understand when you say, may I add that they took your money -- they took my money. I'm confused. What's your point? Are you saying that's a justification for taking someone's life?

**INMATE HERNANDEZ:** No, I'm not saying that.

**DEPUTY COMMISSIONER GARNER-EASTER:** Because you went there. According to the record, you handed someone the 10 dollars (inaudible) money.

Is that correct? They took your money because you handed it -- and that (inaudible) Casias, C-A-S-I-A-S.

**INMATE HERNANDEZ:** Yes.

**DEPUTY COMMISSIONER GARNER-EASTER:** And when he was going to get your product, you, according to the record, busted in the door. You kicked it in. You had a gun and (inaudible). So you're saying as justification, might I add, they took my money. So you're saying I gave them money. They didn't give me my product, my illegal drugs that I came for, that I broke the law to come in. Is that what you're trying to tell this Panel?

**INMATE HERNANDEZ:** No, Ma'am. What I was trying to say is in regards to his questions if I took anything, I was just trying to say that I didn't even take the money that I had -- that was taken from me.

**DEPUTY COMMISSIONER GARNER-EASTER:** No, but you took something more valuable. You took a man's life. So how does that equate? Was it worth 10 dollars?

**INMATE HERNANDEZ:** No.

**DEPUTY COMMISSIONER GARNER-EASTER:** Okay. I don't have any other questions.

**PRESIDING COMMISSIONER MUNOZ:** All right. And we may return to the crime a little later in

the hearing, sir, during our question and answer segment. I do want to address your prior criminality. And we'll start with the reason you were there. You were a heroin addict. I think you indicated that earlier in the hearing. How old were you when you first started using heroin, sir?

**INMATE HERNANDEZ:** Twenty-one, perhaps.

**PRESIDING COMMISSIONER MUNOZ:** All right. Twenty-one. All right. Because you have -- You do have an adult and juvenile record. Your last arrest as a juvenile in 1978 was possession of heroin. Do you recall that?

**INMATE HERNANDEZ:** Yes.

**PRESIDING COMMISSIONER MUNOZ:** Were you using heroin at that point?

**INMATE HERNANDEZ:** I might have tried it, but --

**PRESIDING COMMISSIONER MUNOZ:** All right.

**INMATE HERNANDEZ:** -- I wasn't --

**PRESIDING COMMISSIONER MUNOZ:** Well, you were -- Well, you -- I asked you when's the first time you used heroin. You said twenty-one. But the record contradicts that. The record says you were arrested for possession of heroin in 1978 as a juvenile. Then are you telling me that you might have tried it? So you were a juvenile the first time you used heroin. Were you not, sir?

have any trouble getting a sponsor?

**INMATE HERNANDEZ:** I don't believe I'd have any trouble at all.

**PRESIDING COMMISSIONER MUNOZ:** Had you ever considered that?

**INMATE HERNANDEZ:** I've considered it.

**PRESIDING COMMISSIONER MUNOZ:** All right. The Board of Prison Terms complied with 3042 of the Penal Code. We notified the various agencies that have an interest in your case, like the police department, the court system, the DA's office, so on and so forth. And we -- I didn't find any responses from anyone in our Notices and Responses section. I saw where the notices went out. I didn't see anything coming back other than the letters of support that we already referred to. And with that, then we'll go into a question and answer session. So the house you wanted to buy drugs at, that was a drug house. Everybody knew that this man was selling heroin. Is that correct, sir?

**INMATE HERNANDEZ:** That is correct.

**PRESIDING COMMISSIONER MUNOZ:** The other people that were in the house were also drug users or heroin users. Is that correct?

**INMATE HERNANDEZ:** Probably dealers more than users.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And now the -- You say you shot this man because he had a gun. He was asleep when you first went into the house, was he not, sir?

**INMATE HERNANDEZ:** He was not.

**PRESIDING COMMISSIONER MUNOZ:** He was not asleep when you first went in the house?

**INMATE HERNANDEZ:** No, he was reclining, laying down, but not asleep.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And where was the gun at that point?

**INMATE HERNANDEZ:** In his waistband.

**PRESIDING COMMISSIONER MUNOZ:** In his waistband. And you shot him because why?

**INMATE HERNANDEZ:** He drew on me.

**PRESIDING COMMISSIONER MUNOZ:** He drew on you.

**INMATE HERNANDEZ:** And I believe he fired.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And would it be safe to say that he drew on you because all of a sudden there's a man in his house with a shotgun?

**INMATE HERNANDEZ:** He was aware. He was fully aware of what was going on.

**PRESIDING COMMISSIONER MUNOZ:** But what would you expect his reaction to be if he's confronted with a man with a shotgun? What would

your reaction be if someone burst into your house carrying a shotgun?

**INMATE HERNANDEZ:** In the sense of this present day and time?

**PRESIDING COMMISSIONER MUNOZ:** Back when you did this, sir.

**INMATE HERNANDEZ:** Probably everything that happened.

**PRESIDING COMMISSIONER MUNOZ:** All right. Ms. Garner-Easter, any questions of the inmate, Ma'am?

**DEPUTY COMMISSIONER GARNER-EASTER:** Just one. I would like to know your response to the question you asked in this sense and day, the same question the Commissioner asked. What would -- What do you suspect an average citizen if they had a gun would do if someone bust into their home wielding a shotgun, pointing it at them? I'd like to know your answer because you answered it from that day. I'd like to know what you think would happen today. If you were to get a date and bust into someone's home and had a shotgun, what do you think their reaction may be?

**INMATE HERNANDEZ:** That's a very difficult question. But first of all, I don't see being in that position. I don't foresee ever being in that predicament. But what just naturally comes to mind

is a defense response.

DEPUTY COMMISSIONER GARNER-EASTER: Yeah, but you claim to be the self-defense. And I just don't get it. You were the intruder.

INMATE HERNANDEZ: Okay. Part of me, but I was looking at the -- from the prospective of a person who's home was being invaded.

DEPUTY COMMISSIONER GARNER-EASTER: Exactly. So are we. And I'm asking you right now, even if it were to happen, you were the invader, and you sit here and told this Panel today that you shot this man in self-defense. And we're trying to understand -- We're trying to follow your logic. And so far, it's difficult.

INMATE HERNANDEZ: Part of me, but I would never be in that situation again, and so I can't place myself there.

DEPUTY COMMISSIONER GARNER-EASTER: Okay. Thank you. And I think that's an honest answer.

PRESIDING COMMISSIONER MUNOZ: All right. Questions from Mr. Spowart.

ATTORNEY SPOWART: Yeah. First of all, Mr. Hernandez, we talked before we came in here. Is that correct?

INMATE HERNANDEZ: Yes.

ATTORNEY SPOWART: This morning. You seem nervous today. Are you nervous?

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 63, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of HECTOR HERNANDEZ, CDC No. D-33689, on FEBRUARY 20, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated March 5, 2003, at Sacramento County, California.

April Allen

April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**